## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF THE STATE OF IOWA

| | |
|---|---|
| **SAGE OHLENSEHLEN, CHRISTINA KAUFMAN, ALEXA PUCCINI, and KELSEY DRAKE,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**THE UNIVERSITY OF IOWA,**<br><br>      **Defendant.** | **CASE NO. _____**<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

Plaintiffs bring this Complaint against Defendant and, in support thereof, state the following:

1.     Female student-athletes enrolled at the University of Iowa ("UI")—Sage Ohlensehlen, Christina Kaufman, Alexa Puccini, and Kelsey Drake—bring this class action lawsuit to challenge the UI's failure to provide equitable athletic opportunities for its female students and equitable treatment of female student athletes, including the UI's announced elimination of a viable female sports team, with a venerable history and strong public support: women's swimming and diving.

2.     The University of Iowa is a recipient of financial assistance from the United States Department of Education ("Department") to support its programs and activities.

3.     The University of Iowa's actions have caused harm to Plaintiffs, and to those who are similarly situated, and constitute intentional, prohibited discrimination based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") and its

1

implementing regulation at 34 C.F.R. Part 106, which is applicable to universities that receive financial assistance from the Department.

4.     Title IX requires educational institutions receiving federal funds to provide equal opportunity and equal treatment in athletics without regard to gender. The University of Iowa receives substantial federal funding, yet has failed to provide its female undergraduate students with an equal opportunity to participate in athletics, as compared to the opportunities provided to its male undergraduate students. Specifically, the UI has failed to satisfy any of the following measures of compliance with Title IX's mandate to provide equal opportunity for its female student athletes:

   a.  It has failed to provide female student athletes with athletic opportunities at a rate that is "substantially proportionate" to their undergraduate full-time enrollment rate; and

   b.  It has failed to demonstrate a "history and continuing practice of program expansion responsive to the interests and abilities of the sex that has been historically underrepresented"; and

   c.  It has failed to show that the interests and abilities of the historically underrepresented sex have been fully and effectively accommodated.

5.     Plaintiffs seek declaratory and injunctive relief, with immediate reinstatement of the women's swimming and diving team, as well as additional judicial remedies to ensure the University of Iowa's compliance with Title IX, including, but not limited to, orders commanding the institution to establish additional women's sports team opportunities for its female undergraduates.

## PLAINTIFFS

6.     Plaintiffs are female student athletes at the University of Iowa who have been adversely

affected by actions taken by the Department of Athletics that are described in detail herein.  They

include the following:

    a.   **Sage Ohlensehlen** is a senior at the University of Iowa and captain of the women's

       swimming and diving team.  A 2017 graduate of Bettendorf High School, there, she

       was a four-year member of school's swimming team. She was not, initially, offered a

       scholarship to attend the University of Iowa as a member of the women's swimming

       and diving team.  However, determined to earn a place on the team, in her senior year

       of high school, by working hard to reduce her lap times, at the final swimming meet

       of her high school career, she dropped enough time for the UI to offer her a position

       as a walk-on—an event that resulted in what she describes as "the best day of her

       life." At Iowa, being on the swimming and diving team has been an invaluable

       educational experience. The required hard work, both in classes and in the pool, have

       paid off. Ms. Ohlensehlen had to work multiple jobs to pay for rent her first few years

       at Iowa. Yet, in addition to being a full-time student and working, she attended  the

       women's swimming team practices, on her own, multiple times a day, and improved

       her times. Her successes built on each other; prior to her junior year, she earned an

       athletic scholarship.. Her team-mates have responded to her grit, determination and

       contributions to the team, earning her leadership opportunities as a   team captain in

       her senior year. A creative writing major, with minors in history and philosophy, Ms.

       Ohlensehlen plans to attend law school next year.

    b.   **Christina Kaufman** was born in Chicago, Illinois and raised in Oak Brook, Illinois.

       She began swimming competitively at the age of seven, as both of her siblings and

her parents were enthusiastic about the sport. Ms. Kaufman played numerous sports as a child, but none interested her in the same way that swimming always has. In high school, she worked hard academically and athletically and earned leadership opportunities when she was named team captain. to achieve her goal of being a member of the University of Iowa swimming and diving team. In high school, she earned leadership opportunities in being the team captain. Ms. Kaufman grew up a Hawkeye, and achieved her dream of being a member of the UI student body of being offered the opportunity to be a member of the women's swimming and diving team. She is currently a second-year undergraduate, with an intended major of Business Analytics and Information Systems. She completed her first year at Iowa with a GPA of 3.58 and was on the Dean's Lists both semesters. This year, Ms. Kaufman was honored to be a part of the Iowa Student Athlete Advisory Committee (ISAAC) and the ISAAC Leadership Sub-Committee. She had hopes of expanding her leadership role through ISAAC, being an advocate for Iowa student athletes, especially swimmers and divers.

c. **Alexa Puccini** was born and raised in Naperville, Illinois. She is a freshman at the University of Iowa, with an open major. At the age of eight she started swimming, competing as a part of her neighborhood's swim team. She immediately fell in love with, and excelled in, the sport. In the course of her swimming career at Naperville Central High School –where she was also a strong student, she was a 16-time State qualifier, a nine-time State medalist, and the recipient of All American honors in nine events. At the conclusion of her high school career, she received her high school's Female Athlete of the Year Award. Although other options were available to her,

4

Ms. Puccini chose to attend the University of Iowa in May of her junior year of high
school because she was drawn to the challenge of collegiate competition and the
group effort necessary to win. Her experience on the UI's women's swimming and
diving team have enriched her academic efforts. Until the completely unexpected
termination of the program, Ms. Puccini had envisioned a future that involved
serious, competitive swimming, where she swims the 50 Free, the 100 Fly and Back,
as well as the IM and 200 Backstroke.

d. **Kelsey Drake**, a senior at the UI, is currently enrolled in the Industrial Engineering
program. Born and raised in Marion, Iowa, she attended Jefferson High School for
her freshman year and finished her high school career at Linn-Mar High School in
Cedar Rapids, where she excelled in swimming. A long-time fan of the UI swimming
and diving program, she worked hard to become a part of this elite collegiate athletic
team, and has been member of it for each of the past three years. She recently
qualified for the 2020 NCAA meet in the 200 yard Butterfly. Ms. Drake believes that
being a part of the swimming team has allowed her to achieve a dream of competing
for the team she grew up cheering for, and has supplied her, along with her
teammates, with tools and abilities, as well as long-term friendships and future
professional connections, necessary for a productive and enjoyable professional and
personal life.

