**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF THE STATE OF IOWA**

| | |
|---|---|
| **SAGE OHLENSEHLEN, CHRISTINA KAUFMAN, ALEXA PUCCINI, KELSEY DRAKE, MIRANDA VERMEER and ABBIE LYMAN,** | **CASE NO. 3:20-cv-0080-SMR-SBJ** |
| **Plaintiffs,** | |
| **v.** | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| **THE UNIVERSITY OF IOWA, BRUCE HARRELD, in his official capacity as President of the University of Iowa, and GARY BARTA, in his official capacity as Director of the Department of Athletics at the University of Iowa,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

**I. INTRODUCTION** ........................................................................................................1

**II. FACTUAL BACKGROUND** .....................................................................................4

**III. ARGUMENT** ...........................................................................................................11

    A. Standard Applicable to Temporary Restraining Order
       and Preliminary Injunction ..................................................................................11

    B. Plaintiffs Will Likely Succeed on the Merits Where UI is Not in
       Compliance with Title IX and Therefore UI Cannot Eliminate Viable
       Women's Swimming and Diving Team .................................................................13

    C. Plaintiffs Will Suffer Irreparable Harm if the University of Iowa is
       Not Enjoined From Eliminating the Women's Swimming and Diving Team .....30

    D. The Balance of Equities Favor Plaintiffs as UI Will Not Suffer Injury from
       This Injunctive Relief ...........................................................................................33

    E. Public Interest Served by Saving the Women's Swimming and Diving Team ....34

**IV. CONCLUSION** ........................................................................................................35

I.      **INTRODUCTION**

On August 21, 2020, Defendant University of Iowa (sometimes "UI" or "University"), in an announcement issued by Defendants UI President Bruce Harreld and UI Athletics Director Gary Barta, terminated women's swimming and diving. *See* Steve Batterson, *Iowa Announces Cuts to Athletic Program Amid Budget Shortfall*, GLOBE GAZETTE, Aug. 21, 2020, *available at* https://globegazette.com/sports/iowa-announces-cuts-to-athletic-program-amid-budget-shortfall/article_51286e1a-b5f9-5392-aef5-c2925b9eabe8.html.[1]  Thirty-five opportunities for undergraduate female athletes will be lost at the University of Iowa if the cut goes into effect, despite the fact that, on the date of the termination announcement, the UI was already out of compliance with the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. sections 1681-88 ("Title IX"). These 35 swimmers and divers, represented here by Plaintiffs Sage Ohlensehlen, Christina Kaufman, Alexa Puccini and Kelsey Drake, have been directly and adversely affected by the intentional gender discrimination. The UI's termination decision further violates clear federal legal precedents, in this and other circuits, prohibiting the elimination of viable women's intercollegiate teams when a university fails to meet the accommodation of student interests and abilities in violation of Title IX. *See, e.g.*, *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 978 (D. Minn. 2016) (issuing preliminary injunction against a university that was seeking to eliminate the women's tennis team), *aff'd* after trial as to Title IX violation in *Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 840 (D. Minn. 2019); *Barrett v. West Chester Univ. of Pa.*, No. 03-CV-4978, 2003 U.S. Dist. LEXIS 21095 (E.D. Pa. Nov. 12, 2003) (granting preliminary injunction restoring women's gymnastics team); *Roberts v. Colo. State Univ.*, 814 F. Supp. 1507 (D. Colo. 1993) (granting permanent injunction restoring

---

[1] The termination decision also included three men's sports teams: men's swimming and diving, men's gymnastics, and men's tennis. *See id.*

women's softball team), *aff'd in pertinent part*, 998 F.2d 824 (10th Cir. 1993); *Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992) ("Cohen I") (granting preliminary injunction restoring women's varsity gymnastics and volleyball teams and ordering Brown to provide all incidental benefits of varsity status), *aff'd*, 991 F.2d 888 (1st Cir. 1993) ("Cohen II").

There is an urgent need for immediate preliminary injunctive relief in this instance. The college years are fleeting, and, if the UI's decision to terminate the women's swimming and diving program is not enjoined, Plaintiffs[2] will suffer irreparable harm by losing any opportunity to participate in their chosen sport. There is also a time-sensitive decision for some of these female athletes as to whether to stay at UI without the opportunity to participate on the team that brought them to UI in the first place. Of the total 35 swimmers and divers, 15 have placed themselves into the NCAA's "Transfer Portal," seeking opportunities to swim competitively at other universities. Already, an adverse snowball effect has begun that was caused by the cessation of recruiting efforts this year—an effect that will last years into the future.

By contrast, the Court's issuance of a temporary restraining order, prohibiting UI from moving forward with its announced termination of the women's swimming and diving team, will cause the University to suffer minimal, if any, harm.

In light of the balance of these prospective harms—the irreparable harm to be inflicted on Plaintiffs versus *de minimis* harm, if any, to be suffered by Defendants—Plaintiffs now seek a temporary restraining order of UI's decision to terminate the women's swimming and diving team, and/or a preliminary injunction of the same.

---

[2] Two Plaintiffs, Sage Ohlensehlen and Kelsey Drake, are seniors, but have already been adversely affected by the decision to terminate the team, as described in their attached Declarations. In addition, given a recent Covid-19-based decision by the NCAA, if seniors do not graduate, they would still be eligible to compete next year. *See* NCAA, *DI Council Extends Eligibility for Winter Sports Student Athletes*, October 14, 2020, *available at* https://www.ncaa.org/about/resources/media-center/news/di-council-extends-eligibility-winter-sport-student-athletes

## II.    FACTUAL BACKGROUND

On August 21, 2020, Defendant UI announced the cut to the women's swimming and diving team through statements issued by Defendant President Bruce Harreld and Defendant Athletics Director Gary Barta. *See* Chuck Culpepper, *Iowa Cuts Four Sports, Becoming the First Big 10 School to Ax Programs During the Pandemic*, THE WASHINGTON POST (Aug. 21, 2020), *available at* https://www.washingtonpost.com/sports/2020/08/21/iowa-cuts-four-sports-becoming-first-big-ten-school-ax-programs-during-pandemic/ (describing open letter signed by the university president and athletics director). The elimination of the sport is to take effect after the 2020-2021 academic year. *Id*. The team cuts were made allegedly solely for budgetary reasons, when UI was set to have its football season canceled entirely due to public health concerns caused by the COVID-19 pandemic. *See id.* ("The COVID-19 pandemic resulted in a financial exigency which threatens our ability to adequately support 24 intercollegiate athletics programs at the desired championship level," according to Defendants President Harreld and Athletics Director Barta).

Four of the Plaintiffs are undergraduate student athletes attending UI and members of the women's swimming and diving team that the University announced it is cutting. Two Plaintiffs are female undergraduates who are involved in other sports that the University currently does not offer as varsity sports (rugby and wrestling). Plaintiff Alexa Puccini is a first-year student at UI from Naperville, Illinois. (Appendix ("App.") 11, Puccini Declaration, ¶1). She started swimming competitively at the age of eight, and, during high school, was a 16-time State qualifier, a nine-time State medalist, and a four-year All-American and All-State swimmer. (App. 11, Puccini Declaration, ¶6). Ms. Puccini turned down a higher-amount scholarship at the University of Illinois in order to come and swim at UI. (App. 11-12, Puccini Declaration, ¶7). Ms. Puccini chose UI for its amazing facilities, its coaches, and the team atmosphere. (App. 12,

Puccini Declaration, ¶8). She is devastated at the idea that her coaches would also lose their jobs

if the team is not reinstated, as they are an inspiration to her. (App. 12, Puccini Declaration, ¶10).

