**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | |
|---|---|
| **SAGE OHLENSEHLEN, CHRISTINA KAUFMAN, ALEXA PUCCINI, KELSEY DRAKE, MIRANDA VERMEER and ABBIE LYMAN,**<br><br>**Plaintiffs,**<br>**v.**<br>**UNIVERSITY OF IOWA, BRUCE HARRELD, in his official capacity as President of the University of Iowa, and GARY BARTA, in his official capacity as Director of the Department of Athletics at the University of Iowa,**<br><br>**Defendants.** | **CASE NO. 3:20-CV-00080-SMR-SBJ**<br><br><br>**DEFENDANTS' RESISTANCE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**COME NOW** Defendants the University of Iowa ("University" or "UI"), Bruce Harreld, in his official capacity as President of the University of Iowa, and Gary Barta, in his official capacity as Director of the Department of Athletics at the University of Iowa, and submit their Resistance to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.[1]

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 2

II.     STATEMENT OF FACTS .................................................................................... 4

III.    STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF ............................ 6

IV.     ARGUMENT ......................................................................................................... 7

    A.     Legal Foundation: Title IX and the Three-Part Test ............................... 7

    B.     Plaintiffs Can Show No Likelihood of Success on the Merits ................. 9

        1.     Plaintiffs' analysis is speculative, outdated, and not does not provide a factual basis to assert that UI will not comply with Prong One without women's swimming for the 2021-2022 academic year. ............................ 9

---

[1] The Court denied Plaintiffs' Motion for Temporary Restraining Order in its December 4, 2020 Order. (Doc. 13 (Order on TRO)).

1

2.     The University of Iowa expects to comply with Prong One for the 2021-2022 academic year.................................................................................. 15

3.     Even if the University did not comply with Prong One in a previous year, the Court should not enjoin the University's 2021-2022 compliance plan. ................................................................................................................ 20

4.     Even if the University does not comply with the Three-Prong Test, rugby has no likelihood of success on the merits because rugby is not a "viable" team for UI under Title IX. ...................................................................... 22

C.     Plaintiffs Cannot Show Irreparable Harm............................................................ 24

D.     Granting Plaintiffs' preliminary injunction would inflict a greater harm on the University and students than the status quo....................................................... 27

E.     Granting Plaintiffs' preliminary injunction is not in the public interest.............. 29

F.     Plaintiffs' claims are entirely speculative, not ripe for review, and should be dismissed in their entirety. ................................................................................. 29

G.     The Court Must Order Security. ......................................................................... 30

V.     CONCLUSION................................................................................................................ 30

## I.     INTRODUCTION

Plaintiffs[2] are members of the University of Iowa's Women's Swimming and Diving Team which is set for discontinuation after the 2020-2021 academic year.[3] The team will have a full opportunity to compete during this 2020-2021 academic year (if COVID allows), with its first meet scheduled for January 15, 2021. The team also continues to receive substantial financial support from the University this year. (*See* UI App. 3 (Barbara Burke Affidavit ("Burke Aff.") at ¶ 9)). Plaintiffs move for a preliminary injunction which would prevent UI from eliminating the swim team so that they can continue to swim competitively at UI after the 2020-2021 academic

---

[2] Plaintiffs Miranda Vermeer and Abbie Lyman are not members of the UI Women's Swimming and Diving team, but assert that their interests have not been accommodated because UI has failed to establish women's rugby and women's wrestling teams. (Doc. 9, pp. 5-7 (First Amended Complaint)).

[3] Bruce Harreld and Gary Barta, *Open Letter to the University of Iowa and Hawkeye Athletics Community*, August 21, 2020, *available at* https://hawkeyesports.com/news/2020/08/21/open-letter-to-the-university-of-iowa-and-hawkeye-athletics-community/ (last accessed December 10, 2020).

year.[4] (*See* Document 12 (Motion for Preliminary Injunction and Temporary Restraining Order), 12-1 (Brief in Support, hereinafter "TRO Brief")).

For all the bulk of Plaintiffs' Motion, this case is simple.  The only question before the Court is whether UI will comply with Title IX under Prong One of the Three-Prong Test (a/k/a the Three-Part Test) in 2021-2022 without the women's swimming team and three men's teams that are also being discontinued after the current 2020-2021 academic year. If so, Plaintiffs have no legal grounds upon which to enjoin UI's existing compliance plan. "Financially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates *become* substantially proportionate to their representation in the undergraduate population." *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 830 (10th Cir. 1993) (emphasis added).

Prong One compliance consists of an uncomplicated, objective mathematical formulation, which can dispositively demonstrate compliance. "An institution complies with Title IX by meeting one of [three] benchmarks; *the least stringent is benchmark one, which provides a safe harbor.*" *Chalenor v. Univ. of N. Dakota*, 142 F. Supp. 2d 1154, 1157-58 (D.N.D. 2000) (emphasis added); *aff'd* 291 F.3d 1042 (8th Cir. 2002).

Due to their dependence on untimely and incomplete data, Plaintiffs do not, and cannot, carry their burden of proof to show that UI will fail to comply with Prong One next year without the women's swimming team. Accordingly, Plaintiffs have offered no legal justification for injunctive relief. On the other hand, UI's compliance plan easily demonstrates that UI will be able

---

[4] Plaintiffs make no requests for injunctive or declaratory relief with regard to Defendants' purported past or present noncompliance with Title IX. (*See* Document 12-1).

to reach compliance with Prong One next year without women's swimming. (UI App. 3-5, Burke Aff., ¶¶ 13-23; UI App. 18-20, Lyla Clerry Affidavit ("Clerry Aff.") ¶¶ 8-16).

Universities have discretion to offer any sports they choose, or no sports at all, as long as they comply with Title IX. And when a university's sports offerings comply with Title IX, students have no legal right to any particular team that they may wish to add or preserve. *E.g., Gonyo v. Drake Univ.*, 837 F. Supp. 989, 994 (S.D. Iowa 1993) ("Title IX does not establish a right to participate in any particular sport in one's college and there is no constitutional right to participate in intercollegiate or high school athletics."); *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002) ("There is no constitutional right to participate in intercollegiate athletics."); *Equity in Athletics, Inc. v. Department of Education*, 639 F.3d 91, 109 (4th Cir. 2011) (there is no "property interest in intercollegiate athletic participation").

Here, faced with both public health and financial crises, administrators at UI made a reasoned and transparent decision to eliminate three men's and one women's sports teams. This Court should not impose Plaintiffs' preference for a swim team over the University's carefully-devised plans to both maintain its financial health and the civil rights of its students.