## DEFENDANT

7. Defendant University of Iowa, located in Johnson County, is an agency of the State of
Iowa which receives federal funding and whose Department of Athletics is charged with the

administration of women's and men's intercollegiate sports programs. It is established and

maintained pursuant to Iowa Code Chapter 263.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3), (4).

9.      Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201 and

2202.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b), as all of the claims arose in Johnson

County, Iowa.

## CLASS ACTION ALLEGATIONS

11.     The individual student plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) on

behalf of themselves and on behalf of a class consisting of all present and future University of

Iowa female students—including currently enrolled students and prospective students—who

participate, seek to participate, or have been deterred or prevented from participating in, or

obtaining the benefits of, intercollegiate athletics sponsored by the UI.

19.     All class members are aggrieved persons under federal civil rights law as a result of the

University of Iowa's actions, policies, and practices. The named individual student plaintiffs

seek declaratory and injunctive relief on behalf of themselves and all class members to prevent

the University of Iowa from engaging in future unlawful conduct and to rectify the effects of

present and past discrimination.

20.     This matter is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2)

in that:

> (a) The class members are so numerous as to make joinder of all of them impracticable.
>
>     Based on information and belief, the number of athletic opportunities allotted to

female students is not substantially proportionate to the number of female students in the University of Iowa's full-time undergraduate student body.  According to the latest information available on the Equity in Athletics Data Analysis website,[1] only 3.1% of students at the UI are provided with the educational opportunity to participate in sports; these are rare, highly rationed educational opportunities that are not equally available to men and women at this public university. All female students at the UI face unlawful barriers to intercollegiate athletic participation and unequal treatment by their university's athletics program. Furthermore, the UI's decision to eliminate a viable women's varsity team directly harms the opportunities for females, as well as the members of the team, as well as all future University of Iowa students who have an interest and ability to participate at the varsity level at UI.

(b) There are questions of law and fact common to the class members. These common questions of law and fact predominate over any particular questions concerning individual class members. The common questions include the University of Iowa's compliance with Title IX as well as common facts involving the UI's athletics programs and its treatment of its female athletes.

(c) The claims of the named individual student plaintiffs, which involve claims of unequal athletic opportunities and treatment, are typical of the claims of the proposed class members.

(d) The named student plaintiffs will fairly and adequately protect the interests of the class members. Their attorneys are experienced in class action

---

[1] See the Equity in Athletics Data Analysis website, at https://ope.ed.gov/athletics/#/

litigation.

(e) The University of Iowa, acting through its Department of Athletics, has acted on

grounds generally applicable to the class, thereby making final declaratory and

injunctive relief appropriate with respect to the class as a whole.

## BACKGROUND FACTS

**A.**    **Iowa: a State with a unique heritage of supporting female sports.**

21.    Admitted as a State in 1846, and initially settled largely by those who, scattered in

thousands of farms, hundreds of communities and ninety-nine counties, Iowa's version of the

American Experiment has uniquely combined progressive stands on many issues affecting

females and a high value placed on public education. As such, Iowa evolved into one of the first

states in the nation to offer school-based organized sports opportunities for females.

22.    Iowa's Constitution of 1857 and the state's earliest statutes created a statewide system of

public education. Iowa's courts, as a part of their earliest decisions, enforced the right of every

child to obtain a free public-school education, regardless of gender or race.

23.    At many of those schools, particularly in Iowa's rural settings, from the earliest days,

females competed in robust physical environments, often in the context of organized sports

events which were played out in well-attended competitions in small-town fields and

gymnasiums.

24.    By the late 19th Century, Iowa's high school females competed in sports with those in

other communities, starting with basketball. Contests often occurred in large public events hosted

in a wide variety of settings, with girls' games frequently drawing more spectators than those

involving their boy-classmates.

25.    "Gentlemen," Mystic School Superintendent John W. Agans memorably warned, in 1925, those at a meeting whose actions were perceived as aiming to reduce the presence of Iowa girls basketball, "if you attempt to do away with girls basketball in Iowa, you'll be standing at the center of the track when the train runs over you."[2]

26.    In that year, rural school districts formed the first formal association (the Iowa Girls High School Athletics Union, or IGHSAU) devoted to supporting female athletics, with an initial focus on basketball, and which, by the mid-1940s, became the first organization in the United States to host annual statewide girls' basketball tournaments.

27.    In 1951, the state girls' basketball tournament, hosted in Des Moines, was one of the first such sports to be televised in the United States, broadcast into nine states, under a contract that provided funds to support girls' athletics in Iowa.

28.    In the mid-1950s and early 1960s, in addition to basketball, the number of high school sports opportunities for Iowa's high school female students increased, when the sports of softball (1955), golf and tennis (1956), track and field (1962), cross-country (1966), swimming and diving (1967), and volleyball (1970) were sanctioned by the IGHSAU—all of them before the advent of Title IX's mandates.

**B.**    **The University of Iowa: reflecting the State's cultural heritage by providing national leadership in expanding women's sports opportunities under Title IX.**

29.    In 1855, the University of Iowa became the first state university in America to admit men and women on an equal basis. From its earliest days, drawing deeply from the state's rural and small-town cultural priorities, the university offered female students opportunities to obtain a quality education and also to engage in athletic endeavors.

---

[2] R.H. Chisholm, "Iowa Girls High School Athletic Union," *The Palimpsest* (Iowa City: State Historical Society of Iowa, April 1968), 125.

30.    Although for most of the first century of the UI's history, many of the women athletes'
activities were confined to physical education classes, intramural settings and, sometimes,
competitions with nearby colleges, a steady stream of female undergraduates who had benefited
from strong high school sports programs assured that the University of Iowa could build one of
the nation's leading women's academic physical education departments, one that promoted
female opportunities in sports activities.