Ms. Puccini has learned time-management skills from her career swimming, and with practice

six days a week—with three of those days having practice mornings and afternoons—it is a

balance also to be a student. (App. 12, Puccini Declaration, ¶11). Ms. Puccini knows that the

positive mental state from her work in the pool carries over to her academics. (App. 12, Puccini

Declaration, ¶13). On August 21, 2020, Ms. Puccini was called to the emergency meeting to

learn the worst news of her life. (App. 13, Puccini Declaration, ¶16). Athletics Director Barta

walked in, announced the news, and walked out without taking questions. (App. 13, Puccini

Declaration, ¶16). At the meeting, Ms. Puccini was crying uncontrollably, and was confused and

angry, among other emotions. (App. 13, Puccini Declaration, ¶16). Ms. Puccini feels that the loss

of the swimming and diving team at UI would take a piece of what makes her who she is, and

she will transfer to another school if the team is not reinstated. (App. 13, Puccini Declaration,

¶18). She is concerned that the team termination notice has already damaged the program. She

believes that the UI is now already two years behind on recruiting. (App. 13, Puccini

Declaration, ¶20). The incoming class of 2025 will have already recommitted elsewhere upon

hearing the news of the team being cut, and no new talent is being recruited now. (App. 13,

Puccini Declaration, ¶20).  Ms. Puccini recently entered the Transfer Portal, in an effort to allow

her continued interest in competitive swimming.  However, if UI's women's swimming and

diving team is not eliminated, Ms. Puccini will remain at UI. (App. 13, Puccini Declaration,

¶15). Ms. Puccini still has four more years of eligibility to swim since the NCAA granted winter

sports an extra year due to the pandemic's disruption. (App. 13, Puccini Declaration, ¶15). She

has been talking to other universities that have women's swimming and diving teams, to explore

her transfer options, and is close to making a final decision. (App. 13, Puccini Declaration, ¶18).

Ms. Puccini is devastated at the idea of transferring, as she will have to start over, losing connections on campus and the best teammates and coaches she has ever had as a competitive athlete. (App. 13, Puccini Declaration, ¶19). She also worries that, if she were to transfer, she will be farther from home and will be paying more for her tuition. (App. 13, Puccini Declaration, ¶19).

Plaintiff Christina Kaufman is a second-year undergraduate student at UI, studying Business Data Analytics and Information Systems. (App. 6, Kaufman Declaration, ¶1). Ms. Kaufman was born and raised in Illinois, and has been swimming competitively since she was seven. (App. 6, Kaufman Declaration, ¶1). Ms. Kaufman was captain of her swimming team her senior year of high school; her team was conference champion in 2017. (App. 6, Kaufman Declaration, ¶5). Ms. Kaufman was recruited to UI's women's swimming and diving team as a walk-on; she chose UI, in part, because her parents and older sister attended the UI. (App. 7, Kaufman Declaration, ¶7). Ms. Kaufman did not receive a scholarship, and pays approximately $9,000 per semester in tuition. (App. 7, Kaufman Declaration, ¶8). Balancing a grueling practice schedule, academic life, and participation in several organizations on campus, has required intensive focus and healthy habits. (App. 7, Kaufman Declaration, ¶11). Ms. Kaufman has taken advantage of the free tutoring available to athletes, and maintained a cumulative 3.54 GPA. (App. 7, Kaufman Declaration, ¶13). Ms. Kaufman has greatly enjoyed her teammates, who have given her a wonderful college experience. (App. 7, Kaufman Declaration, ¶14). She was shocked and devastated when she was summoned to the practice courts at Carver-Hawkeye Arena to learn the news about the team being eliminated. (App. 7-8, Kaufman Declaration, ¶15-19). Ms. Kaufman currently intends to remain at UI and end her swimming career, which is a difficult decision. (App. 8, Kaufman Declaration, ¶19). She worries that transferring to another school would mean loss of credits, greater expense, being farther from home, and difficulty finding a

path for her major that is similar to UI so she could graduate on time. (App. 8, Kaufman Declaration, ¶19).

Plaintiff Sage Ohlensehlen graduated from Bettendorf High School, where she was a four-year member of the swimming team. (App. 2, Ohlensehlen Declaration ¶1). She is a senior at UI and will graduate in May of 2021 with a major in English Creative Writing and minors in History and Philosophy. (App. 2, Ohlensehlen Declaration, ¶2). She plans on attending law school beginning in 2021. (App. 2, Ohlensehlen Declaration, ¶2). Ms. Ohlensehlen is captain of UI's women's swimming and diving team, and has been a member all four years. (App. 2, Ohlensehlen Declaration, ¶3). She began swimming when she was six years old, and worked hard to reduce her lap time to be recruited to UI. (App. 2-3, Ohlensehlen Declaration, ¶5-7).  In her final year, she had dropped enough time for UI to offer her a position as a walk-on. (App. 2-3, Ohlensehlen Declaration, ¶7). Receiving this offer was the best day of her life. (App. 3, Ohlensehlen Declaration, ¶7). She was offered athletic scholarships at other schools, but committed to UI. She chose UI because she wanted to be a part of the team at UI. (App. 3, Ohlensehlen Declaration, ¶8). Ms. Ohlensehlen received a partial academic scholarship for four years, and a partial athletic scholarship only the winter of her junior year, which was not renewed. (App. 3, Ohlensehlen Declaration, ¶9). She has worked two jobs while being enrolled at UI and a member of the swimming and diving team. Most practices during the six days a week last two hours (with two, two-hour practices three days each week), but on Saturday, it lasts three hours. (App. 3, Ohlensehlen Declaration, ¶10).  Meets also take a lot of time, where an athlete can miss up to four days of classes for a single meet. (App. 3, Ohlensehlen Declaration, ¶10). Up until the announcement terminating the women's swimming and diving program, Ms. Ohlensehlen wore her Hawkeye athletic gear proudly. (App. 3, Ohlensehlen Declaration, ¶11). She credits her coaches with turning her into the person she is today, and was amazed at how

kind and welcoming the coaches were at UI, which felt like a family. (App. 3, Ohlensehlen Declaration, ¶13). Ms. Ohlensehlen is a better student because of swimming, and she has made the Dean's List every semester in which she could qualify; she maintained a 3.75 GPA. (App. 3-4, Ohlensehlen Declaration, ¶15). Ms. Ohlensehlen has observed that women's sports are undervalued at UI, and men's sports obviously receive more resources than women's sports. (App. 4, Ohlensehlen Declaration, ¶16). The announcement of the team cut was the worst news Ms. Ohlensehlen has ever received, and she still has nightmares about it. (App. 4, Ohlensehlen Declaration, ¶17). She is also concerned about how this decision affects the younger teammates, and the legacy of a program into which she has put so much time, money, effort and dedication. (App. 4, Ohlensehlen Declaration, ¶17). UI is already well behind in recruiting, and has lost all of its high school student commitments for next year or for the following; it is therefore imperative that UI's team be reinstated quickly. In fact, 15 of the 35 women on the women's swimming and diving team have already committed to swim elsewhere next semester or next year, although these commitments can be undone. (App. 4, Ohlensehlen Declaration, ¶19). Two swimmers left the program at the beginning of the year once they heard the termination news. (App. 4, Ohlensehlen Declaration, ¶19). Four women are currently in the NCAA's Transfer Portal but have not committed elsewhere yet. (App. 4, Ohlensehlen Declaration, ¶19). The effects have already been greatly felt, and Ms. Ohlensehlen has been harmed in her development as an athlete and student with the cut; she is more stressed than ever, has lost sleep and weight, and her grades are lower than usual. (App. 4, Ohlensehlen Declaration, ¶21). She no longer feels she can commit herself to staying at UI, although she had planned to attend law school here, due to the emotional damage caused by UI's decision. (App. 4, Ohlensehlen Declaration, ¶21).

Plaintiff Kelsey Drake is a senior studying Industrial Engineering at University of Iowa. (App. 16, Drake Declaration, ¶1). She finished her high school career at Linn-Mar High School

in Cedar Rapids, where she excelled in swimming. (App. 16, Drake Declaration, ¶2). She is finishing her fourth year of swimming at Iowa, and has been swimming competitively since she was seven years old. (App. 16, Drake Declaration, ¶5). Ms. Drake qualified for the 2020 NCAA Swimming and Diving Championship meet in the 200 Butterfly, although it was canceled due to COVID-19. (App. 17, Drake Declaration, ¶8). Ms. Drake was recruited by UI and three other schools, each of which offered her athletic scholarships. (App. 17, Drake Declaration, ¶9). Ms. Drake had been a UI fan growing up and wanted to select a university based on fitting in with the team as she would be spending a lot of time with them. (App. 17, Drake Declaration, ¶10). Being a member of the UI women's swimming and diving team has meant everything to her. (App. 17, Drake Declaration, ¶12). She knows there are multiple teammates she will stay in contact with for the rest of her life. (App. 17, Drake Declaration, ¶12). She has also made alumni contacts, and has received tremendous support from them in furthering her job search. (App. 17, Drake Declaration, ¶12).  Ms. Drake has appreciated the incredible coaches on staff, who have supported her throughout her college career. (App. 17, Drake Declaration, ¶13). The swimming and diving team is a huge time commitment, as its members train 20 hours per week. (App. 17, Drake Declaration, ¶14). Before COVID-19, they would generally have two to three meets per month heading into November. (App. 17, Drake Declaration, ¶14). Ms. Drake has taken the work ethic she learned from swimming and applied it to her studies, maintaining a 3.74 GPA. (App. 17, Drake Declaration, ¶15). Ms. Drake was devastated by the announcement of the team being cut, and was particularly worried about the younger team members. (App. 18, Drake Declaration, ¶18). She knows that recruiting for the team has stopped, and many people are leaving the team. (App. 18, Drake Declaration, ¶19).