## II.      STATEMENT OF FACTS

On August 21, 2020, UI announced its decision to eliminate four varsity sports programs at the conclusion of the 2020-21 academic year: men's gymnastics, men's tennis, and men's and women's swimming and diving.[5] The decision was necessitated by the financial exigency created by COVID-19-related cancellations of competitions throughout the Big Ten Conference and the

---

[5] Bruce Harreld and Gary Barta, *Open Letter to the University of Iowa and Hawkeye Athletics Community*, August 21, 2020, *available at* https://hawkeyesports.com/news/2020/08/21/open-letter-to-the-university-of-iowa-and-hawkeye-athletics-community/ (last accessed December 9, 2020).

entire NCAA.[6] As a result of those cancellations and postponements, UI Athletics projected lost revenue of approximately $100 million and a $60 to $75 million dollar deficit for this fiscal year.[7] While being driven by a financial crisis of unprecedented proportions, UI carefully considered a variety of factors in determining which programs to eliminate.[8] Indeed, continued compliance with Title IX was a critical factor in making a final determination. (UI App. 3, Burke Aff. ¶ 10). With the cuts and various other cost-saving measures in place, UI estimated that it would save approximately $5 million in direct and indirect costs to support its athletic programs each year.[9]

Just weeks after UI made its announcement, Plaintiffs filed the instant lawsuit for alleged violations of Title IX of the Education Amendments of 1972 under three theories: equal participation, equal treatment, and equal scholarships. (*See* Docs. 1 (Complaint), 9 (First Amended Complaint)). Two months later, Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 12). Plaintiffs' motion seeks preliminary relief "concerning the reinstatement of the women's swimming and diving team at UI, which is scheduled for elimination for the next academic year, or 2021-2022." (*Id.* at ¶ 3). Though the anticipated harm—elimination of the women's swimming and diving team—will not occur until the fall of 2021, Plaintiffs cite the "immediate, time-limited and difficult decisions by team members whether: on the one hand to stay at the University . . . or, on the other hand, to start all over again by transferring to other colleges or universities where they can at least continue to participate in a sport to which they have committed years of training" as the basis for their request for preliminary injunction. (*Id.* at ¶ 4).

---

[6] *Id.*

[7] *Id.*

[8] *Id.* (noting that UI Athletics considered factors such as "sponsorship at the NCAA Division I level, impact on gender equality and Title IX compliance, expense savings, history of the sport at Iowa, engagement level, and other factors.").

[9] *Id.*

Plaintiffs also cite general harms to the "integrity of the team" such as UI's failure continue to recruit new swimmers. (*Id.*).

Plaintiffs' Title IX claims are based on a flawed review of outdated and incomplete data. (*See* UI App. 3-5, Burke Aff. ¶¶ 13-23; UI App. 18-20, Clerry Aff. ¶¶ 8-16). Despite submitting a motion which purports to address the anticipated dissolution of the women's swimming team *next* year, the majority of Plaintiffs' claims are couched in terms of UI's alleged *historical* noncompliance. Even if Plaintiffs' analysis was correct (it is not), it is untimely and has little bearing on UI's compliance position *next* year without women's swimming. The most recent Title IX compliance data (which Plaintiffs do not possess) puts UI in a strong compliance position heading into next year.  Ultimately, though, the data Plaintiffs require in order to show a substantial likelihood of success on the merits will not exist until next year. As such, with Plaintiffs only bringing forth erroneous speculation based on outdated and inapposite data, this Court should deny Plaintiffs' Motion for Preliminary Injunction and dismiss this case in its entirety.

### III.    STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

In evaluating a request for preliminary injunction, the Court wields "an awesome power" that necessarily requires it to "analyze the record carefully to determine whether Plaintiff has shown that it will be irreparably harmed absent the issuance of the requested relief." *Mediacom Communications Corp. v. Sinclair Broad. Group, Inc.*, 460 F. Supp. 2d 1012, 1017 (S.D. Iowa 2006). Issuance of a "preliminary injunction of *any* scope is 'an extraordinary remedy.'" *Rodgers v. Bryant*, 952 F.3d 451, 465 (8th Cir. 2019) (emphasis in original), quoting *Winter Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of such an injunction. *Baker Elec. Coop. Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

Courts in this circuit apply a four-part test—generally referred to as the *Dataphase* test— to determine whether preliminary injunctive relief is appropriate. *Sanborn Mfg. Co., Inc. v.*

*Campbell Hausgfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993), citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (1981) (en banc). The four *Dataphase* factors are: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Sanborn Mfg. Co., Inc.*, 997 F.2d at 485-86, citing *Dataphase Sys., Inc.,* 640 F.2d at 114. "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc.,* 28 F.3d at 1472, quoting *Calvin Klein Cosmetics Corp. v. Lenox Lab.,* 815 F.2d 500, 503 (8th Cir. 1987); *Dataphase*, 640 F.2d at 114. Applying the four-part *Dataphase* test, Plaintiffs are unable to demonstrate that a preliminary injunction is appropriate in this case, and their motion for preliminary injunction should be denied.

## IV.   ARGUMENT

### A.   Legal Foundation: Title IX and the Three-Part Test

Title IX directs that no person shall, on the basis of gender, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX does not specifically address intercollegiate athletics, but the U.S. Department of Education and multiple courts have developed a legal framework for equity pertaining to athletic participation opportunities.[10]

---

[10] Equitable participation opportunities is the only matter at issue in Plaintiffs' motion. (TRO Brief at 14.)

7

As the Eighth Circuit explained in *Chalenor*,[11] the Three-Part Test furnishes an institution with three alternative avenues to determine whether it provides equitable participation opportunities to "accommodate effectively the [athletic] interests and abilities of members of both sexes so as to comply with Title IX:

> "(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> "(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> "(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program."

*Chalenor*, 291 F.3d at 1045 (citing to 1979 Policy Interpretation, 44 Fed. Reg. 71413, 71418

(1979)).[12] "*If an institution has met **any** part of the three-part test, … the institution is meeting this*

---

[11] After UND discontinued its men's wrestling team in 1998, four wrestlers sued for alleged gender discrimination under Title IX.  The Eighth Circuit affirmed dismissal of those plaintiffs' complaint, holding that the team's elimination did not violate Title IX and, like UI has alleged in its contemporaneous motion to dismiss, "Plaintiffs neither allege nor provide facts supporting a [viable Title IX] claim."  *Chalenor v. Univ. of N.D.*, 142 F. Supp. 2d 1154, 1157-58 (D.N.D. 2000); *aff'd Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir. 2002).

[12] In 1979, the U.S. Department of Health, Education, and Welfare (the predecessor to the U.S. Department of Education) published a regulatory "Policy Interpretation" to "provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs." 44 Fed. Reg. 71413 (1979). The 1979 Policy Interpretation outlined a three-part test for determination of whether an educational institution has properly accommodated students of both sexes in its athletic programming.  44 Fed. Reg. at 71418.  The Eighth Circuit, among others, has adopted this test for use in Title IX athletics cases. *See Chalenor*, 291 F.3d at 1045.

*[equitable athletic participation] requirement.*" *Id.* at 1045-1046 (emphasis added) (citations omitted).

Courts in the Eighth Circuit have consistently applied the Three-Part Test to measure equitable athletic participation opportunities. *Chalenor*, 291 F.3d at 1046-47; *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 975 (D. Minn. 2016) (holding that the three-part test provides college athletics departments with "three different means of complying with Title IX" in a case challenging the elimination of women's sports teams); *Gonyo v. Drake Univ.*, 879 F. Supp. 1000, 1004 (S.D. Iowa 1995) (relying on the three-part test and granting summary judgment for defendant university). "An institution complies with Title IX by meeting one of [three] benchmarks; *the least stringent is benchmark one, which provides a safe harbor*." *Chalenor*, 142 F. Supp. 2d at 1157-58 (emphasis added); *aff'd* 291 F.3d 1042 (8th Cir. 2002). The legal metrics for determining whether athletic participation opportunities are "substantially proportionate" to enrollment under that first benchmark are described *infra* at pages 10 and 18.