31.    Based on this longstanding tradition supporting female sports activities, when Title IX
was passed in 1972, requiring gender equity in every federally-funded educational program, the
State of Iowa, generally, and the University of Iowa, specifically, quickly became a proving
ground for the expansion of sports opportunities for females in the United States—a nation
where many schools and universities did not yet offer sports programs for females.

32.    High schools and colleges throughout the United States scrambled to meet the federal
law's requirements. The then-widely read magazine, *Sports Illustrated*, compiled a three-part
story in 1973 on women's sports and Title IX. One issue featured the long-standing, strongly-
supported girls' and women's sports programs in the state of Iowa.

33.    Also in that year, 1973, the University of Iowa uniquely divided the administration of its
intercollegiate sports program between two nationally-eminent athletic directors. Now, the
women's intercollegiate sports program would be guided, for the first time in its history, by its
own Athletics Director, Dr. Christine Grant. She joined, and worked alongside Chalmers P.
("Bump") Elliott, the Men's Athletics Director, who had been hired in 1970.

34.    Dr. Grant had been a high school teacher and coach in Scotland and, then, for a decade,
had served as a field hockey coach and umpire at the high school, collegiate, national and
international levels in several Canadian provinces. In the late 1960s she had moved to Iowa City

to pursue higher degrees in physical education and administration at the University of Iowa. Consistent with her past experiences, she immediately began coaching women's hockey at the UI, then a club sport.

35.     In her position as the UI's first Women's Athletic Director, she became nationally prominent for her advocacy for gender equity in athletics. While continuing her teaching as an associate professor within the Department of Physical Education for Women, she also testified before Congress on several occasions and served as consultant for the United States Department of Health, Education and Welfare's Civil Rights Title IX Task Force. She would become a founding member, and would lead, a number of national organizations created to improve gender equity in sports opportunities.

36.     In Dr. Grant's first year as Women's Athletic Director, 1973, the University of Iowa established an intercollegiate women's field hockey team, which she continued to coach for two years. Over time, that program would produce, in the decades that followed, dominating conference and national championship teams.

37.     Ironically, given the strength of the public's support for high school girls' basketball, the UI had never sponsored an inter-collegiate women's team. Title IX changed that when, in 1974, for the first time, the UI started a women's basketball program that competed with other teams in the Big Ten Conference.

38.     It was also in that year, 1974, that the women's swimming and diving team was started, engaging in parallel with a storied men's team that had been competing for 57 years.

39.     Within a few years of her being hired as Women's Athletic Director, Dr. Grant firmly moved the UI in the direction of Title IX's 1978 compliance mandate. The university increased the number of women's sports roster positions when it started three new women's sports

programs: softball (1978); rowing (1994); soccer (1996). The start of one more intercollegiate women's team would immediately follow her retirement in 2000: volleyball (2003). No new varsity teams have been initiated since 2003.

40.     In August 2000, Dr. Grant retired. UI convened a task force to study whether the men's and women's Athletics Departments should be merged and, if so, to determine the impact such a merger would have on women's athletics.

41.     Aware of the risks to equality in athletics opportunities to men and women that could result from any such merger, the University of Iowa, in a document styled, the Merger Memorandum, made the commitment that it would not permit any merged women's and men's athletics programs adversely to impact the ability of women to achieve equal athletic opportunities as compared to those enjoyed by men.

42.     The Merger Memorandum directed that gender equity would remain the primary priority of the UI and it adopted the task force's recommendation that a male and female administrator would occupy the top two positions of authority within the merged department, regardless of which gender the person holding the athletic director's position might be.

43.     That is to say, if the athletic director, the No. 1 position, were to be a male, then a female Senior Woman Administrator would occupy the department's No. 2 position, serving, in effect, as the chief of staff or the chief operating officer position—comparable to a deputy director.

44.     Finally, the Merger Memorandum made it clear that any cost savings obtained by the new administrative structure would be used to expand athletics opportunities for women, thereby reducing the inequalities existing between opportunities afforded to women and men.

45.     Based on the Merger Memorandum, the University of Iowa did not replace Dr. Grant. Rather, the existing men's Athletic Director, Bob Bowlsby, in August 2000, was appointed to

serve as Athletics Director for the merged departments; Jane Meyer was named Senior Woman

Administrator, in 2001, to serve in the No. 2 capacity.

46.     Mr. Bowlsby held that position for six years, until August 2006. He was replaced, starting

on August 1, 2006, by Gary Barta, who started with an annual salary of $295,000.

47.     Just before Director Barta assumed the position, in June of 2006, the Big Ten Network

had been launched, and was projected to provide substantial new funding streams to the Athletics

Department, thereby allowing it markedly to increase its annual budget which, in the year

Director Barta was hired, was a little over $46 million.

**C.     The Barta Era: women's sports troubles in an era of unprecedented public
        investments in collegiate sports.**

48.     In the next fourteen years, along with the other Division I, Power Five intercollegiate

sports programs in the United States, so, too, did the University of Iowa's Athletic Department

benefit from a period of unprecedented prosperity—what might be called, given Director Barta's

landing in his position at that same time—the "Barta Era." During that period, the departmental

budget would expand steadily based on income that annually included tens of millions of dollars

from the Big Ten Conference, millions more from game broadcasting rights, and substantial

sums from contributors making payments to the UI Foundation. By fiscal year 2020-21, the

Athletics Department's budget was projected to reach $127.5 million: two and one-half times the

size as when Director Barta had been hired.

49.     Yet, even with all the new revenue, the UI Athletics Department during those same years

did not make meaningful advances in providing women with equal athletic opportunities to those

enjoyed by men. Although substantial capital investments in sports facilities were made, those

expenditures, cumulatively, heavily favored those used by male sports teams.

50.     Additionally, during the Barta Era, while coaching and administrative salaries for all sports have been significantly increased, those increases have drastically, disproportionately favored males. For example, Director Barta's own pay has been increased repeatedly, so that by the time of a three-year contract extension, August 7, 2019, he was provided with an annual salary of $1 million, plus an opportunity to be paid incentive bonuses, to be determined by UI President Harreld.