Plaintiff Miranda Vermeer is a senior at UI, and has played club rugby for many years. (App. 20, Vermeer Declaration, ¶2). Ms. Vermeer would have played on a women's varsity team

at the UI had an opportunity been offered. (App. 21, Vermeer Declaration, ¶8-9). Instead, for four years she has participated in women's rugby as a club sport; she now serves as the club's President. (App. 21, Vermeer Declaration, ¶9).  Prior to the COVID-19 pandemic, between 35-40 University of Iowa students participated in women's rugby club activities. (App. 22, Vermeer Declaration, ¶13). The support of the University of Iowa for the rugby club is minimal. (App. 22, Vermeer Declaration, ¶10-12). They are allowed to use UI fields and receive small financial stipends. Ms. Vermeer believes that there are enough colleges and universities in traveling proximity to the University of Iowa to allow the scheduling of full competitive rugby season if such a varsity team were created and financially supported. (App. 22, Vermeer Declaration, ¶10-12).  Each club team requires, at minimum, 10 members to remain active.  (App. 22, Vermeer Declaration, ¶14). Importantly, during Ms. Vermeer's four years as an undergraduate, neither her interests, nor those of any teammate known to her, have ever been assessed by the UI with respect to their possible participation of intercollegiate women's rugby. (App. 22, Vermeer Declaration, ¶18-19).

The University of Iowa has not added a woman's varsity team since 1997-1998. (App. 102, Dr. Lopiano Report, p. 12). In 2018-2019, the percentage of female enrollment at UI was 53.6%, and the athletic participation of women in 2018-2019 was 50.8%. (App. 101, Dr. Lopiano Report, p. 11, Table 1). According to University of Iowa's own records, the current proportion of full-time undergraduate students as of Fall 2020 who are female is 55.0%, and based on the roster counts from the University's website, the number of female athletes is 377, or 47.1 % of the total, without any cuts to any teams. (App. 101, Dr. Lopiano Report, p. 11, Table 1). The women's swimming and diving team represents 35 roster positions. (App. 4, Ohlensehlen Declaration, ¶4).

### III.   ARGUMENT

#### A.  Standard Applicable to Temporary Restraining Order and Preliminary Injunction

Federal Rule of Civil Procedure 65 describes the process for issuing temporary restraining orders as well as preliminary injunctions. Unlike a TRO, notice is required to be given to the adverse party for a preliminary injunction. Fed. R. Civ. P. 65(a)(1). Even prior to filing the Complaint, Plaintiffs had informed Defendants of their position with respect to the illegal termination of the women's swimming and diving team, and, prior to filing this Motion, Plaintiffs notified Defendants' counsel by telephone and email of the anticipated filing; Plaintiffs are further concurrently serving this motion on Defendants. (App. 282-283, Affidavit of James Larew). Under the rules, movants are required to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Plaintiffs seek an exception to this requirement given that they are students with limited means, and given the limited, if any, financial harm to the University if its decision is stayed.

In order to obtain a temporary restraining order, the moving party must demonstrate: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981). The factors are balanced against each other and none is by itself determinative. *Id.*; *see also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (describing how a "court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene") (citations omitted).

The same standard applies to the issuance of a preliminary injunction. *See Libertarian*

*Party of Ark. v. Thurston*, 962 F.3d 390, 399 (8th Cir. 2020) (quoting same four factors from *Dataphase* in affirming grant of preliminary injunction); *see also Beaner v. United States*, 361 F. Supp. 2d 1063, 1066-67 (D.S.D. 2005) (finding that the same standard is applicable to both actions) (citing *S.B. McLaughlin & Co., Ltd. V. Tudor Oaks Condominium Project*, 877 F.2d 707 (8th Cir. 1989)). Where notice is given of the application for a temporary restraining order, "the procedure that is followed does not differ functionally from that on an application for a preliminary injunction . . . if there is an adversary hearing or the order is entered for an indeterminate length of time, the 'temporary restraining order' may be treated as a preliminary injunction." WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2951, pp. 254-55 (2d ed. 1995).

"Issuance of the injunction, in light of the *Dataphase* factors, is within the sound discretion of the district court." *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 709 (8th Cir. 1989) (citation omitted). The burden is on the movant to demonstrate the four factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). The factors are often flipped in order, but the four elements remain. *See, e.g., Watkins*, 346 F.3d at 844 (reviewing the balance of factors with the "likelihood of the movant's success on the merits" as the first prong); *Rimstad v. Wells Fargo Bank, N.A.,* No. 07-2582 (DWF/AJB), 2007 U.S. Dist. LEXIS 43933, at 6-7 (D. Minn. June 15, 2007) (same). Plaintiffs likewise begin here by reviewing the likelihood of success on the merits. Plaintiffs recognize, however, that the "risk of irreparable harm" is often considered a threshold inquiry, as the "failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402-03 (8th Cir. 2009) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987)). Plaintiffs will address the significant irreparable harm immediately thereafter.

**B. Plaintiffs Will Likely Succeed on the Merits Where UI is not in Compliance with Title IX and Therefore UI Cannot Eliminate the Viable Women's Swimming and Diving Team**

   *1. Requirements of Title IX*

Title IX, enacted in 1972, provides, in relevant part, as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the befits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The U.S. Department of Education ("ED")[3] adopted regulations interpreting Title IX in 1975, codified at 34 C.F.R. Part 106 ("Regulations"). These Regulations are now enforced by the ED's Office for Civil Rights ("OCR"), and courts accord "substantial deference" to an agency's interpretation of its own regulations. *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1046-47 (8th Cir. 2002) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *accord Cohen v. Brown Univ.*, 101 F.3d 155, 172-73 (1st Cir. 1996) ("*Cohen IV*"). The Regulations make it clear that Title IX's mandate applies to athletic programs, specifically:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a). The Civil Rights Restoration Act of 1987 further clarified that Congress intended "program or activity" as used in Title IX to apply to any program or activity, as long as any part of the institution receives federal financial assistance. 20 U.S.C. § 1687; s*ee also Chanelor v. Univ. of N.D.,* 142 F. Supp. 2d 1154, 1158 n.4 (D.N.D. 2000) (describing same

---

[3] At the time it was the Department of Health, Education, and Welfare ("HEW"), that subsequently became two separate entities: Department of Health and Human Services and the Department of Education. *Cohen* II, 991 F.2d at 895.

historical expansion). Therefore, given that UI receives federal financial assistance,[4] its varsity athletics offerings must comply with Title IX even if none of the funding for any of the men's or women's teams comes from those sources.

Title IX specifically requires (1) equal athletic participation opportunities; (2) equal athletic scholarships or financial assistance; and (3) equal treatment and benefits. 34 C.F.R. §§ 106.37(c), 106.41(c); Title IX of the Education Amendments of 1972; A Policy Interpretation: Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413-71423 (Dec. 11, 1979) ("Policy Interpretation"). More specifically with respect to equal athletic participation opportunity, the following ten factors are reviewed:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 CFR 106.41(c). In addition, the "failure to provide necessary funds for teams for one sex" may also be considered. *Id*. While Plaintiffs will seek enforcement of all of Title IX's mandates after discovery, the focus of this request for preliminary relief is Defendants' failure to provide to Plaintiffs equal athletic participation opportunities, or to accommodate their interests and abilities.