### B.      Plaintiffs Can Show No Likelihood of Success on the Merits.

Under *Dataphase*, Plaintiffs bear the heavy burden of showing that they have a "substantial likelihood" or "fair chance" of prevailing on the merits of their claims. *See Sanborn Mfg. Co., Inc.*, 997 F.2d at 485-86, citing *Dataphase Sys., Inc.,* 640 F.2d at 114 (en banc); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Here, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits where their entire analysis is speculative and outdated, while UI's compliance plan demonstrates its strong compliance position heading into next year without women's swimming.

### 1.      Plaintiffs' analysis is speculative, outdated, and not does not provide a factual basis to assert that UI will not comply with Prong One without women's swimming for the 2021-2022 academic year.

Plaintiffs offer no non-speculative, factual basis for asserting UI does not comply with Prong One during the current 2020-2021 academic year, when the vast majority of UI teams' seasons have not yet begun—and when Plaintiffs continue to swim and prepare for their first competition of the UI 2020-2021 season in January 2021. And Plaintiffs certainly cannot provide any non-speculative, factual basis for asserting UI will not comply with Prong One next year, after the swimming program is discontinued, as Plaintiffs are required to do if they wish to enjoin that discontinuation.  Accordingly, Plaintiffs have offered no persuasive basis on which this Court could enjoin implementation of UI's legally-compliant plans next year.

Plaintiffs' analysis primarily depends on two sets of data: (1) outdated Equity in Athletics Disclosure Act reports ("EADA reports") from 2018-2019 and prior years, and (2) Plaintiffs' website searches of webpages designed for sports fans that have no relation whatsoever to UI's legal compliance metrics.  (TRO Brief at 20-21.)

a.      Historical EADA reports

Plaintiffs' analyses relying on EADA reports from 2018-2019 and prior years are simply not probative of the question currently before the Court: whether UI will comply with Prong One in 2021-2022 without the women's swimming team.[13] Even if Plaintiffs' EADA data were not outdated (TRO Brief at 21 (acknowledging "the reports to EADA are a few years behind")), EADA data is of limited utility, as EADA reports do not purport to reflect Title IX compliance.[14]

---

[13] *Contra* TRO Brief, pages 21- 23; App. 0091 et. seq., Lopiano Report.; App. 0035 et. seq., Makar Decl.

[14] Plaintiffs' own expert specifically disclaimed that "EADA reports are not Title IX compliance reports" (App. at 0101, Lopiano Report at 11) before proceeding to extensively rely on them in her analysis.

As noted above, Title IX compliance under Prong One involves a measurement of intercollegiate athletic participation opportunities. For purposes of Title IX, "participants" are "defined as those athletes:

> "a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and
> "b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
> "c. Who are listed on the eligibility or squad lists maintained for each sport, or
> "d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability."

1979 Policy Interpretation, 44 Fed. Reg. at 71,415; see also OCR's 1996 Clarification.[15]

The Equity in Athletics Disclosure Act imposes its own legal requirements on schools, and those EADA requirements differ from Title IX in several, material ways.  The two laws require schools to measure similar things, but in different ways. For example, page 31 of the 2019 EADA Manual[16] _requires_ schools to report participants under at least four metrics that differ from Title IX's requirements:

1. "Male practice players … should be counted as participants on the women's team." (This EADA requirement is starkly inconsistent with Title IX; yet, it is _required_ by the EADA.)
2. "Participants are students who … Receive athletically related student aid." (Athletic aid can only be a stand-alone metric under Title IX if the person is otherwise medically unable to participate.)
3. "Include: Fifth-year team members who have already received a bachelor's degree." (This cannot be a stand-alone metric under Title IX.)
4. "Do not include: Individuals who joined the team after the day of the first scheduled contest."  (This EADA requirement is also inconsistent with Title IX.)

---

[15] U.S. Dep't of Educ., Office for Civil Rights ("OCR"), _Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test_ (Jan. 16, 1996) (the "1996 Clarification"), _available at_ https://www2.ed.gov/about/offices/list/ocr/ docs/clarific.html (last accessed December 11, 2020).

[16] The 2019 EADA Manual is available at https://surveys.ope.ed.gov/athletics2k20/wwwroot/documents/2019_EADA_Users_Guide.pdf.

(*See* UI App. 19-20, Clerry Aff. at ¶ 16 (citing to EADA Manual)).

Because EADA data does not purport to reflect Title IX compliance, Plaintiffs' reliance on it is problematic.  To the extent Plaintiffs attempt to cast UI's EADA counts as erroneous (or worse), they have offered no non-speculative basis to do so.  But even if they did, such an analysis of EADA data is not probative of UI's Title IX compliance.  And with UI's 2021-2022 Title IX compliance at issue on Plaintiffs' motion—whether UI may discontinue women's swimming *and* comply with Prong One next year—the fact that Plaintiffs' EADA analysis relies on data dating back to 2018-2019 and earlier makes it wholly unreliable for assessing Plaintiffs' motion.

### b.   Website rosters

Plaintiffs' purported Title IX analyses, based on assessments of website rosters, lack credibility.

UI maintains athletics websites for people who follow their teams. (*See* UI App. 67, Andrew Carter Affidavit ("Carter Aff.") ¶¶ 11-14). While UI's athletics websites typically contain team rosters, they have no relationship whatsoever to UI's official count of Title IX participants. (UI App. 19, Clerry Aff. at ¶¶ 12-13). The website rosters are maintained by UI communications staff, often without even input from coaches (*id*.; UI App. 66-67, Carter Aff. ¶¶ 11-14), and certainly do not purport to reflect legal compliance.  The website rosters are not static, and are typically updated as student-athletes may leave the team. (*Id.*). Moreover, redshirts, injured student-athletes, and other Title IX participants may be omitted from the website. (*Id.*).  Those decisions are made by communications staff. (*Id.*). Archived website rosters exist, but sometimes one year's participants are deleted as the website is updated to prepare for the ensuing season, or other errors are made.  For example, Rowing Coach Andrew Carter observed that five starters from

UI's 2018-2019 Big Ten Championship team are not currently listed on the team's 2018-2019 website roster. (UI App. 67, Carter Aff. ¶ 14).

In light of those facts, Plaintiffs' attempts to assert that any *current* glimpse at a website roster should mirror a school's Title IX count is egregiously presumptive. (TRO Brief, pages 21-22; App. 0101-0112, Lopiano Report at 11-22).  Moreover, to the extent Plaintiffs attempt to assert that website rosters can be used to assess UI's current (2020-2021) Title IX participants, that assertion denies the reality of the current state of the world.  During the current-year COVID environment—when most sports' seasons have not yet started, when UI's website communications staff has been downsized and furloughed and has not been tasked yet with updating all teams' website rosters (UI App. 5, Burke Aff. ¶ 23)—it is not credible for Plaintiffs to assume that current website roster lists are supposed to mirror Title IX compliance lists, *even if* website communications staff were responsible for legal compliance.  (They are not.)