51.     Moreover, by the 2018-2019 fiscal year, under Director Barta's direction, the average annual institutional head coach salaries were increased to over $998,000, for men, but, for women head coaches, less than one-third that amount, at only about $230,000.  For assistant coaches, the average salaries for the men exceeded $197,000, while women assistant coaches received, on average, less than one-half that amount, approximately $72,500.[3]

52.     By comparison, during this same time period, Director Barta failed to initiate a single new women's sports program or to provide other meaningful, new opportunities for women athletes to engage in intercollegiate athletics.

53.     Further, and as if to mask these fundamental deficiencies in women's sports opportunities, the University of Iowa, through the Athletics Department, attempted, on multiple fronts, to create public illusions of gender-parity for student athletes.

54.     On the one hand, the UI reported data to the federal government, on internet websites accessible to the general public, that minimized the UI's failure to provide equal athletic opportunities to men and women. In reports made annually to the U.S. Department of Education's Equity in Athletics Data Analysis (EADA), pursuant to the Equity in Athletics

---

[3] Although this is a Title IX Athletics lawsuit, it should be noted that Title VII does not allow employers to pay their employees less because they *are* women or because they *coach* women.

Disclosure Act of 1994, a number of "female" athletes who ostensibly had been provided with roster opportunities on women's teams were, in fact, actually *male* students participating on those women's teams' practice squads.

55.     On the other hand, the Athletics Department pushed to add large numbers of women to a number of its teams to comply with Title IX's gender equity mandate, who had no comparable opportunity to participate or compete as their male teammates enjoyed. By "counting" women who were, in effect, "benchwarmers," and not true participants, the practice allowed UI to avoid the cost of starting new women's sports programs that reflected female student interests. For example, in 2014, the UI's women's rowing team had 89 participants, which was nearly 40 percent larger than the 64.4 average squad size for all NCAA Division I women's rowing programs. In 2018-2019, the UI reported that its rowing team had even more, with 94 participants. The UI team had been as much as 70 percent larger than national averages in years before that. The UI's roster for its women's rowing team for the 2020-2021 rowing team, however, only shows 48 participants.

56.     By using such masking and distorting practices, the women's participation statistics in the Barta Era have been significantly inflated and the substantial failure of the UI to have provided equal athletics opportunities for men and women have been obscured.

57.     In addition to these multiple issues demonstrating a failure to provide equal athletic opportunities to men and women, a number of fundamental Title IX non-compliance issues and related gender-based legal problems, all of them arising under Director Barta's watch and departmental supervision, have confronted the University of Iowa.

58.     In November, 2015, Jean Meyer, who had served, since 2001, under Director Bowlsby in the "No. 2" position (Senior Associate Director, the slot that had been created in the Merger

Memorandum) and then had played the same role for Director Barta since he had arrived at the Athletics Department in 2006, filed a lawsuit in the Iowa District Court for Polk County against the University of Iowa, the Iowa Board of Regents and the State of Iowa. Advanced under the Iowa Civil Rights Act—and, not under Title IX—Ms. Meyer brought forward five separate claims, including gender discrimination, arising from a common core of facts under which she had been demoted from her position after she had complained, in August of 2014, about Athletic Director Gary Barta's firing of the UI's women's field hockey coach, Tracey Griesbaum, who was also Ms. Meyer's longtime partner, as well as Ms. Meyer's opposition to Title IX sex discrimination, such as differences in treatment for men and women in the Department of Athletics.

59.     In her Amended Complaint filed on October 17, 2016, Ms. Meyer alleged that "[s]ince Gary Barta became the Director of Athletics in 2006, Jane Meyer noticed a change in the direction of women's sports and how females were viewed in the Athletics Department." Ms. Meyer then detailed in the Amended Complaint a series of issues concerning Mr. Barta's conduct: allowing sexist comments; providing more advancement to male coaches; and favoring football and other male sports in creating new positions within those teams.

60.     On March 7, 2016, Tracey Greisbaum, who, on August 4, 2014, had been fired as University of Iowa women's field hockey coach after a long and successful career, filed a lawsuit against the same Defendants, alleging that Director Barta's abrupt termination of her, despite a 169-107 career record and 22 years of service to the university, had violated her civil rights by discriminating against her based on her gender and sexual orientation and in retaliation. More specifically, Ms. Greisbaum alleged that Director Barta, starting in 2010, had initiated an unfair pattern of dismissing five female sports coaches and one female administrator, in addition to his

wrongful treatment of Ms. Greisbaum, based on unlawful gender bias and stereotypes. In addition to Ms. Meyer's termination, the women's softball, volleyball (multiple times), golf, and rowing coaches (all of them female) had all be fired or replaced in a short period of time in the Barta Era.

61.     Shortly thereafter, to be effective July 1, 2016, the University of Iowa agreed to a five-year contract extension for Director Barta, guaranteeing him $4.6 million in compensation through 2021 and increasing his base salary from $400,000 to $550,000. The new deal added an additional $40,000 in potential bonuses based on whether he meets yearly goals established by UI President Bruce Harreld, and made him eligible for up to $110,000 in annual bonuses for academic and athletic achievements spelled out in Director Barta's earlier contract.

62.     Ms. Meyer's trial was convened in April 2017, during which Director Barta testified in defense of his treatment of his former top assistant and his complained-of conduct, more generally. On May 4, 2017, the jury rendered a verdict, in favor of Ms. Meyer, and against Defendants, on all five of her claims, for more than $1.43 million in damages. That verdict made Ms. Meyer eligible for additional payments that were the subject of post-trial motions.

63.     Terminated Coach Griesbaum's own trial, scheduled to follow three weeks later in the same Polk County courthouse was called off when, on May 19, 2017, the parties announced that the University of Iowa settled both cases, each of which had complained of unlawful, gender-based conduct by Director Barta, for $6.5 million.