Congress, in passing Title IX, sought to encourage women to participate in sports and "remedy the discrimination that results from stereotyped notions of women's interests and

---

[4] The University of Iowa received $260,461,544 in federal funds just for research and scholarship in 2018. (App. 125, Dr. Lopiano Report, p. 35).

abilities." *Neal v. Bd. of Trustees*, 198 F.3d 763, 768 (9th Cir. 1999) (citation omitted).[5] As the

First Circuit recognized, "[i]nterest and ability rarely develop in a vacuum; they evolve as a

function of opportunity and experience." *Cohen IV*, 101 F.3d at 179.  The OCR, in implementing

this intent in 1979, adopted its Policy Interpretation, a so-called Three-Part Test, which

eventually became the cornerstone of federal regulation. Under it, the OCR determines whether a

particular institution is achieving compliance with the equal athletic participation opportunities

mandate:

> (1) Whether intercollegiate level participation opportunities for male and female students
>     are provided in numbers substantially proportionate to their respective enrollments; or
> (2) Where the members of one sex have been and are underrepresented among
>     intercollegiate athletes, whether the institution can show a history and continuing
>     practice of program expansion which is demonstrably responsive to the developing
>     interest and abilities of the members of that sex; or
> (3) Where the members of one sex are underrepresented among intercollegiate athletes,
>     and the institution cannot show a continuing practice of program expansion such as
>     that cited above, whether it can be demonstrated that the interests and abilities of the
>     members of that sex have been fully and effectively accommodated by the present
>     program.

Policy Interpretation, 44 Fed. Reg. 71,418. In 1996, the first prong was further clarified in

OCR's Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the

"Policy Clarification"). *See* OFFICE OF CIVIL RIGHTS, DEPARTMENT OF EDUCATION,

CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE: THE THREE-PART-TEST

(January 16, 1996) (hereinafter "1996 Clarification"). The first prong compares the aggregate

proportion of male and female varsity athletes participating on the first day of competition to the

proportion of male and female full-time undergraduate students. In other words, the first prong

reviews whether the institution provides female students with a mathematically equal—

---

[5] The Regulations promulgated under Title IX further "recognized a situation that Congress well
understood: Male athletes have been given an enormous head start in the race against their
female counterparts for athletic resources, and Title IX would prompt universities to level the
proverbial playing field." *Id*. at 767.

compared to enrollment—opportunity to participate in athletics. An athlete is participating if he or she receives athletically-related student aid and/or practices with a varsity team and receives coaching and other team support. Policy Interpretation, 44 Fed. Reg. at 71415; Policy Clarification.  In 1993 and 1996, the First Circuit Court of Appeals issued two lengthy opinions in *Cohen v. Brown*, endorsing and strengthening OCR's 1979 Three-Part Test: *Cohen II* and *Cohen IV*.  Under those holdings, compliance under Title IX is nearly impossible to prove until the number of male and female varsity athletes mirrors the gender distribution of the undergraduate student body as a whole. The Eighth Circuit reviewed *Cohen II* and the Policy Interpretation in 2002, finding that the Policy Interpretation "constitutes a reasonable and considered interpretation of the regulation." *Chanelor*, 291 F.3d at 1047 (citation omitted). In 1995, the U.S. District Court for the Southern District of Iowa discussed *Cohen II* and the Policy Interpretation, finding that the "paramount goal of Title IX is equal opportunity to participate." *Gonyo v. Drake Univ.*, 879 F. Supp. 1000, 1005 (S.D. Iowa 1995) (denying preliminary injunctive relief to male wrestling athletes where the proportion of male to female athletes was significantly out of proportion with the undergraduate population). Upon the United States Supreme Court's denial of certiorari in *Cohen II*, *Cohen v Brown*, 520 U.S. 1186 (1996), every federal court that has considered a Title IX since then has followed the First Circuit's lead. *See* R. Shep Melnick, The Transformation of Title IX: Regulating Gender Equality in Education 89 (Brookings Institute Press, 2018).

Under these well-established precedents, Plaintiffs bear the burden to prove an institution's noncompliance with the first prong—mathematically equal opportunities—but, once that is achieved, Defendants bear the burden to prove compliance with the second or third prongs. *See, e.g., Cohen II,* 991 F.2d at 901 (holding burden shifts for second and third prongs); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (finding burden on

defendants for second prong); *Barret v. W. Chester Univ. of Pa. of the State System of Higher Educ.,* No. 03-CV-4978, 2003 U.S. Dist. LEXIS 21095, at *17-18 (holding burden shifts to defendant for both prongs); *Portz,* 401 F. Supp. 3d at 855 (describing the burden of prongs two and three as on the institution to demonstrate) (quoting 1979 Policy Interpretation 44 Fed. Reg. 71,413, 71,417-19)). Since at least 2003, the OCR has made it clear that a university's cutting men's teams to meet its participation obligation is a "disfavored practice." *See* OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION, FURTHER CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE REGARDING TITLE IX COMPLIANCE (June 11, 2003), *available at* www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html (hereinafter "2003 Clarification").

Under the second prong, an institution's "past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion" is reviewed. *See* 1996 Clarification, www2.ed.gov/about/offices/list/ocr/docs/clarific.html.  Institutions are expected to comply with Title IX's requirements by meeting the demands of the under-represented gender (that is, at UI, the female gender).  A university is required to demonstrate an "actual program expansion" by adding more women's teams in instances in which a university increased the percentage of female athletes by reducing the number of male athletes; in other words, reducing male athletic participation opportunities in an attempt to equalize the male-to-female athletic opportunities ratio does not absolve a university of its duty to prove that an "actual program expansion" occurred, and would result in the OCR not finding a history and continuing practice of program expansion. *Id.*  Further, a university is not given credit under this prong for major expansions of women's teams that occurred more than a few years in the past. *Id.*  Prong two, in short, is focused at a school's "good faith remedial efforts through actual program expansion of women's athletic opportunities." *Id.*  Cuts made of women's teams at a university such as UI, where women athletes are already underrepresented in athletics opportunities, "even when

coupled with cuts in programs for … [men's teams], cannot be considered remedial because they burden members of the sex already disadvantaged" by the existing program. *Id.*

Under the third prong of the Three-Part Test, an institution's athletic program is reviewed to determine whether it is fully and effectively accommodating the athletic interests and abilities of its female students.  Policy Interpretation, 44 Fed. Reg. 71,418. Universities that eliminate women's teams face a particularly demanding burden of proof under Part Three of the test; cutting an existing women's sports team creates a "presumption that the institution is not in compliance" with Part Three. OFFICE OF CIVIL RIGHTS, DEPARTMENT OF EDUCATION, INTERCOLLEGIATE ATHLETICS POLICY CLARIFICATION: THE THREE-PART TEST—PART THREE (April 20, 2010), p. 5 ("2010 OCR Letter"), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.pdf; *see also Portz*, 401 F. Supp. 3d at 858 (describing presumption created and citing 2010 OCR Letter). To overcome this presumption, the institution must "provide strong evidence that interest, ability, or competition no longer exists."  *Id.* OCR will not "consider the failure by students to express interest during a survey…as evidence sufficient to justify the elimination of a current and viable intercollegiate team for the underrepresented sex." *Id.*  In assessing whether there is unmet athletic interest among the underrepresented sex, a broad range of indicators are considered, including, but not limited to, the following:

- Interviews with students, admitted students, coaches, administrators and others regarding interest in a particular sport;
- Participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws it students;
- Tryouts or other direct observations of participation in the particular sport in which there is interest;
- Complaints from the underrepresented sex with regard to a lack of athletic opportunities or request for the addition of new teams; and
- Routine monitoring of participation of the underrepresented sex in club and intramural sports.

*Id.*, at pp. 5-8. Under the assessment obligation established by the third prong, it is not enough for a university to assess the current interest among its female undergraduates with respect to sports. Rather, the policy is designed to promote and develop interest among current students and those whom the university can recruit, admit and train in coming years because, as the OCR explained in its 2010 Letter, students "may have, or may be unaware of whether they will have, a future interest in athletic participation." *Id.*, at p. 11, n. 25.

### 2. *Probability of Success on the Merits*

The Eighth Circuit, in weighing the probability of success on the merits factor, where a statute's validity is not at issue, reviews whether Plaintiffs have a reasonable probability of succeeding, or "fair chance of prevailing" on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). This is something less than a 50% chance. *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 974 (D. Minn. 2016) (describing "fair chance of prevailing" on the merits as less than 50 percent).