Plaintiffs' expert referred to her own 2020-2021 website roster analysis as "highly suspect" because "roster numbers …could not be known for all fall and winter sports" as well as spring 2021 sports.[17] (App. 0101, Lopiano Report at 11).  Yet, that did not stop Plaintiffs from presenting such poorly-designed analyses to the Court.  All "expert" opinion relying on website rosters for extrapolated Prong One compliance assessments should be stricken.

Plaintiffs' analyses of *older* website rosters are no more reliable or credible.  Plaintiffs take issue with how many female rowers they count today on UI's 2018-2019 website roster (TRO Brief at 21; Lopiano Report. at 15), but that has no bearing on UI's 2018-2019 legal compliance with Prong One. According to the team's head coach, UI had 94 female student-athlete participants on the women's rowing team in 2018-2019.  (UI App. 66-67, Carter Aff. ¶ 7, 11-14).  Plaintiffs'

---

[17] Current-year enrollment is also anomalous due to COVID.  (UI App. 18, Clerry Aff. ¶ 7).

attempt to persuade the Court that the correct count should instead be 48—because they recently looked up a website roster on the internet—is not credible.

Plaintiffs' website roster analyses cannot form the basis for injunctive relief.

c.    Conspiracy theories

Plaintiffs' remaining conspiracy theories about UI's allegedly-improper Title IX counts cannot survive *Daubert* scrutiny.  (TRO Brief at 22; Lopiano Report. at App. 0102, et. seq.).  For example, Plaintiffs' expert was bold enough to state: "I opine that UIowa has been consistently over counting female participants … through 2018-19 [w]ithout being able to examine UIowa NCAA Squad Lists, NCAA Hour Limitation Records and actual competition records." (App. 0103 (punctuation omitted)). The lack of any relevant records (which are solely in UI's possession at this time) was not a deterrent on the path to "expert" assertions.

That type of baseless speculation was recently rejected by a fellow Eighth Circuit district court.

> "Plaintiffs also alleged that UND failed to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students due to "its improper calculations of bona fide opportunities for female participation in intercollegiate athletics, and its over-reporting of the number of female athletes on teams." This allegation is purely speculative. The Plaintiffs have not alleged what UND's calculations are regarding athletic opportunities, how UND is improperly calculating opportunities for women, how UND is over-reporting the number of female athletes on teams . . . . Without any further facts to support this allegation, the Plaintiffs have failed to assert a right to relief above the speculative level.

*Berndsen v. N.D. Univ. Sys.*, 395 F. Supp. 3d 1194, 1200 (D.N.D. 2019) (citing *Twombly* and *Iqbal* and dismissing Plaintiffs' complaint); see also April 25, 2018 letter from OCR to UI (relied on by Ms. Lopiano (App. 0124) (in which the Office for Civil Rights ("OCR")—the federal agency tasked with Title IX enforcement—affirmed the accuracy of UI's Prong One counting methodology and compliance).

Plaintiffs' brazen speculation should be stricken, as it certainly cannot provide any evidentiary basis for asserting UI will not comply with Prong One in 2021-2022 once women's swimming is discontinued. Accordingly, it offers no basis for enjoining UI's 2021-2022 compliance plan.

### 2. The University of Iowa expects to comply with Prong One for the 2021-2022 academic year.

Plaintiffs acknowledge that they bear the burden of demonstrating that UI will be unable to comply with Prong One during the 2021-2022 academic year in order to enjoin the elimination of the women's swimming team.[18] (TRO Brief at 16). At this point in time, neither side can say with certainty whether UI will comply with Prong One by the conclusion of the 2021-2022 academic year, but courts have acknowledged that "[f]inancially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates *become* substantially proportionate to their representation in the undergraduate population." *Roberts,* 998 F.2d at 830 (emphasis added). As described below, based on actual Title IX participation data from the most recent year available—which Plaintiffs do not possess— UI expects to start the fall 2021 semester from a position of Title IX compliance or, at worst, very close to compliance with a small disparity that could be easily managed if needed to achieve

---

[18] *Roberts,* 998 F.2d at 831 ("Because a Title IX violation may not be predicated solely on a disparity between the gender composition of an institution's athletic program and the gender composition of its undergraduate enrollment . . . plaintiff must not only show that the institution fails on the first benchmark of substantial proportionality but also that it does not fully and effectively accommodate the interests and abilities of its women athletes. Further, an institution would be hard-pressed to establish the full and effective accommodation of the interests and abilities of its women athletes in the abstract. The ultimate burden must lie with the plaintiffs to show that they have been 'excluded from participation in, [or] denied the benefits of' an athletic program 'on the basis of sex.'"), citing *Cohen,* 991 F.2d at 897.

compliance during the 2021-2022 academic year. UI's evidentiary basis for its analysis stands in sharp contrast to Plaintiffs' speculative case, discussed *supra*.

Under Prong One of the Three-Prong Test, an educational institution may demonstrate compliance with Title IX where "intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments[.]" 1979 Policy Interpretation, 44 Fed. Reg. at 71418; *Chalenor*, 291 F.3d at 1045. Compliance under this proportional participation test creates a "safe harbor" for universities. *Gonyo,* 879 F. Supp. at 1004; *Berndsen*, 395 F. Supp. 3d at 1198. "Participation opportunities" are measured by squad or eligibility lists maintained for each sport and factual analysis of who participated and received other institutionally-sponsored support during each sport's competitive season. 1979 Policy Interpretation, 44 Fed. Reg. at 71,415; 1996 OCR Clarification.

Prong One's "substantial proportionality" metric does not require an educational institution to offer athletic opportunities in quantities that precisely mirror the percentage of enrolled male and female students. Rather, the analysis requires consideration of the individual facts of each case, the "institution's specific circumstances and the size of its athletics program." *Portz,* 196 F. Supp. 3d at 975, citing *Ollier v. Sweetwater Union High School Dist*., 768 F.3d 843 (9th Cir. 2014). As a result, some deviation is acceptable. *See Portz*, 196 F. Supp. 3d at 975 (collecting cases which discuss various percentages of deviation and their resulting compliance or noncompliance). "[A] deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate." *Id.* (citations omitted).

In the summer of 2020, as UI Athletics administrators contemplated the plan to eliminate three men's teams and the women's swimming team, they relied on Title IX compliance data from the just-completed 2019-2020 year. (UI. App. 3-4, Burke Aff. ¶¶ 13-14; UI App. 16, University of

Iowa Prong One Compliance Projection for Academic Year 2021-2022 ("Prong One Projection")).

Utilizing squad lists for each sport and other internal information from which UI could accurately

and factually assess who participated and received other institutionally-sponsored support during

each sport's most recent competitive season, UI engaged in a factual analysis of UI's 2019-2020

Prong One compliance.[19] (UI App. 18-19, Clerry Aff. ¶¶ 8-10; UI App. 3-4, Burke Aff. ¶¶ 13-14).