64.     In commenting on the combined litigation's outcome two months later, Director Barta said that, even in hindsight, the Athletics Department had done nothing wrong: "We did what we thought was right at the time. We still believe that, principally, we were in the right." He reported to the press that he has never feared for his job or considered resigning and that he

remains "very confident with the decisions that we made [with respect to Ms. Meyer and Coach Greisbaum] and that I made." [4]

65.    Arising from the same period of time as Coach Griesbaum's firing, a complaint under Title IX with the Office for Civil Rights at the U.S. Department of Education (OCR), had also been filed against the University of Iowa, alleging that it had failed to provide equal athletics opportunities to its men and women students.

66.    Upon concluding an investigation that had started in the 2015-2016 year, the OCR, in a letter to UI President Bruce Harreld dated January 10, 2018 ("OCR letter"), reported that, after interviewing coaches, athletics administrators and athletes, after obtaining questionnaires from coaches, and after reviewing the UI's athletic facilities and equipment and supplies, the OCR had determined that, using Title IX's "Three Part Test" to assess whether an institution is providing equal participation opportunities for individuals of both sexes with respect to the selection of sports, it could not conclude that the UI was in compliance with the federal statute's mandates.

67.    More specifically, as to the First Test—Whether intercollegiate level participation opportunities for male and female students are provided at the University of Iowa in numbers substantially proportionate to their respective enrollments—the OCR could not conclude, based on 2015-2016 information provided by the UI, that the university "provided intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their enrollments." *OCR letter*, at 6.

---

[4] DES MOINES REGISTER, July 23, 2017, editorial, *"Gary Barta cost Hawkeye athletics $6.5 million. Why doesn't he seem to care?" available at* https://www.desmoinesregister.com/story/opinion/editorials/2017/07/22/gary-barta-6-5-million-university-iowa/498783001/.

68.     Because the University of Iowa had failed to meet the First Part of the "Three Part Test"
to demonstrate compliance with Title IX, the OCR had moved to the Second Test—Where the
members of one sex have been and are underrepresented among intercollegiate athletes, whether
the institution can show a history and continuing practice of program expansion that is
demonstrably responsive to the developing interests and abilities of that sex.  Here, too,
according to the OCR's letter to President Harreld, the University of Iowa had been unable to
demonstrate compliance with the federal law's mandate, as follows:

> [T]he information [provided by the University of Iowa] does not indicate that that
> University has shown continuing program expansion, particularly because it has not
> assessed interest, ability, and available competition for women in a meaningful way.
> Despite expressed interest in adding sports to the University's athletics program, the
> University did not demonstrate any plans to expand the program.

*OCR letter*, at 7. Moreover, the letter noted that there had not been any additional women's sport
added to the University's Athletics Department for more than a decade.

69.     Having failed to demonstrate any history of continuing practice or plans to expand the
program to provide opportunities for women athletes when, already, the University of Iowa's
intercollegiate programs were unbalanced, disfavoring females, the OCR then moved to the
Third Test—Whether the University of Iowa could show that it is fully and effectively
accommodating the athletic interests and abilities of women.

70.     Here, too, according to the OCR's report to President Harreld, the University of Iowa had
failed to pass. The OCR reported its own findings, that, based on its investigation, there were
clear indications of interest by female members of the student body in participating in variety of
emerging sports that could be development into meaningful sports programs consistent with the
mandates of Title IX and subject to competitions sanctioned by the NCAA with colleges and
universities geographically proximate to the University of Iowa. However, none of those

interests had been assessed by the institution. "Before OCR could conclude whether the University [was] fully and effectively accommodating the athletic interests and abilities of its female students," concluded the OCR report, "the University requested to further assess and as appropriate, resolve this component of its athletic program." *OCR letter*, at 10.

71.     Having failed to pass *any* part of the Three Part Test, the OCR moved forward to describe to President Harreld its findings with respect to the University's fulfillment of its obligations under Title IX to provide athletic scholarships or grants-in-aid for members of each sex in proportion to the number of students of each sex participating in intercollegiate athletics, as required under Title IX, at 34 C.F.R § 106.37(c).

72.     As described by the OCR to President Harreld, any unexplained disparities in the scholarship budget for athletes of either sex that is greater than 1 percent for the entire budget for athletic scholarships, there is a strong presumption that the unexplained disparity is in violation of the federal law. Here, too, the OCR found that the University could not demonstrate that it was in compliance. The UI asked the OCR for an additional opportunity to resolve this component of its athletic program.

73.     Similarly, the OCR found inconclusive evidence that the University of Iowa had complied with its legal obligation to eliminate disparities in its provision of equipment and supplies—comparing those provided to male athletes versus female athletes—that could be explained by nondiscriminatory factors. For example, the OCR made factual findings pointing to gender-based disparities:

> Overall, the total budget for equipment and supplies was $2,867,083 in 2015-16. Women, who were 49.1% of the athletes, received $899,748 or 31.4% of the equipment and supplies budget for 13 sports, while men, who were 50.9% of the athletes, received $1,967,335 or 68.6% of the equipment and supplies budget for 11 sports.  On average, the 463 men received $4,249.10 per athlete while 447 women received $2,012.86 per athlete.

> Among similar teams, all but four men's teams had larger budgets than the corresponding women's team: golf, gymnastics, swimming and diving, and tennis.

*OCR letter*, at 14. Confronted with this finding, the University, again, asked the OCR for additional time to assess and, as appropriate, "resolve this component of its athletic program."

74.     The OCR further determined that the federal agency could not find sufficient evidence to find that the UI had complied with additional Title IX requirements, including: the accommodation of athletic interests and abilities; the provision of athletic financial assistance; equipment and supplies; tutoring; locker rooms; practice and competitive facilities; housing and dining; and recruitment.

75.     Instead, the University of Iowa was required to pledge its future assessment of its compliance in those listed areas, and, pursuant to a Resolution Agreement it had executed on December 29, 2017, to work with the OCR and to take "proactive" measures to resolve deficiencies.[5]

**D.     Title IX Noncompliance: The University of Iowa has not provided equal athletics opportunities to men and women in the Barta Era.**

76.     The OCR's report and attempted remedy did not resolve long-standing and deeply-rooted problems caused by the University of Iowa's failure to provide equal athletic opportunities to men and women in the Barta Era—and did not end the UI's efforts to obscure those deficiencies with funny math.