The first step in determining compliance with Title IX in accommodating athletic interest and abilities is taken under the first prong, or the mathematical proportion analysis. In order to make this assessment, the University's proportion of full-time undergraduates who are female must be determined. According to UI's website with respect to its Registrar's report of enrollment numbers, the total full-time undergraduate population that reported their gender during the fall semester of 2020-2021 was 20,253. (App. 101, Dr. Lopiano Report, p. 11, Table 1); *see also* University of Iowa, A Profile of Students Enrolled, *available at* https://registrar.uiowa.edu/sites/registrar.uiowa.edu/files/fallprofile_20203_completed.pdf. Of the 20,253 full-time students whose gender is reported, women make up 55.0% (at 11,146). *Id.* Therefore, under prong one, approximately 55% of the University's athletic opportunities must

be reserved for women, although the analysis only begins with the percentages, and then reviews whether a team can be fielded with the missing opportunities.[6] For the year 2019-2020, there were 11,501 women full-time undergraduates out of 21,234 total, comprising 54.2% of the student body. (App. 101, Dr. Lopiano Report, p. 11, Table 1).

To this proportional relationship of full-time undergraduate students in a university's student body, a comparable count is made of what the courts have described as "genuine athletic participation opportunities"—that is, the number of athletes participating on women's and men's varsity teams.[7] In reviewing the data points available regarding athletic opportunities afforded, UI has not in the past, and, clearly, not at the moment when President Harreld and Athletic Director Barta announced their swimming and diving team termination decision, met its gender equity mandate under Title IX's first prong.[8] For instance, data obtained from a database published under the federal 1994 Equity in Athletics Disclosure Act (EADA)[9] show that only

---

[6] Based on 2018-2019 data, women made up 53.6% of the total undergraduate population, or less than the current numbers. (App. 101, Dr. Lopiano Report, p. 11, Table 1). Despite this, UI was still out of compliance with Title IX at that time by 47 female opportunities. *Id.*

[7] This phrase, "genuine athletic participation opportunities," was used in the district and appellate courts in the *Quinnipiac* cases in the context of describing varsity team participation, and is a useful shorthand to include all of the requirements of a genuine experience. *See Biediger v Quinnipiac University*, 728 F. Supp. 2d 62, 64, 66, 94 (D. Conn. 2010); *Biediger v Quinnipiac University*, 691 F. 3d 85, 95, 99 (2nd Cir. 2010); *see also Portz*, 196 F. Supp. at 977 (describing "genuine participation opportunities").

[8] UI may well point to its Resolution from the OCR regarding Title IX compliance in defense of its conduct, but such an approach must fail, for multiple reasons. First, the Resolution was based on data that is not consistent with what the University provided to other government entities. (App. 102, Dr. Lopiano Report, pp. 33-39). Second, it is based on data from earlier years such as 2016-2017, where the current data demonstrates that the University is now further out of compliance based on any measure. (App. 101, Dr. Lopiano Report, p. 11, Table 1). Finally, the limited review of the OCR for administrative complaints, where the individuals do not participate in the investigations, is not a substitute for the Court's own analysis and determination. *See Roberts*, 814 F. Supp. at 1515-16 (rejecting OCR's conclusion that Colorado State was in compliance with Title IX), *aff'd in relevant part*, 998 F.2d 824 (10th Cir. 1993).

[9] Under the EADA, the University of Iowa, along with all other universities subject to Title IX compliance are required to provide data to the U.S. Department of Education which, in turn, publishes the information at https://ope.ed.gov/athletics/#/institution/details.  The 2018-2019 data, cited here, is the most recent data provided by EADA.

394[10] women (in the duplicated[11] count, and 296 women in the unduplicated count) in 2018-2019 were afforded athletic opportunities. (App. 101, Dr. Lopiano Report, p. 11, Table 1). That represents only 50.8% of the athletic opportunities, despite comprising 53% of the full-time undergraduate student body in that year. *Id*. Based on this data, the University was short 47 female roster spots in 2018-2019. (App. 101, Dr. Lopiano Report, p. 11, Table 1). More recently, using data from the University's website, as the reports to EADA are a few years behind, women make up 55.0% of the full-time undergraduate student body. (App. 101, Dr. Lopiano Report, p. 11, Table 1). Based on data from the University's website rosters, however, there are only 377 female athletes currently, representing only 47.1% of the athletic opportunities. (App. 101, Dr. Lopiano Report, p. 11, Table 1). Without any cuts to the teams, therefore, based on current data published by the University, when President Harreld and AD Barta announced their termination decision, the UI's female students were *already* shorted 141 roster spots as compared to its male students *Id*. This is more than sufficient to field a team. The data shows that the differential has been getting worse over the past few years; based on the UI's website roster counts and registrar publications from 2019-2020, the data demonstrates that UI was short 92 spots for female athletes.

The EADA data from 2018-2019 also showed 94 UI women on the rowing team, but the UI's website reports that only 48 women were on that team in the same time period. (App. 105, Dr. Lopiano Report, p. 15). Both numbers reported to the public regarding the same subject matter cannot be true, even though, in each instance, it would appear that the UI has inflated

---

[10] This number does not include the total of 15 male practice members of a women's team who are counted by UI as part of the EADA data on the website. (App. 102, Dr. Lopiano Report, p. 12, Table 1).

[11] Duplicated counts describe the situation where athletes who participate in multiple sports, the athlete counts once in each sport; unduplicated counts involve an athlete counting only one time, no matter how many sports he or she plays. (App. 102, Dr. Lopiano Report, p. 38).

participation rates in one or more women's sports in order to mask its noncompliance with Title

IX's first prong mandate.  But even if one were to accept, *arguendo*, that the UI genuinely

supports 94 roster spots on its women's rowing team, an extraordinary and likely-inflated

number, the female team roster spot deficit is significant. This clearly non-compliant shortfall—

no matter which, if either, of the UI's published accountings is accurate--existed *prior to*

President Harreld and Athletic Director Barta's announced decision that the University would be

cutting the women's swimming and diving team, which termination represents a future

additional loss of 35 roster spots. Of course, several men's teams were also cut at the same

time,[12] but such cuts do not bring the University into compliance (App. 137, Dr. Lopiano Report,

p. 47), and the institution cannot cut a viable women's team where it is out of compliance with

Title IX. *See Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 828 (10th Cir. 1993),

*cert. denied* 510 U.S. 1004 (1993) (affirming the permanent injunction preventing Colorado

State University from eliminating the women's softball team where the university violated Title

IX's requirement of substantial proportionality between enrollment and athletic participation).

The fact that the UI reported so many females on the women's rowing team, contrary to the

website's roster numbers, is, at the very least, indicative of its recognition that it is not meeting

Title IX's first-prong requirements.

In the course of these proceedings, Plaintiffs intend to seek discovery to further explore

these disparities, but even accepting, *arguendo*, that *either one* of the University's two

differently-reported numbers of female roster spots are accurate, the institution is clearly not in

compliance with the first prong of the OCR's test to enforce Title IX's mandate, being short

---

[12] Dr. Lopiano demonstrates how these men's cuts were made in an apparent attempt to show a spurious first-prong compliance "on paper" based on 2018-2019 data, but the more recent data from the University demonstrates how far off this is. (App. 135-137, Dr. Lopiano Report, pp. 45-47).

more than 141 spots for women before the cuts. "Substantial proportionality" has been interpreted to require a very close correlation between enrollment and athletic participation opportunities. *See* Policy Clarification. While it is possible that a differential of a few percentage points might not result in finding noncompliance (*see id.*), University of Iowa's numbers, historically, and at present, have been, and continue to be, further off than just a few points. Indeed, the percentage differential is not the dispositive test because some universities are significantly larger, and therefore the numbers are much higher even with a small percentage differential. (App. 97-100, Dr. Lopiano Report, pp. 7-10). Rather, the question is whether the percentage differential could field a competitive women's team, and, therefore, additional reasonable opportunities could be provided. *See* 1996 Clarification; (App. 98, Dr. Lopiano Report, p. 8) (quoting same).[13] Where the disparity is sufficient enough that the number of opportunities required to assure substantial proportionality would support a women's varsity team, as here (even before the cut), a finding of noncompliance is warranted. *See* Policy Clarification.

Given Plaintiffs' demonstration of UI's failure to comply with the test's first prong, the University must attempt to demonstrate compliance with prongs two or three. With Defendants' announced plans to permanently eliminate the viable women's swimming and diving team after not expanding opportunities for more than two decades, it is difficult—indeed, Plaintiffs contend, impossible—for UI to demonstrate its compliance with either of the other two prongs. The second prong has been interpreted as requiring an institution's positive ongoing response to the interests and abilities of the underrepresented sex through present and past good-faith expansion. *See* Policy Clarification.

---

[13] Dr. Lopiano also describes the failure of the University to provide equal scholarship benefits, among others, which are not the focus of the instant motion.