UI discovered that, by removing the men's tennis, gymnastics, and swimming teams as well as the

women's swimming team from the 2019-2020 calculation, UI would comply with Prong One

without any further adjustments. (UI App. 4, Burke Aff. ¶¶ 15-18; UI App. 18-19, Clerry Aff. ¶

10). Thus, as long as the 2021-2022 compliance factors remain comparable to UI's final and

accurate 2019-2020 data, UI would occupy a compliance position without those four teams. (*Id.*).

In other words, UI's initial step towards 2021-2022 compliance will not require any roster growth

or restrictions – UI will be substantially proportionate in fall 2021 if student-athlete participation

rates on the remaining teams stay *as they actually were in 2019-2020*. Of course, UI assumes that

some factors will change over the course of 2021-2022, but because UI's starting point is a point

of projected compliance, UI should be able to easily adjust rosters over the course of 2021-2022

to ensure it achieves Prong One compliance without the four discontinued teams. (UI App. 4-5,

Burke Aff. ¶¶ 19-21).

According to UI's projections, after the elimination of the men's gymnastics, men's tennis,

and men's and women's swimming teams—and using the same participant counts for all remaining

teams that they *actually* had in 2019-2020—UI Athletics expects to have approximately 376

---

[19] Plaintiffs have not had access to any of this 2019-2020 information in conducting their analyses
(UI App. 3-4, Burke Aff. ¶ 13) and promulgating their ill-informed complaint and motion asserting
UI's non-compliance "relying merely on records and documents that are in public domain [sic.]."
(TRO Brief, Doc. 12-1, at 30.)

female student-athletes and approximately 336 male student-athletes in 2021-2022. (UI App. 4, Burke Aff. ¶ 15; *see also* UI App. 18-19, Clerry Aff. ¶ 10).  As a result, UI expects to provide 47.2% of its athletic opportunities to male student-athletes and 52.8% of its athletic opportunities to female student-athletes. (*Id.* at ¶ 16). This compares favorably to UI's 2019-2020 full-time undergraduate enrollment, which was 54.2% female,[20] leaving a mere 1.4% difference between the number of athletic opportunities offered to female student-athletes, without yet making *any* roster adjustments to other sports. (*Id.* at ¶ 17; UI App. 16, Prong One Compliance).

|  |  | S-A Count | % | FT U'grad Count | % | Disparity % |
|---|---|---|---|---|---|---|
| **P.1 Ratios:** | **m:** | 336 | 47.2% | 9,733 | 45.8% | 1.4% |
|  | **w:** | 376 | 52.8% | 11,501 | 54.2% | -1.4% |

Accordingly, UI expects to start 2021-2022 from a position of Title IX compliance or, at worst, very close to compliance with a small disparity that could be easily roster-managed if needed to achieve compliance. (UI App. 4, Burke Aff. ¶ 17); *see Portz*, 196 F. Supp. 3d at 975.

The 1.4% gap is the equivalent of only 21 additional athletic opportunities that UI could offer to female student-athletes in 2021-2022 before reaching perfect 0.0% proportionality. By comparison, the UI women's swimming team had 35 participants last year.  (UI App. 4, Burke Aff. ¶ 18)). That team could not "fit" back within the projected 21-person gap; doing so would cause *men* to become the under-represented gender. (UI App. 4, Burke Aff. ¶ 18).  While a 1.4% disparity is likely in compliance with Title IX, which requires substantial proportionality and not perfection, UI Athletics expects to engage in some roster management during the upcoming year to close the gap even further. (*Id.* ¶¶ 19-21.)

---

[20] UI expects its 2021-2022 enrollment rates to be comparable to its pre-COVID 2019-2020 enrollment rates.  Due to the impact of COVID, 2020-2021 is expected to be anomalous. (UI App. 18, Clerry Aff. ¶ 7). COVID certainly provides legitimate and non-discriminatory justifications for fluctuations in the 2020-2021 data.

To determine whether a projected deviation of 21 athletic opportunities is small enough to comply with Title IX under a Prong One analysis, the Court may utilize two different methods utilized by OCR.[21]  Most commonly, "OCR may consider the average size of teams offered for the underrepresented sex" to assess whether a school's athletics opportunities are "substantially" proportionate.  1996 OCR Clarification. UI's average women's squad size in 2021-2022 is expected to be 31.3. (UI App. 16, (Prong One Projection)). Since the "gap" of athletic opportunities needed for exact proportionality is smaller than an average squad, UI expects to comply with Prong One under this metric. *See Portz,* 401 F.Supp.3d at 856-57, citing 1996 OCR Clarification. Alternately, substantial proportionality is reached "when the number of [additional] opportunities … would not be sufficient to sustain a viable team." 1996 OCR Clarification.  A viable team is "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *See Portz,* 401 F.Supp.3d at 857, citing 1996 OCR Clarification. Here, Plaintiffs' fundamental claim is that their swimming team remains a viable team. (*See* Doc. 12, p. 4). However, its squad size last season was 35. (UI App. 4, Burke Aff. ¶ 18)). A 35-person swimming team, even if viable, cannot fit within a 21-person Prong One gap; doing so would cause *men* to become the under-represented gender at UI.[22]  (*Id.*) As a result, UI expects to comply under this metric as well.

Though UI expects to comply with Prong One in 2021-2022 based on its *actual* 2019-2020 Prong One compliance data, which is the most recent data that exists, UI cannot offer this Court a

---

[21] 1996 OCR Clarification, *supra* note 15.

[22] The average size of a NCAA Division I swimming team is 29.6 student-athletes, suggesting that a much smaller swim team would not be viable.  NCAA, *Sports Sponsorship and Participation Rates Report 1981-82 – 2018-19* at p. 253, available at https://ncaaorg.s3.amazonaws.com/research/sportpart/2018-19RES_SportsSponsorshipParticipationRatesReport.pdf (last accessed December 10, 2020).

precise accounting of the number of male and female students who will enroll for the fall 2021 semester, nor can it predict how many students will qualify as "participants" during each sport's 2021-2022 season. More importantly, since Plaintiffs carry the burden of proof on this issue, Plaintiffs cannot, with any certainty, demonstrate that UI will be out of compliance with Title IX in 2021-2022 unless women's swimming's discontinuation is enjoined.[23] Given the speculative and outdated nature of Plaintiffs' "proof," this Court should not grant Plaintiffs' injunctive relief.

### 3. Even if the University did not comply with Prong One in a previous year, the Court should not enjoin the University's 2021-2022 compliance plan.

Though Plaintiffs opine on UI's Title IX compliance in past years at great length in their brief and supporting documentation, the issue before the Court is whether UI should be enjoined from enacting its plans to comply with Title IX in 2021-2022. Even if Plaintiffs are able to somehow show technical, non-numeric compliance under Prong One in some prior year, this Court should not enjoin UI's 2021-2022 compliance plan. As demonstrated above, once UI implements programmatic changes by eliminating three men's teams and one women's team and engages in its typical roster management process, UI will achieve numeric compliance under Prong One. (UI App. 3-5, Burke Aff. ¶¶ 11-21; UI App. 16 (Prong One Compliance)). "[T]itle IX does not require that a school pour ever-increasing sums into its athletic establishment," and "[f]inancially strapped institutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in

---

[23] Because the majority of UI's teams have not yet had their first day of 2020-2021 competition due to COVID-induced delays, UI cannot provide the Court with 2020-2021 Title IX compliance statistics either. (UI App. 5, Burke Aff. ¶ 22; UI App. 19, Clerry Aff. ¶ 11). Any attempt by Plaintiffs to claim that UI is currently out of compliance with Title IX is entirely speculative until final 2020-2021 competitions have been completed. Plaintiffs certainly cannot show a substantial likelihood of success on the merits when the basic data required to calculate UI's 2020-2021 compliance does not yet exist.

the undergraduate population." *Roberts*, 998 F.2d at 830, 835 n. 9, citing *Cohen*, 991 F.2d at 989-99 n. 15.