---

[5] Plaintiffs understand, based on correspondence dated September 24, 2020, from the University of Iowa's General Counsel to Plaintiffs' attorney, that the UI may take the position that all problems described in the OCR letter have been subsequently resolved.  Even if such a position were assumed to be true, the issues that are the crux of this lawsuit involving the recent decision by the UI to terminate the women's swimming and diving program, occurred after the completion of the OCR's investigation.

77.     By the 2018-2019 academic year, for example, the data provided to the U.S. Department of Education's Equity in Athletics Data Analysis by a senior accountant reporting directly to Director Barta revealed that three *women's* teams' roster numbers had included a total of fifteen *male* practice players as a part of the analysis (the women's basketball team roster number had included ten male practice players; the women's soccer team roster had included four male practice players; and the women's volleyball team roster had included one male practice player).[6]

78.     In fact, had Title IX's mandate for equal athletic opportunities for men and women been followed, according to the information the University of Iowa provided to the federal government in that academic year (2018-2019), the UI would have needed to have added between 47 and 61 roster opportunities for women. Specifically, in that year, Iowa women had comprised approximately 53.56% of the UI student body, but had been provided with only approximately 50.77% of Athletics Department opportunities, based on the number of participants on the first day of scheduled contest.[7]

79.     During that time, the UI had provided just 2.83% of its female undergraduates with a sports experience, while it had provided approximately 3.36% of its men undergraduates with such experiences. Again, to have fulfilled one of the legal tests for compliance, UI would have needed to have provided between 47 and 61 roster opportunities for women—but had failed to do so.[8]

---

[6] Even if the U.S. Department of Education's Equity in Athletics Data Analysis allows this type of reporting, Title IX does not: male participants in female sports certainly cannot be considered part of the substantially proportionate opportunities for female athletes.

[7] U.S. Department of Education, Equity in Athletics Data Analysis ("EADA"), *available at* https://ope.ed.gov/athletics/#/.

[8] Some athletes participate in more than one intercollegiate sport and, in such instances, may, sometimes, be counted twice or even three times. The number "47" takes into account the fact

80.     Meanwhile, according a different set of facts, the UI "Hawkeye Sports" websites, the
reported number of women and male athletes were far different from those reported to the
Department of Education. According to the rosters that UI has itself posted on its athletics
website, for the 2020-2021 academic year, at the moment that the University of Iowa announced
its intent to terminate the women's swimming and diving program, along with three men's
programs, those statistical proportions were now far worse for women athletes: it has been
estimated that the UI would need to add between 113 and 115 sports opportunities for women to
achieve gender equivalency.

81.     By 2020, based on long-term practices unrelated to the UI financial solvency or the rise
of COVID-19, Iowa women were projected to occupy only 47% of the sports teams' rosters (as
compared to 53% of Iowa's men), and only 2.56% of the women in the UI's student body (as
compared to 3.55% of the UI's men's undergraduates) were afforded athletic opportunities.[9]

---

that the UI counts more women as participating in more than one sport. For example, universities
may count one athlete on the swimming team and the tennis team as taking two participation
opportunities.  It would appear that the UI attempts to reduce its investments in women's sports
by double- or triple-counting middle-distance women running athletes, but it does not count male
athletes more than once in its cross country, indoor and outdoor track programs. Using such
counting methodologies, it would appear that the UI counts one woman runner as many as two or
three times when computing the numbers of opportunities the UI has provided women athletes.
The higher number of women student athletes that we believe the UI needs to add to its rosters,
"61," is, therefore, the number of additional women athletes who should be participating in the
athletic program if the UI were to meet its Title IX legal obligation. In other words, it appears to
us that the UI is over-counting its women as fulfilling roster spots, when compared to its roster-
counting methods for its men student athletes. This also takes into account that the UI counts
men with whom its women's teams practice in the UI's numbers for women's teams as reported
to the U.S. Department of Education.

[9] This presumes that enrollment rates for men and women were consistent with those in the
recent past as reported to EADA and on the UI's website, but see Para.109, *infra*, citing recent
data from the University of Iowa's Office of Registrar, which suggests that the percentage of
enrollees as undergraduates who are males is declining, as compared to female enrollees. If true,
then the deficiencies with respect to the UI's failure to treat women student athletes

82.     In this context of widening disparities between Iowa's Title IX obligations and its

offering of sports opportunities to its female students, on June 5, 2020, University of Iowa

President Bruce Harreld and Athletics Director Gary Barta received a copy of two letters from

Champion Women and the California Women's Law Center, two non-profits that are dedicated

to women's educational opportunities in sports. In it, Nancy Hogshead-Makar, J.D. and Amy

Poyer, J.D. addressed to Big Ten Commissioner Kevin Warren, outlining a series of Title IX

non-compliance issues affecting a number (but not all) of the Big Ten universities.

83.     In it, President Harreld and Director Barta were informed that, based on objective

measures, such as the count of roster positions available to men and women students on sports

teams, women were not being provided with equal athletics opportunities.

84.     Neither President Harreld nor Director Barta, nor any other person at the University of

Iowa, responded to their letters.

**E.      A Startling Announcement: The University of Iowa terminates the women's
Swimming and Diving program in violation of Title IX.**

85.     Knowing of the results of the Department of Education's OCR's findings of Title IX non-

compliance—including, expressly, the OCR's finding that the University of Iowa could not

demonstrate its compliance with Title IX's mandates—the UI, acting through President Harreld

and Director Barta, on August 21, 2020, startled its student-athletes, their coaches, members of

the University of Iowa community, Iowa taxpayers, and even, national observers[10] when Director

Barta unexpectedly announced to team members that the UI would be terminating their

---

proportionately to their representation in the student body, as a whole, are likely greater than
those describe in this Complaint.
[10]Pat Forde, *Iowa's Elimination of Four Sports Shows the Cruel Side of College Athletics*, Sports
Illustrated, Aug. 25, 2020, https://www.si.com/college/2020/08/25/iowa-cuts-sports-swimming-
gymnastics-tennis.

respective intercollegiate scholarship sports programs, to take effect in academic year 2021-2022.