The University cannot demonstrate compliance with this prong for no fewer than three reasons.  First, given the planned elimination of a viable women's swimming and diving team, UI is precluded from showing a positive ongoing response to the interests and abilities of the underrepresented gender because it is eliminating, not expanding, women's opportunities.

Second, UI has not added a new women's team for at least twenty years, since 1997-98, when women's soccer was added. (App. 102, Dr. Lopiano Report, p. 12). UI therefore cannot show an increase of women's teams where it has been at least twenty years since any expansion took place. *See Barrett*, 2003 U.S. Dist. LEXIS 21095 (finding that periods in excess of a decade are too long to constitute continued expansion); *Bryant v. Colgate Univ*., No. 93-cv-1029 (N.D.N.Y. June 11, 1996) (denying university's motion for summary judgment and finding this prong not met due to four-year hiatus since women's varsity team had been added); *Cohen v. Brown Univ*., 879 F. Supp. 185, 211 (D.R.I. 1995) ("*Cohen III*") (finding failure to demonstrate a continuing practice of program expansion where last varsity team had been added nine years before the demotion of two women's teams).[14]

Third, the elimination of more men's teams does not bring the University into compliance with the second prong. Even with the proposed men's teams cuts (along with women's swimming and diving), and accepting the current website roster and registrar numbers as accurate for 2020, the University is still missing 102 genuine athletic participation opportunities for women. (App. 137, Dr. Lopiano Report, p. 47). This also ignores the requirement that the "institution's good faith remediation efforts through actual program expansion" are to be

---

[14] Indeed, as Athletics Director Barta recognized, he has not provided any expansion since he arrived in 2006, despite growing calls for women's wrestling or a hockey team addition. *See* Marc Morehouse, *Iowa Isn't Adding Any Sports*, THE GAZETTE (Feb. 13, 2018), *available at* https://www.thegazette.com/subject/sports/hawkeyes/iowa-isnt-adding-any-sports-20180213.

considered. *See* Policy Clarification, at 3-4.[15] "Expansion" in opportunities does not occur where

a viable women's team is cut, no matter what is done to men's teams. *See Mayerova v. E. Mich.*

*Univ.*, 346 F. Supp. 3d 983, 996 (E.D. Mich. 2018) ("[T]he ordinary meaning of the word

'expansion' may not be twisted to find compliance under this prong when schools have increased

the relative percentages of women participation in athletics by making cuts in both men's and

women's sports programs.")[16] (quoting *Roberts*, 998 F.2d at 830); *see also Cohen II*, 991 F.2d at

906 ("[E]ven balanced use of the budget-paring knife runs afoul of Title IX where, as here, the

fruits of a university's athletic program remain ill-distributed after the trimming takes place.").

The fact that the University also announced the elimination of men's teams, concurrently with

cutting the women's swimming and diving team, further does not "negate a potential finding of

intentional discrimination." *Mayerova*, 346 F. Supp. at 991 (citing *Barrett*, 2003 U.S. Dist.

LEXIS 20195, at 11-12). The "shortcomings that plagued its program before it took blade in

hand[]" cannot be ignored. *Id.* (quoting *Cohen II*, 991 F.2d at 905-906).[17] Therefore, the

---

[15] The following statement in the Policy Clarification demonstrates that removing men's teams does not suffice: "OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for the underrepresented sex by reducing opportunities for the overrepresented sex alone or by reducing participation opportunities for the overrepresented sex to a proportionately greater degree than for the underrepresented sex." *Id.*

[16] On a subsequent motion to stay the preliminary injunction, after the women's tennis team had been reinstated, the Sixth Circuit granted a stay on the issuance of the injunction. *See Mayerova v. E. Mich. Univ.*, No. 19-1177, 2019 U.S. App. LEXIS 9373, at *2-4 (6th Cir. Mar. 28, 2019) (finding that the university's decision to reinstate the women's tennis team placed the university in greater compliance with Title IX, fixed the irreparable harm for those players, and the university still had to provide a Title IX-compliant proposal for the start of the 2019 year).

[17] Moreover, the main reason for the elimination of the teams was allegedly financial, as described above, and not solely an attempt to bring the University into compliance with Title IX. *Cf. Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp.2d 88, 91 (W.D. Va. 2007) (upholding Three-Part Test and reduction in men's and women's teams taken to bring university into compliance with Title IX proportionality test), *aff'd* 639 F.3d 91 (4th Cir. 2011). The Fourth Circuit noted that the university recognized in the press release that it felt it had to make the cuts to comply with prong one as it could not comply with prong two (as it had only added one women's team since 1990) or prong three (as it could not add any more teams to accommodate unmet student interest). *Equity in Athletics*, 639 F.3d at 97-98.

University cannot meet its burden to demonstrate compliance with prong two, as it has not been expanding women's opportunities for more than 20 years, and it cut the teams based on financial exigency, and not to come into compliance with Title IX.

Similarly, University of Iowa cannot meet its burden of proving its compliance with Title IX under the third prong of the 1996 Policy Clarification, which requires full and effective satisfaction of athletic interests and abilities. When there is an expressed interest among female athletes, when there is sufficient ability and interest to maintain viable teams, such as a swimming and diving team, and when such team members hold a reasonable expectation of competition, the University cannot meet this prong when it terminates that team. *See Roberts*, 814 F. Supp. at 1517; *Cohen* I, 809 F. Supp. at 992; *Cohen* II, 991 F. 2d at 898. The women's swimming and diving team at UI is viable and competitive; there are sufficient eligible members of that team to compete intercollegiately; there has been no break in competition from the inception of the team nearly forty years ago (App. 25-34, Declaration of Robert Rydze), until recent restraints were imposed upon that competition due to the COVID-19 pandemic: these facts provide conclusive evidence that the interests and abilities of these women student athletes cannot be satisfied with the elimination of their team. *See Roberts*, 988 F.2d at 832 (finding the question less vexing when "plaintiffs seek the reinstatement of an established team rather than the creation of a new one"); *Cohen II*, 991 F.2d at 904 (noting the questioning of viability to be unlikely where plaintiffs seeking "merely to forestall the interment of healthy varsity teams").

Moreover, the full and effective satisfaction of the institution's female undergraduates' athletic interests and abilities, as determined under the third prong, cannot be demonstrated by UI in an instance such as is presented here, where a woman undergraduate, such as Plaintiff Miranda Vermeer, attests to the fact that there are unmet needs and interests in women's athletics

at UI. (App. 20-24, Vermeer Declaration). Specifically, Ms. Vermeer has played club rugby for many years, and would have played on a women's varsity team at the UI had an opportunity been offered. Instead, for four years she has participated in women's rugby as a club sport; she now serves as the club's President. (App. 21, Vermeer Decl., ¶9).  Prior to the COVID-19 pandemic, between 35 and 40 University of Iowa female students participated in women's rugby club activities. (App. 22, Vermeer Decl, ¶13). The support of the University of Iowa for the rugby club is minimal.  Club members are allowed to use UI fields and receive small financial stipends. Ms. Vermeer believes that there are enough colleges and universities in traveling proximity to the University of Iowa to allow the scheduling of full competitive rugby season if such a varsity team were created and financially supported. (App. 22, Vermeer Decl., ¶12). Importantly, during her four years as an undergraduate, neither her interests, nor those of any teammate known to her, have ever been assessed by the UI with respect to their possible participation in intercollegiate women's rugby. (App. 22-23, Vermeer Decl., ¶17-20).

    Given that the University cannot meet the last two prongs, it cannot demonstrate compliance with Title IX. The ostensible financial condition of the University, which Defendants Harreld and Barta cited as the reason to eliminate the teams,[18] is not a valid defense where women's athletics interests and abilities are not effectively accommodated. *See Favia*, 812 F. Supp. at 583 ("Title IX does not provide any exception to its requirements simply because of a school's financial difficulties. In other words, a cash crunch is no excuse."). "[T]he pruning of athletic budgets cannot take place solely in comptrollers' offices, isolated from the legislative and regulatory imperatives that Title IX imposes." *Cohen II*, 991 F.2d at 905. Moreover, based

---

[18] *See* John Bohnenkamp, *Iowa Cuts Four Sports*, Sports Illustrated, Aug. 21, 2020, *available at* https://www.si.com/college/iowa/football/iowa-cuts-four-sports-082120 (citing letter from Defendants Athletic Director Barta and President Harreld regarding the alleged "financial exigency" faced by the University).

on the analysis of Professor Andrew Zimbalist, the alleged economic exigency, described by

Defendants as the basis for cutting he women's swimming and diving team, appears artificial.