Student-athletes, including Plaintiffs, have no right to any particular team as long as the University complies with Title IX's Three-Prong Test in the aggregate.[24] Courts cannot act as "super athletics directors," substituting their preferred teams (or Plaintiffs' preferred teams) for the university's preferred teams. *Grandson v. University of Minnesota*, 272 F.3d 568, 573 (8th Cir. 2001); *see Mayerova v. E. Mich. Univ.*, No. 19-1177, 2019 U.S. App. LEXIS 9373, at *2-4 (6th Cir. Mar. 28, 2019) ("[T]itle IX requires equality between men's and women's teams, not that certain teams (say women's softball) be reinstated rather than other sports teams be created, supported, or expanded") (dissolving district court injunction that had stayed the elimination of the softball team). Here, with UI's evidence demonstrating that UI expects to comply with Prong One following the elimination of the women's swimming team and the three men's teams, the Court cannot substitute Plaintiffs' preference for reinstating the swimming team over UI's carefully made decision to eliminate it.

---

[24] *See Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir. 1993) ("Title IX does not require institutions to fund any particular number or type of athletic opportunities"); *Boucher v. Syracuse University*, 164 F.3d 113, 116 (2d Cir. 1999) ("compliance [with Title IX] might well be achieved by the elevation [of resources devoted to] one sport and not [an]other"); *Mayerova v. Easter Michigan University*, No. 19-1177 (6th Cir. March 28, 2019) ("[T]itle IX requires equality between men's and women's teams, not that certain teams (say women's softball) be reinstated rather than other sports teams be created, supported, or expanded."); *Neal v. Board of Trustees of California State Universities*, 198 F.3d 763, 770 (9th Cir. 1999) ("If a university wishes to comply with Title IX by leveling down programs instead of ratcheting them up . . . Title IX is not offended."); Roberts *v. Colorado State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993) (in a class action, "an order specifically requiring an institution to maintain a softball team [may go] further than necessary to correct a violation of Title IX"); *Berndsen v. North Dakota University System*, 395 F. Supp. 3d 1194 (2019) ("The assumption that eliminating an athletic program . . . leads to disproportionate opportunities is misguided."); *Miller v. Univ. of Cincinnati,* 241 F.R.D. 285, 290 (S.D. Ohio 2006) ("compliance could conceivably be achieved, in part, by taking away the allegedly paltry resources allocated to women's rowing and bestowing them along with new resources on other women's varsity sports…").

**4.    Even if the University does not comply with the Three-Prong Test, rugby has no likelihood of success on the merits because rugby is not a "viable" team for UI under Title IX.**

Aside from swimming, Plaintiffs' TRO Brief makes no allegation that any other team could conceivably fit within UI's Prong One calculation besides rugby. However, rugby is not a "viable" team for UI to add under Title IX metrics. Thus, Plaintiffs have failed to carry their burden of proof to assert a potential Prong One violation.

Under both Prong One and Prong Three, UI complies with Title IX as long as there is not a "viable" team to add. Under Prong One, substantial proportionality is reached "when the number of [additional] opportunities … would not be sufficient to sustain a *viable* team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." 1996 OCR Clarification (emphasis added). In determining Prong Three compliance,[25] "OCR will consider whether there is (a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team." 1996 OCR Clarification.[26]  This language matches.  In this way, there is a confluence between Prong One and Prong Three: a school complies with Prong One when no "viable" team would fit within its Prong One gap, with "viability" determined under the Prong Three standards.

---

[25] Plaintiffs' Prong Three analysis (TRO Brief at 26) errs in its temporal focus. UI concedes that it will not meet swimmers' athletic interests under Prong Three *next* year, after swimming is discontinued, but that has no bearing on whether UI *currently* complies with Prong Three while the swimmers' athletic interests remain accommodated. Plaintiffs have not offered sufficient, factual allegations that UI does not comply with Prong Three this year. *See Roberts*, *supra* note 18 (burden of proof on Plaintiffs to demonstrate a violation of the Three-Part Test).

[26] *See also* 1979 Policy Interpretation, 44 Fed. Reg. 71413, 71418 at Sections C.4.a.2. and C.4.b.2. (1979) (a sport addition may be required when a school does not comply with Prong One and when "[t]here is sufficient interest and ability among the members of the excluded sex to sustain a *viable* team and a reasonable expectation of intercollegiate competition for that team.") (emphasis added).

Under Prong Three, a team is "viable" where there is interest, ability, and "a reasonable expectation" of competition for the team.[27] 1996 OCR Clarification. The last factor is dispositive here.[28] Just as a skiing team would not be viable in Florida based on lack of regional competition, rugby is not a viable sport in Iowa due to the lack of NCAA competition for a potential team.

Nationwide, there are only 21 NCAA women's rugby programs, with 16 of them clustered approximately 1,000 miles away in the Northeast (CT, MA, ME, NH, NY, RI, VT).[29] The only NCAA rugby program within approximately 550 miles of UI is Division II Notre Dame *College* in Ohio.[30]  There are only eight NCAA Division I programs nationwide, and none at a state school like UI.[31] Title IX does not require UI to travel to Long Island University, Sacred Heart University (CT) and to Ivy League schools just to find scant NCAA Division I competition.  *Portz v. St. Cloud University*, 401 F. Supp. 3d 834, 859 (D. Minn. 2019) ("In evaluating whether a reasonable expectation of competition exists, the Court will look at available competitive opportunities offered by schools in the institution's geographic area[.]"), *appeal filed*, *Portz v. St. Cloud State University*, No. 19-2921 (8th Cir. 2019), citing 1996 OCR Clarification.

In short, UI would not have "a reasonable expectation of competition" for a new NCAA women's rugby team, so rugby is not a "viable" option that can be forced upon UI under any provision of Title IX.

---

[27] "In evaluating available competition, OCR will look at available competitive opportunities in the geographic area in which the institution's athletes *primarily* compete." (1996 OCR Clarification) (emphasis added).

[28] Accordingly, Plaintiffs' descriptions of alleged student interest in rugby (TRO Brief at 26-27) are not germane to the legal analysis. Further, the potential existence of club rugby teams (App. 0022) is inapposite to the analysis of whether a UI NCAA-level rugby team would have sufficient intercollegiate NCAA competition.

[29] (UI App. 5, Burke Aff. ¶ 24). *See also* NCAA Directory, *available at* https://web3.ncaa.org/directory/ (last accessed December 11, 2020).