86.     Cut programs included women's swimming and diving program, along with three other male sports programs (swimming and diving, tennis, and gymnastics).

87.     According to a jointly-issued statement by UI President Bruce Harreld and Director Barta, the August 21 program-cut action was ostensibly caused by what the statement characterized as, "[t]he COVID-19 pandemic [which had] resulted in a financial exigency which threatens [the UI's] continued ability to adequately support 24 intercollegiate athletics programs at the desired championship levels."

88.     The statement did not explain how, after years of public investment in the sports programs, including the windfalls of money that had poured into the Athletics Department during the Barta Era, its financial condition could be so dire, even given the difficulties posed by the COVID-19 pandemic, as to require the elimination of some of one of its least-costly programs, including women's swimming and diving, amongst an entire array of programs that provides only about 3% of its student body with this unique type of educational experience.

89.     On August 24, 2020, Director Barta, in a press interview, indicated that the University of Iowa was considering making even more, although unspecified, sports team cuts.

90.     Neither of the statements, on August 21 and 24, provided a full and more truthful accounting for wrongful and discriminatory conduct by the UI that had preceded that action, as described herein.

91.     In fact, the University of Iowa was, and has been, intentionally discriminating against its female students in its athletics offerings for some time.

92.     The UI has been aware of these Title IX non-compliance issues for a number of years, as recently as the Department of Education's OCR raised some of them several years ago, as described above. Despite the Resolution Agreement entered into by the UI in December of 2017 to address non-compliance issues and to work with the OCR to resolve the same, the UI remains out of compliance and cannot meet any prong of the Three-Part Test.

93.     The "financial exigency" described by Director Barta and President Harreld to justify cutting the women's swimming and diving program does not provide the basis for a successful defense to a Title IX claim.

94.     Any present financial problems attributable to the pandemic were long-preceded by enormous gender differences in UI athletics that took thousands of separate decisions over a period of years to arrive at such a lop-sided athletic program for its male and female students. This flies in the face of the history of Iowa and UI being at the forefront of women's sports and equal treatment of women even before it was legally required.

95.     Even with the cuts made to men and women's teams, based on the online rosters for men's and women's teams, the UI will still need to add 81 new athletic opportunities for women, in order to prevent the UI from continuing to violate Plaintiffs' civil rights guaranteed to them under Title IX.

96.     Ideally, the UI would reinstate all the sports teams recently cut (both male and female sports), and then add new opportunities for women as required to comply with Title IX, including, but not limited to, such sports that were already noted as of interest to UI students: hockey, wrestling, lacrosse, and bowling.

97.     The cuts of four sports teams did not remedy the UI's sex discrimination practices. The University will still be providing male students with far more athletic opportunities, more

scholarship dollars and better treatment than its female students, even if it moves forward with the announced cuts to the men's sports programs.

98.     The University of Iowa has postured that the sports team program-cuts have been consistent with Title IX.

99.     However, based on published information, before the decision was made to eliminate these programs, the University of Iowa was not providing women with equal sports opportunities or equal scholarships, and was not treating women's athletic programs equally with its men's athletic programs, and was not providing men and women with equal athletic scholarship opportunities, placing the institution far out of compliance with Title IX.

100.    Even though the UI has announced planned cuts to more men's teams than to women's, it is *still* discriminating against women in athletics, and is still violating the federal law. Therefore, the UI is prohibited from cutting *any* women's teams.

101.    The ostensible reason given for the program cuts-- that based on financial stresses created by the cancelation of the Big Ten football season due to the COVID-19 pandemic, which, according to the UI, would create a $100 million budget shortfall—even if it were a viable excuse for failing to comply with Title IX, which it is not, it was at least partially resolved when the Big Ten Conference announced that it had reversed its earlier decision and that a truncated football season would be played, although spectators would not be allowed to attend.

102.    And, in any event, according to Director Barta, the total cost of the four sports teams subject to the cutting action had a reported accumulated annual cost approximated at $4.5 to $5 million. The cost of restoring the women's swimming and diving team, alone, would be a small fraction of that cost.

103.    There can be little credible dispute that, even in a tight budgetary year, whether subject to
COVID-19 restrictions, the University of Iowa's Athletics Department can afford to continue
with its women's swimming and diving program.

104.    For example, less than two months prior to the announced termination of its women's
swimming and diving program, Director Barta's office announced that the Athletics Department
would be making a $1.1 million payment to a UI assistant football coach who had been accused
publicly by former black football players of mistreating them while they had been student
athletes.

105.    And, further, just one week *after* Director Barta and President Harreld's announcement of
the swimming and diving team's cut, on August 28, the Athletics Department announced that the
UI assistant football coaches would be receiving a raise in their annual base salaries—an
accumulated annual cost of more than $575,000.

106.    More recently, parents and supporters of the UI women's swimming and diving team
have pledged approximately $2 million to the university, payable upon Director Barta's
willingness to reinstate the program.

107.    Despite these types of expenditures, and despite that fact that the Big Ten Conference's
football season is now back on the boards, and despite pledges of funds that would support the
program's viability, Director Barta has reported to the press that there would be no change in the
decision made to terminate the women's swimming and diving team, involving 35 female
athletes.

G.      **Termination Tidal Wave: Adverse impacts caused by the UI's decision.**

108.    The impact of the termination decision has been immediate and detrimental to the
student-athletes and to the coaches and staff members who are responsible for assuring that the

female student athletes are provided with athletic opportunities equivalent to male athletes at the University of Iowa.

109.    The impact, with respect to Iowa's noncompliance with Title IX, stands to worsen in the near future. According to records published by the University of Iowa Registrar the trend line appears to show that the proportion of full-time enrolled male students may be dropping. In the Spring 2020 academic semester, the number of full-time, enrolled male students was 45.2% of the student body.  If, in fact, the Registrar's reports demonstrate such a trend, then Iowa's non-compliance with Title IX—without cutting women's swimming and diving program—has been worsening. In the midst of such a trend, the University of Iowa's decision to terminate one of its most viable women's sports teams, leads Plaintiffs to conclude that, without this Court's supervision and intervention, they, and others whom they have agreed to represent, will result in a future that is both increasingly inconsistent with the University's storied past, and contrary to this federal law.