(App. 167-181, Expert Report of Andrew Zimbalist, Ph.D. ("Zimbalist Report")). Indeed, the

fact that UI increased the salaries for a majority of its assistant football coaches by more than

$500,000[19] just over one week after citing a financial exigency serious enough to cause the

elimination of multiple women's varsity sports is indicative of the same. *See* Robert Read,

*Majority of Assistant Iowa Football Coaches Receive Raises Despite Athletic Department Cuts*,

THE DAILY IOWAN, Sept. 1, 2020, *available at* https://dailyiowan.com/2020/09/02/majority-of-

assistant-iowa-football-coaches-receive-raises-despite-athletic-department-pay-cuts/. Dr.

Zimbalist reviewed the history of the University as a non-profit institution focused on education,

and noted that it was one of 25 schools in the NCAA to report a significant financial surplus in

the years preceding the swimming and diving team's termination. (App. 170, Zimbalist Report,

p. 5). Specifically, in the 2005-2019 period, UI's Athletic Department amassed not less than a

$72.24 million *surplus* according to its annual reports to the NCAA. *Id*. (citing App. 176,

Zimbalist Report, p. 11, Table One). In 2018-2019 alone, UI Athletics had a surplus of $5.05

million. *Id*.  This surplus is in striking contrast to the majority of schools within the Power Five

conferences, even though they are the "most commercialized and financially most successful

schools in intercollegiate athletics." *Id*. Dr. Zimbalist describes the inefficiencies present in

---

[19] According to data provided to the Department of Education by the University, the budget of
the women's swimming and diving program was only $244,141 in 2019, or less than half of the
amount of the raises. (App. 174, Zimbalist Report, p. 9) (citing
https://ope.ed.gov/athletics/#/institution/details). On the other hand, it has been reported that
women's swimming and diving cuts will result in a net savings of $1,364,698, but it is unclear
what is the source of this data. *See* Chad Leistikow, *University of Iowa Cuts Four Sports in Wake
of COVID-19 Pandemic, Loss of Fall Football*, HAWKCENTRAL, Aug. 21, 2020, *available at*
https://www.hawkcentral.com/story/sports/college/columnists/chad-leistikow/2020/08/21/iowa-
cut-4-sports-coronavirus-swimming-gymnastics-tennis-gary-barta-bruce-harreld/3409666001/.
This presumably also does not include loss of tuition paid by swimmers, many of whom receive
only partial scholarships, who will transfer based on this determination.

university athletics, generally. Specifically, Dr. Zimbalist explains that the presence of stakeholders (boosters, alumni, administrators and students), rather than stockholders, as investors in a university render the focus on wins, rather than profits. *Id*. at 5-6. Therefore, an "athletic director or coach is evaluated primarily based on the wins he or she produces." *Id*. at 6. In this context, incoming revenues—media contractors, sponsorship deals, donations, etc.—are:

> deployed in the interest of recruiting better athletes and building successful teams. Unable to lure prospective athletes with compensation offers, athletic departments spend wantonly on new facilities, expensive coaches, fancy hotels, and so on to attract these recruits. The result is massive waste, unjustifiably inflated compensation packages, and bloated athletic staffs.

*Id*.[20] Consequently, "[w]ithout the normal marketplace cost discipline, management practices with athletic departments often grow lax and negligent, if not abusive." *Id*. This must explain the reference of Athletic Director Barta to maintaining 24 teams at "the desired *championship* level," but that is of course not the test for compliance with Title IX. *See* Chuck Culpepper, *Iowa Cuts Four Sports, Becoming the First Big 10 School to Ax Programs During the Pandemic*, THE WASHINGTON POST (Aug. 21, 2020), *available at* https://www.washingtonpost.com/sports/2020/08/21/iowa-cuts-four-sports-becoming-first-big-ten-school-ax-programs-during-pandemic/ (emphasis added). This is a non-profit educational institution that must not discriminate based on gender, not a money-making machine to create only championship teams. Dr. Zimbalist describes efforts of other universities, which, rather than cutting women's sports teams unlawfully when confronting unexpected economic exigencies, have introduced salary cuts, dipped into reserve funds, and arranged access to multi-million-

---

[20] For instance, "while UI Athletic Department revenues increased 2.46 times between fiscal years 2005 and 2019 (from $61.7 million to $152 million), Athletic Director Gary Barta's compensation package has increased 3.34 times before considering potential bonuses over the same period (from $295,000 to $1 million plus bonuses). Meanwhile, the staff size at the Department has grown to over 300, and the 'administrative and general' budget item over the last three years prior to the pandemic: it grew from $15.79 million in 2017 to $18.58 million in 2020, or by 17.7 percent." (App. 170-171, Zimbalist Report, pp. 5-6).

dollar lines of credit. *Id*. at 10.  Given these alternative courses of action to responding to

financial stresses, and given the fact that, under Title IX, a financial exigency is not a defense to

a compliance failure, the University of Iowa's contention that financial circumstances compelled

the elimination of the women's swimming and diving team is without factual or legal

justification.

Based on an application of the three prongs of the OCR's Title IX compliance test, and

relying merely on records and documents that are in public domain before any discovery has

been conducted—Plaintiffs assert that the UI's violation of federal law is clear. As in *Portz*,

*Cohen*, *Roberts* and *Favia*, the universities' intentional action—dropping a women's team—

exacerbated the women's underrepresentation within the athletic department, and unlawfully

denied the women the educational opportunity of sports participation. *See Cohen I*, 809 F. Supp.

978 (preliminary injunction), *aff'd, Cohen II*, 991 F.2d 888, *on remand* to *Cohen III*, 879 F.

Supp. 185 (D.R.I. 1995)  (trial on the merits), *aff'd in part, rev'd in part*, *Cohen IV*, 101 F.3d

155, *cert. denied*, 520 U.S. 1186 (1997); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th

Cir. 1993), *cert. denied*, 510 U.S. 1004 (1993); *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332 (3d Cir.

1993); *Portz*, 401 F. Supp. 3d 834.

Plaintiffs, here, have a likelihood of success on the merits, even more than a fair chance

of prevailing. In addition, as described further, below, the other factors considered in a

preliminary injunction all weigh in Plaintiffs' favor, particularly with respect to the irreparable

harm that will be suffered by them if temporary injunctive relief is not promptly ordered by the

Court. Plaintiffs will then seek, after a full trial, a permanent injunctive order prohibiting the UI

from terminating the women's swimming and diving program.

### C.  Plaintiffs Will Suffer Irreparable Harm if the University of Iowa is not Enjoined From Eliminating the Women's Swimming and Diving Team

Plaintiffs will suffer significant and irreparable harm if the University's decision to

eliminate its women's swimming and diving team is not enjoined. Plaintiffs will lose their ability

to compete in interscholastic athletics if UI cuts the program. Plaintiffs have devoted much of

their lives to swimming, most beginning when they were six or seven. (App. 2-19, Declarations

of Ohlensehlen, Kaufman, Drake, Puccini). Swimming has been central to their lives, and they

made important life decisions about where to attend college based on the sports offered. *Id.*

Generally, the opportunity to compete in this sport in college is all many of these women will

ever have, and what they had been working toward since they were little. *Id.* It is a critical

relationship that coaches and athletes cherish alike. *Id.*, (App. 29-30, Rydze Declaration, ¶38-

45). Unless these Plaintiffs transfer to other universities and colleges, which would necessarily

uproot their lives, disrupt their friendships and fracture their relationships with their coaches,

they will lose their chances to compete intercollegiately. *Id.* The termination action could also

affect their ability to graduate on time or even stay in their chosen major. *Id.* "Given the fleeting

nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to

participate in their sport of choice on a continuous and uninterrupted basis." *Biediger v.*

*Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291-92 (D. Conn. 2009). There is no adequate remedy at

law to replace this experience. A year of swimming has been described as "a significant

proportion of [a] swimming career[.]" *Ganden v. National Collegiate Athletic Association*, 1996

U.S. Dist. LEXIS 17368, at *6 (N.D. Ill. 1996). These are athletes who "develop skill, self-

confidence, learn team cohesion and a sense of accomplishment, increase their physical and

mental well-being, and develop a lifelong healthy attitude." *Favia v. Indiana University of*

*Pennsylvania*, 812 F. Supp. 578, 583 (W.D. Pa. 1993) ("The opportunity to compete in

undergraduate interscholastic athletics vanishes quickly, but the benefits do not.").