[30] *Id.*

[31] *Id.*

### C.    Plaintiffs Cannot Show Irreparable Harm.

Here, Plaintiffs have suffered no legally-cognizable injury, and certainly no irreparable harm. There is little doubt that Plaintiffs are greatly disappointed in the decision to eliminate the UI women's swimming team, but there is no "property interest in intercollegiate athletic participation." *Equity in Athletics, Inc.*, 639 F.3d at 109; *see Miami Univ. Wrestling Club*, 302 F.3d at 615 ("There is no constitutional right to participate in intercollegiate athletics.").

Moreover, student-athletes, including Plaintiffs, have no right to a given team (such as swimming) if the university complies with Title IX's Three-Prong Test in the aggregate. *Gonyo*, 837 F. Supp. at 994 ("Plaintiffs' desire to complete their college education and intercollegiate wrestling at Drake, the school of their choice, is understandable, but Title IX does not establish a right to participate in any particular sport in one's college") (dismissing discontinued team's lawsuit seeking reinstatement and damages). Plaintiffs' only possibility of legally-cognizable injury is tied to Plaintiffs' likelihood of success on the merits – i.e., if the elimination of the swimming team next year would violate their civil rights.  But, absent a civil rights violation, they have no right to "participate in any particular sport in one's college[.]" *Id.*; *see Mayerova*, 2019 U.S. App. LEXIS 9373, at *2-4 (6th Cir. Mar. 28, 2019) ("[T]itle IX requires equality between men's and women's teams, not that certain teams (say women's softball) be reinstated rather than other sports teams be created, supported, or expanded");[32] *Roberts*, 998 F.2d at 833 ("an order specifically requiring an institution to maintain a softball team [may go] further than necessary to correct a violation of Title IX"); *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006) ("compliance could conceivably be achieved, in part, by taking away the allegedly paltry

---

[32] Plaintiffs acknowledge this recent 6th Circuit opinion, in which the Court reversed an injunction and permitted the university to eliminate its softball team because the university "provide[d] a Title IX-compliant proposal for the start of the [next academic] year."  TRO Brief at 25, n.16.

resources allocated to women's rowing, and bestowing them along with new resources on other women's varsity sports…"); *Berndsen*, 395 F. Supp. 3d at 1200 (no right to a women's hockey team when Plaintiffs cannot show that the university will violate Prong One after its discontinuation).

Further, Plaintiffs' claims are largely for future injuries. Plaintiffs claim that they *will* suffer irreparable harm if UI is not enjoined from moving forward with its plans to comply with Title IX in the upcoming 2021-2022 academic year. (Doc. 12-1, pp. 31-33). Plaintiffs make various speculative claims about being forced to "uproot their lives," losing their close-knit relationships with their coaches and teammates, as well as the difficulties they will face should they need to transfer to another university to continue their athletic careers. (*Id.*). In their affidavits, Plaintiffs also cite general harms to the UI swimming and diving program and its coaches, such as UI being unable to recruit high school students or losing coaches to new jobs at different universities.[33] However, no Plaintiff will be forced to "uproot their lives" because they are free to stay at UI and enjoy the same level of athletic grant money that they are receiving this year. (*See* Open Letter, *supra* note 3). Plaintiffs are also free to transfer to another university to compete in intercollegiate swimming and diving. While being sensitive to the personal disruption involved in such a choice, there is no cognizable legal right being lost. *See Equity in Ath. v. Dep't of Educ.*, 291 F. App'x 517, 521 (4th Cir. 2008) (court declining to find irreparable harm where "the students were free to transfer to other colleges offering their chosen sport, which some students had done, so that those athletes were still able to compete at the college level."); *Gonyo*, 837 F. Supp. at 993-94 (finding on denial of a motion for preliminary injunction that harm to plaintiffs upon elimination of the college wrestling team was "not in the nature of harm to their legal rights" where plaintiffs retained

---

[33] Plaintiffs do not have standing to make claims on behalf of the University or its employees.

their athletic scholarships and were free to transfer to other colleges in pursuit of athletic opportunities). As long as UI complies with Title IX, it may sponsor any combination of teams that best fit its need and goals. *See Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 286 (S.D. Ohio 2006).[34]

Moreover, the NCAA has granted all current NCAA athletes an extra season of eligibility due to the challenges of the current COVID environment. (UI App. 30-32, NCAA COVID Action Chart, pp. 2-4). Whereas Plaintiffs in older cases may have argued that a loss of one season's eligibility caused them damages due to the "fleeting" nature of college athletics,[35] that is not the case here. *See Mayerova*, 346 F.3d at 997-98 (explaining that the "calculus is different when … plaintiffs have demonstrated that their right to be free from discrimination under Title IX has likely been violated"). Under the NCAA's current transfer rules and extension of all student-athletes' eligibility for an extra year, all swimmers are free to transfer and compete next year at another university without risking any loss of a season of eligibility.

---

[34] This point was further illustrated in *Miller v. University of Cincinnati*. That case began with inequitable treatment claims brought by members of the University of Cincinnati's women's rowing team related to UC's allegedly inferior boathouse facility, inferior equipment, and other issues. *E.g., Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 286 (S.D. Ohio 2006) (early opinion certifying class of rowing team members). However, the case grew into an equitable opportunity case after UC eliminated the rowing team altogether under an assertion that UC would continue to comply with Part One afterwards. In the end, the Court dismissed all of the rowers' claims, holding that a team with no right to exist (due to Cincinnati's compliance with Part One after the rowing team's elimination) has no right to complain about alleged inequitable treatment after its (permissible) termination. *Miller v. Univ. of Cincinnati*, No. 1:05-cv-764, 2008 WL 203025, at *5-*8 (S.D. Ohio Jan. 22, 2008) (granting UC's motion for summary judgment and terminating the case).

[35] *See Portz v. St. Cloud State University*, 196 F. Supp. 3d 963, 973-73 (D. Minn. 2016); *Mayerova v. Eastern Michigan University*, 346 F.3d 983 (E.D. Mich. 2018) (irreparable harm to the women student-athletes in denial of opportunity to develop personal virtues and physical or mental well-being); *Biediger v. Quinnipiac University*, 616 F.Supp.2d 277, 297-298 (D. Conn. 2009) (irreparable harm in losing the opportunity to participate in their chosen sport on an uninterrupted basis). Notably, these types of harms have been found to be "irreparable" only in cases where plaintiffs have been able to demonstrate a substantial likelihood of success on the merits.

As a result, Plaintiffs cannot show any legally-cognizable injury, much less irreparable harm. Their motion for preliminary injunction should be denied.

### D.    Granting Plaintiffs' preliminary injunction would inflict a greater harm on the University and students than the status quo.

Contrary to the lack of irreparable harm shown by Plaintiffs, UI will suffer significant harm if the court grants an injunction "ordering Defendants not to eliminate the women's swimming and diving team." (Doc. 12, p. 6).  The third *Dataphase* factor—the balance between any irreparable harm and "the injury that granting the injunction will inflict on other interested parties," *Sanborn Mfg. Co, Inc.*, 997 F.2d at 485-86—weighs in favor of denying the requested injunction.