110.    Plaintiffs are presently and continuously injured by Defendant's violation of Title IX, an intentional discrimination action against female athletes on the basis of sex.  The adverse impacts include, but are not necessarily limited to, the following:

    a.  All of the Plaintiff student-athletes chose to attend the University of Iowa, in whole or in part, because the University of Iowa offered them the opportunity to compete in intercollegiate swimming and diving.  For several of them the UI women's Swimming and Diving program was the most important consideration in their selection of a university.

    b.  The Plaintiff student-athletes reacted to the news that the Swimming and Diving Program's announced elimination after the current season with shock, disbelief and

grief.  Their participation on this team has been, and is, central to their happiness at
the University of Iowa, and a critical part of their academic achievements.

c.  All of the Plaintiffs are accomplished athletes.  All of them participated in high
school sports at the varsity level, many with distinction.  Some of them turned down
opportunities at other universities to attend the UI.

d.  Some of the Plaintiffs will graduate this year.  But they are adversely affected by the
attrition of team-mates that seek transfer opportunities to colleges and universities
who continue to support women's swimming and diving programs.  Those who
transfer will be faced with additional burdens and expenses that they did not
anticipate when they enrolled at the University of Iowa.

e.  Other Plaintiffs will be eligible to compete in their sport for one or more years under
applicable rules.  All of them would continue to participate on the women's
swimming and diving team if the UI reversed its decision to eliminate the program at
the end of this academic year—an act that President Bruce Harreld and Director Gary
Barta have repeatedly, publicly vowed they will not take.

f.  Cutting the women's swimming and diving program is adversely affecting incoming
students, as well as already-enrolled students.

111.  If not enjoined by this Court, Defendant's recent cut will violate Title IX by allowing the
University to cut any women's team where there is already a failure to comply with Title IX.
Due to the fleeting nature of collegiate athletics, Plaintiffs will suffer irreparable harm if this
decision is allowed to move forward. Monetary damages would not make Plaintiffs whole.
Injunctive relief is necessary to prevent further degradation of the women's swimming and

diving team, where team members and others are already looking for other opportunities,

including at least one freshman who has already left.

## STATEMENT OF CLAIMS

### COUNT I:  VIOLATION OF TITLE IX – EQUAL PARTICIPATION

112.    Plaintiffs incorporate by reference paragraphs 1 through 111.

113.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), reads

that:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefit of, or be subjected to discrimination
> under any education program or activity receiving Federal financial
> assistance. . . .

114.    Defendant has failed to meet any of the three criteria for compliance with Title IX's

equal participation requirement.

115.    The elimination of a viable women's team, swimming and diving, is impermissible,

given  Defendant's intentional sex discrimination and its lack of compliance with Title IX.

### COUNT II:  TITLE IX – EQUAL TREATMENT

116.    Plaintiffs incorporate by reference paragraphs 1 through 111.

117.    Defendant's failure to treat female athletes substantially equally with respect to athletic

financial assistance, equipment and supplies, tutoring, locker rooms, practice and competitive

facilities, housing and dining, and recruitment violates Title IX's equal treatment requirements.

### COUNT III: TITLE IX – EQUAL SCHOLARSHIP OPPORTUNITIES

118.    Plaintiffs incorporate by reference paragraphs 1 through 111.

119.    The University of Iowa, according to EADA data from 2018-2019, provided $6,709,299

in athletic-related aid to men's athletic programs, but only $6,399,154 to women's athletic

programs, for a ratio of 51 percent for men, and 49 for women.

120.     Defendant's failure to treat female athletes substantially equally with respect to athletic financial assistance violates Title IX's equal treatment requirements

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

(a) Certify this action as a class action for declaratory and injunctive relief on behalf of all present and future University of Iowa female students, including currently enrolled students (students admitted for the 2020-2021 academic year), and prospective students, who participate, seek to participate, or have been deterred or prevented from participating in or obtaining the benefits of, intercollegiate athletics sponsored by the University of Iowa;

(b) Declare that Defendant has engaged in a continuing pattern and practice of discrimination against women on the basis of sex in intercollegiate athletics in violation of Title IX and its applicable regulations, policy interpretation, and clarifications;

(c) Issue a temporary restraining order and preliminary injunction ordering Defendant not to eliminate the women's varsity swimming and diving team, as a University of Iowa-sponsored intercollegiate team, to provide their team with funding, staffing, and other benefits commensurate with their status as an intercollegiate team, and prohibit Defendant from eliminating any other University of Iowa-sponsored women's intercollegiate teams unless, both before and after the elimination, equality of opportunity for women has been achieved;

(d) After a hearing on the merits, issue a final injunction ordering Defendant not to eliminate women's swimming and diving as a University of Iowa-sponsored intercollegiate team and to provide the team with funding, staffing, and other benefits commensurate with its status as an intercollegiate team; prohibiting Defendant from eliminating any other University of Iowa-sponsored women's intercollegiate teams unless, both before and after the elimination, equality of opportunity for women has been achieved; prohibiting Defendant from retaliating in any manner against Plaintiffs or class members for asserting their legal rights to equal opportunity and equal treatment; and prohibiting defendants from treating University of Iowa's female athletes in a gender-discriminatory manner, including but not limited to, providing unequal scholarship dollars to women proportional to their required Title IX participation;

(e) Award Plaintiffs their costs and expenses, including an award of reasonable attorneys' fees;

(f) Award such other and further relief as this Court deems just and proper.

Respectfully submitted,

LAREW LAW OFFICE

James C. Larew   AT0004543
LAREW LAW OFFICE
504 E Bloomington St.
Iowa City, IA  52245
Phone: (319) 337-7079
Fax: (319) 337-7082
Email: James.Larew@LarewLawOffice.com
ATTORNEY FOR PLAINTIFFS