     Even though the University's decision does not take effect until the end of this academic

year, its repercussions are already being felt: 15 of the 35 girls have already committed to swim

elsewhere next semester or next year, although this can be rescinded if the team is reinstated. (App. 4, Ohlenslehen Decl., ¶19-20); *see also* Braden Keith, I*owa – Iowa State: Maddie Ziegert Announces Short Transfer After Program Cut*, Swim Swam, Nov. 1, 2020, *available at* https://swimswam.com/iowa-iowa-state-maddie-ziegert-announces-short-transfer-after-program-cut-1/; Anne Lepesant, *Anna Brooker Announces Transfer to Utah After Iowa Shutters Programs*, Swim Swam, Nov. 15, 2020, *available at* https://swimswam.com/anna-brooker-announces-transfer-to-utah-after-iowa-shutters-program/. Two swimmers already left at the beginning of the year once they heard the news. (App. 4, Ohlenslehen Decl., ¶19). Four women are currently in the NCAA's Transfer Portal but have not committed anywhere else yet. *Id*. In addition, recruiting for future team members has ground to a halt; coaches will be looking for other professional opportunities. (App. 2-19, Declarations of Ohlenslehen, Kaufman, Puccini, Drake; App. 25-34, Declaration of Robert Rydze; App. 138, Lopiano Report, p. 48). Like the women tennis players in *Portz v. St. Cloud State University*:

> [I]f…[t]his case is not resolved in time for Plaintiffs to adequately prepare for and participate in the 2016-17 season — a very real possibility given the pace of modern day litigation — Plaintiffs would likely lose the opportunity to play at least one season of tennis at SCSU even if they later prevail in this case. And even if Plaintiffs' do later win, the temporary elimination of the women's tennis program would harm recruiting efforts for future tennis seasons and could make it difficult for SCSU to retain or hire coaches in the near term. Since Plaintiffs cannot wait for the long term — their time in college is limited — those effects would cost them dearly.

196 F. Supp. 3d at 972-73. There is no monetary compensation that could adequately mend this loss, and it is therefore irreparable. *Id*. Moreover, "transferring would be too costly to mitigate the irreparable nature of losing an intercollegiate sporting opportunity, not only for Plaintiffs specifically, but also generally for all plaintiffs in Plaintiffs' shoes." *Id*.; *see also Biediger*, 616 F. Supp. 2d at 292 (describing necessity to "break into new programs" that increases likelihood of stunting the athletic ability as it is on the brink of the "highest level of amateur competition."). Moreover, these women undergraduate students do not want to transfer elsewhere, as they

dreamed of competing at UI, and have made wonderful friendships there. *Id*. In addition, these

Plaintiffs would suffer the irreparable harm of having their constitutional rights violated as

protected by the Fourteenth Amendment—whether they asserted a such a claim or sought redress

under a statute enacted to enforce the Fourteenth Amendment—which is a cognizable injury.

*Portz*, 196 F. Supp. 3d at 972-73. Therefore, Plaintiffs suffer at least two irreparable harms: the

interruption in their invaluable but fleeting collegiate athletic careers; and an unequal treatment

in violation of their constitutional rights. *Id*.

### D. The Balance of Equities Favor Plaintiffs as UI Will Not Suffer Injury From this Injunctive Relief

With respect to the next prong in the *Dataphase* preliminary injunctive assessment—"the

state of balance between this harm and the injury that granting the injunction will inflict on other

parties litigant"—it is also in Plaintiffs' favor. The cost of the women's swimming and diving

team is minimal, particularly as compared to the overall budget of the University, with the 2018-

2019 cost of the women's swimming and diving program just $244,141. (App. 174, Zimbalist

Report, p. 9) (citing https://ope.ed.gov/athletics/#/institution/details, and alternative numbers

provided).[21] In addition, the University indicated that it would honor scholarships, and therefore

it would not save any amounts from these cuts in the short-term. Moreover, several of these

athletes pay at least some of their tuition, and that will be lost if they transfer, so the University

will, in fact, be losing money. (App. 2-19, Declarations of Ohlensehlen, Kaufman, Puccini,

Drake). The extraordinary facility is also already built for these swimmers and divers, and

therefore it is not an additional cost to construct adequate facilities. (App. 30-31, Rydze

---

[21] Indeed, in the short-term, a group of alumni and other parents had already gathered nearly $2 million to support the University and stop the cuts. *See* KCRG*, Supports of Cut Iowa Sports Raise Nearly $2 Million in Pledge to Save Programs, Barta Adamant that Decision is Final*, KCRG, Sept. 24, 2020, *available at* https://www.kcrg.com/2020/09/24/supporters-of-cut-iowa-sports-raise-nearly-2-million-in-pledge-to-save-programs-barta-adamant-that-decision-is-final/. There is therefore no even arguable immediate harm.

Declaration, ¶47-56). As Dr. Zimbalist noted, there are also cost savings methods available to the UI other than eliminating women's swimming and diving. (App. Zimbalist Report, p. 9-10); *see also Portz*, 401 F. Supp. 3d at 868-69 (D. Minn. 2019) (finding that there were other ways to save costs than eliminating women's tennis and skiing in granting permanent injunction). "The balance of the hardship is decidedly in favor of female students and athletes who should not be required to endure discrimination due to budget constraints at their university." *Id*.

### E.  Public Interest Served by Saving the Women's Swimming and Diving Team

Finally, the public interest would be served by maintaining the women's swimming and diving team and preventing sex discrimination under Title IX. "Promoting compliance with Title IX serves the public interest." *Barrett*, 2003 U.S. Dist. LEXIS 21095, at *50-51 (citation omitted); *see also Favia*, 812 F. Supp. at 585. The Eighth Circuit should also affirm such important public interests in preventing gender discrimination. Indeed, Congress presumably intended to serve the public interest with the passage of Title IX, and complying with it can only further that interest. There is no legally-viable counter-balancing interest that the UI can advance. The University of Iowa is a public institution, administered by public servants, and it is intended to serve the public good. *See Portz,* 401 F. Supp. at 869 (describing SCSU as a public institution established by the Minnesota State Legislature and administered by public servants, and therefore serving the public interest in not discriminating against women).

Balancing ostensible economic exigencies upon the backs of legally-protected rights of women athletes: these are not the interests that are served by public institutions such as University of Iowa – one that is steeped in the culture of a state that has long-valued women's participation in athletics. Rather, Iowans' interests, and their support for public institutions such as UI, align with their core values: the opportunity to compete, to practice, to work hard, to make one's team one's extended family, and to secure a life-long education that comes with an

experience on a varsity athletics team. Those are the interests of these students. Supporting these values in female athletes is certainly in the public interest.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a temporary restraining order barring the University of Iowa from eliminating the women's swimming and diving team before Plaintiff's request for a preliminary injunction can be heard. Plaintiffs further respectfully request that after a hearing, this Court issue a preliminary injunction prohibiting Defendants from eliminating the women's swimming and diving team as a varsity UI-sponsored intercollegiate team, or from eliminating any other women's intercollegiate teams unless, both before and after the elimination, equal athletic opportunities for women have been achieved. Plaintiffs further seek an order prohibiting Defendants from retaliating against Plaintiffs or class members in any manner for asserting their legal rights to equal opportunity and equal treatment.

Respectfully submitted,

**LAREW LAW OFFICE**

*/s/ James C. Larew*
James C. Larew   AT0004543
LAREW LAW OFFICE
504 E Bloomington St.
Iowa City, IA  52245
Phone: (319) 337-7079
Fax: (319) 337-7082
Email: James.Larew@LarewLawOffice.com
**ATTORNEY FOR PLAINTIFFS**

Copy to:

Kayla Burkhiser
Audra Drish
Meghan Jolly
Attorney General's Office
Hoover Building
1305 E Walnut Street
Des Moines, Iowa 50319
Phone: (515) 281-5164
Email:kayla.burkhiser@ag.iowa.gov
audra.drish@ag.iowa.gov
meghan.jolly@ag.iowa.gov
**ATTORNEYS FOR DEFENDANT UNIVERSITY OF IOWA**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon all parties to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on December 3, 2020.

By:
☐   Hand Delivered
☐   US Mail
☐   Fax
X   Email
X   Other-CM/ECF

Signature /s/ *Andrew Kramer*