If UI were prohibited from eliminating the women's swimming and diving team, it would add an estimated additional cost of $1.1 million in annual expenses to operate the program in Fiscal Year 2022. (UI App. 56, Davies Aff. ¶ 15). That amount is estimated to increase approximately 2% to 3% each year. (*Id*.). This is not an insignificant sum as UI seeks to manage through an unprecedented financial crisis with significant lost athletic revenue. Prohibiting UI from engaging in this carefully crafted response would have significant ripple effects as it would be forced to consider other programs to eliminate or costs to cut. (*Id.*). And even the process of revising and recreating its planned response would add additional cost and delay as UI seeks to manage in this challenging crisis. [36]

---

[36] Under the purely-statistical Part One proportionality test, Eighth Circuit Courts have held that the parties' "motivation," i.e., their subjective interests in the discontinued team, "is not a material issue of fact" and thus it could not preclude entry of judgment as a matter of law in favor of the university.  *Chalenor v. Univ. of N. Dakota*, 142 F. Supp. 2d 1154, 1156 (D.N.D. 2000); *aff'd Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042 (8th Cir. 2002). Legally speaking, Iowa can add, drop, or change teams at its discretion.  The COVID budgetary crisis provides *context* for UI's decision, but it is not part of the legal analysis. Mr. Zimbalist's speculative and erroneous financial analysis is wholly immaterial. (TRO Brief at 27-28; App. 166-281, Zimbalist Decl.  *Compare* UI App. 55-56, Davies Aff. ¶¶ 5-15).

In addition to the fiscal harm to UI, an injunction would interfere with UI's self-governance in managing its athletic program. The decision to eliminate the women's swimming team was not made in isolation, but as a part a multi-sport reduction also eliminating men's gymnastics, men's tennis, and men's swimming.[37] An injunction prohibiting one part of the plan would thwart UI's balancing of Title IX compliance, NCAA sponsorship, student engagement, fiscal savings, and other factors.[38]

A preliminary injunction would also harm the student-athletes who are considering whether to continue (or to start) participating in the women's swimming program by making the future of the program *less certain*. The University announced the elimination of the program four months ago—and a year in advance of the program's elimination. This ensured that student-athletes had time to make decisions about transferring to another school if they chose to do so. And it ensured that high school students could make more informed college selection decisions, so as not to select the University and then be surprised by the elimination of the program. Issuing a preliminary injunction now would upset this status quo. It would make it even more challenging for student-athletes to decide whether to transfer or stay at UI because the length of any preliminary injunction is necessarily uncertain. But given the University's likelihood of eventual success on the merits, the injunction will likely end. The student-athletes then would be in the same situation as Plaintiffs now.

For these reasons, the balancing of the relevant harms weighs towards denying the preliminary injunction. *See Mayerova*, 2019 U.S. App. LEXIS 9373, at *2-4 (dissolving a

---

[37] Harreld and Barta, https://hawkeyesports.com/news/2020/08/21/open-letter-to-the-university-of-iowa-and-hawkeye-athletics-community/; (UI App. 3, Burke Aff. ¶¶ 7-8; UI App. 55-56, Davies Aff. ¶¶ 5-15).
[38] *Id.*

preliminary injunction requiring a university to recreate a women's softball team after concluding that the fiscal harm to the university outweighed the harm to the athletes).

### E.   Granting Plaintiffs' preliminary injunction is not in the public interest.

The fourth and final *Dataphase* factor also counsels against granting an injunction because there is no public interest in its favor. *See Sanborn Mfg. Co, Inc.*, 997 F.2d at 486.

Ostensibly, Plaintiffs ask the Court to preserve their women's swimming team. There is no public interest in women's swimming over other sports programs that UI may wish to support.

The University is a public institution, and there is a public interest in its fiscal health. It made the difficult decision to adjust its athletic program when faced with unprecedented fiscal and public health challenges as a result of the pandemic. (UI App. 3, Burke Aff. ¶¶ 7-8; UI App. 55-56, Davies Aff. ¶¶ 5-6). It chose to do so in a transparent and student-focused way.[39] By providing early notice of its decision and offering to honor all scholarships already awarded, the University enabled student-athletes to make choices that are in their best interests.[40] And as discussed above, upsetting this current status quo harms not just the University but the public at large that may be interested in making education plans based on certainty over the athletic programs in existence at one of its public universities.

Moreover, as discussed above, the elimination of UI's women's swimming team will not violate Title IX. Any public interest in enforcement of Title IX is thus irrelevant here.

### F.   Plaintiffs' claims are entirely speculative, not ripe for review, and should be dismissed in their entirety.

In the end, UI will comply with Title IX in the year at issue, 2021-2022, after its program changes are implemented and it has the opportunity to engage in its typical roster management.

---

[39]   Harreld and  Barta, https://hawkeyesports.com/news/2020/08/21/open-letter-to-the-university-of-iowa-and-hawkeye-athletics-community/.

[40] *Id.*

(UI App. 4-5, Burke Affidavit ¶¶ 17-21). As discussed at length above and in the affidavits accompanying this resistance, Plaintiffs do not have the data needed to make plausible claims about UI's future compliance and their stated claims are based on nothing but speculation. Not only should Plaintiffs' request for injunctive relief be denied; this case should be dismissed in its entirety.

### G.    The Court Must Order Security.

This Court must order security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed R. Civ. P. 65(c). UI has provided careful estimates of the anticipated costs associated with issuance of a preliminary injunction in this matter.  Those costs total around $1.1 million per year and are subject to 2% to 3% annual inflation. (App. 56, Davies Aff. ¶¶ 12, 15). Without citation to any authority, Plaintiffs request a waiver of security based on their status as students, while paying three expert witnesses at rates as high as $650 per hour. (*Compare* Doc. 12, p. 5 *with* App. 0037). Given the large financial cost to the University at a time when resources are exceedingly tight, UI asks the Court to deny this request.

## V.    CONCLUSION

UI respectfully requests that the Court deny Plaintiffs Motion for Preliminary Injunction, as Plaintiffs cannot demonstrate a substantial likelihood of success on the merits, cannot show irreparable harm, and cannot point to a balance of harms or public interest which favors Plaintiffs' case.  Should this Court decide to enter a preliminary injunction in this case, UI ask that the Court order security.

Respectfully Submitted,

**THOMAS J. MILLER**
Attorney General of Iowa

/s/ *Kayla Burkhiser Reynolds*
KAYLA BURKHISER REYNOLDS
Assistant Attorney General
Department of Justice
Hoover State Office Building, 2nd Floor
1305 E. Walnut Street
Des Moines, IA 50319
Ph:        (515) 725-5390
Fax:       (515) 281-4902
kayla.burkhiser@ag.iowa.gov

/s/ *Ryan Sheahan*
RYAN SHEAHAN
Assistant Attorney General
Department of Justice-Special Litigation
Hoover State Office Building
Des Moines, Iowa 50319
Phone: (515) 281-6658
Fax: (515) 281-4902
ryan.sheahan@ag.iowa.gov

ATTORNEYS FOR DEFENDANTS

| PROOF OF SERVICE |
| --- |
| The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on December 13, 2020: |
| ☐ U.S. Mail              ☐ FAX<br>☐ Hand Delivery        ☐ Overnight Courier<br>☐ Federal Express      ☒ Email<br>☒ CM/ECF |
| Signature: /s/*Audra Drish* |