IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | | |
|---|---|---|
| SAGE OHLENSEHLEN, CHRISTINA KAUFMAN, ALEXA PUCCINI, KELSEY DRAKE, MIRANDA VERMEER, and ABBIE LYMAN, | ) ) ) ) | Case No. 3:20-cv-00080-SMR-SBJ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |
| THE UNIVERSITY OF IOWA, BRUCE HARRELD, in his official capacity as President of the University of Iowa, and GARY BARTA, in his official capacity as Director of the Department of Athletics at the University of Iowa, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This lawsuit stems from the University of Iowa's August 21, 2020 decision to eliminate women's swimming and diving as a varsity intercollegiate sport for the 2021–22 academic year. In response, Plaintiffs Sage Ohlensehlen, Christina Kaufman, Alexa Puccini, Kelsey Drake, Miranda Vermeer, and Abbie Lyman ("Plaintiffs") filed this class action lawsuit against the University of Iowa (the "University"), President Bruce Harreld, and Athletic Director Gary Barta (collectively, the "Defendants"), alleging that the University fails to provide equal participation, equal treatment, and equal scholarship opportunities for female athletes as it is required under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").  They request a preliminary court order prohibiting Defendants from eliminating the women's swimming and diving team, or any other women's intercollegiate team, to preserve the intercollegiate athletic opportunities for women at the University of Iowa until they can prove their case at trial.

Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction on December 3, 2020.  [ECF No. 12]; *see* Fed. R. Civ. P. 65.  On December 4, 2020, the Court denied the request for emergency injunctive relief but ordered that the matter proceed on an expedited basis.  [ECF No. 13].  The Court has reviewed the parties' written briefs, [ECF Nos. 12-1; 20; 29], as well as the affidavits and documentary evidence submitted for and against the motion, [ECF Nos.  12-2; 20-1; 29-1; 32; 33; 34; 39; 41].  A hearing was held on December 18 and 22, 2020, where the Court received additional testimony and heard oral argument on the matter.  For the reasons detailed below, Plaintiffs' Motion for Preliminary Injunction is GRANTED.

## I.    TITLE IX

Title IX of the Education Amendments of 1972 requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Though the statute does not explicitly mention intercollegiate athletics, it has long been interpreted to apply to all aspects of an institution's operations, including athletic programs.  *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271–72 (6th Cir. 1994) (citing 20 U.S.C. § 1687(2)(A)).  Regulations promulgated by the agency that has now become the Department of Education provide, in part:

> (a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
>
> …
>
> (c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In

determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

34 C.F.R. § 106.41. In addition, the "failure to provide necessary funds for teams for one sex" is a relevant consideration "in assessing equality of opportunity for members of each sex." *Id.* Plaintiffs' motion concerns the first factor: effective accommodation.

Interpretive guidance from the Department of Education's Office of Civil Rights ("OCR") requires a university's athletic program to meet one of three standards to show that the institution is effectively accommodating the interests and abilities of members of both sexes in compliance with Title IX:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program

> expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71413, 71418 (December 11, 1979) ("OCR Policy Interpretation" or the "Three-Part Test"). In a 1996 clarification memorandum, OCR elaborated on its interpretation of Title IX and the Three-Part Test:

> [T]he three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, . . . the institution is meeting this requirement.

Department of Education, Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) ("1996 Interpretive Guidance").[1] In short, Prong One of the Three-Part Test affords an institution of higher education a "safe harbor" for establishing compliance with Title IX. *Id.* Prongs Two and Three "allow a university lacking 'substantially proportionate' athletic participation opportunities to remain in compliance by demonstrating 'an ongoing effort to meet the needs of the underrepresented gender' or where the university can demonstrate it has fully and effectively accommodated the interests and abilities of the underrepresented sex." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 294 (D. Conn. 2009) (citation omitted); *see Cohen v. Brown Univ.*, 991 F.2d 888, 898 (1st Cir. 1993) (*Cohen II*)

---

[1] The OCR's interpretation of its own regulations governing Title IX and the Three-Part Test are given controlling deference. *E.g. Chalenor v. Univ. N. Dakota*, 291 F.3d 1042, 1047 (8th Cir. 2002) (citing *Cohen v. Brown Univ.*, 991 F.2d at 896); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993).

("The second and third parts of the accommodation test recognize that there are circumstances under which, as a practical matter, something short of this proportionality is a satisfactory proxy for gender balance.").

## II.   FACTUAL BACKGROUND[2]

The University of Iowa is one of three public institutions of higher education in the State of Iowa.  Like most institutions of higher education, it receives federal funding in pursuit of its educational mission.  And for the past ten years, it has demonstrated a general trend of increasing the percentage of undergraduate students who are women.  Currently, the University offers twenty-four intercollegiate athletic programs; thirteen of these are women's teams and eleven are men's teams.

Under the Equity in Athletics Disclosure Act ("EADA"), the University of Iowa (along with every other university receiving federal funding) is required to submit a report to the United States Department of Education detailing (among other things) the total number of full-time male and female undergraduate students enrolled at the university, the varsity intercollegiate athletic teams it sponsors, and the total number of participants on each team measured at the date of the team's first competition.  20 U.S.C. § 1092(g)(1)(A)–(B)(i); *see also* 34 C.F.R. § 668.47.[3]  This data is eventually made accessible to the public by the Department of Education.  The following

---

[2] The factual background, for purposes of this Order, is derived from the exhibits submitted in support of Plaintiffs' motion and those filed in opposition, as well as testimony received at the hearing.  *See generally* [ECF Nos. 12-2; 20-1; 29-1; 32; 33; 34; 39; 41].

[3] More specifically, EADA reports contain information about a university's "undergraduate enrollment, broken down by gender; the number and type of men's and women's varsity teams; the number of participants on each team; the number, distribution, and average salaries of head and assistant coaches; the amount of athletic scholarship money available to each gender; the total revenues, operating expenses, and total expenses for each team; and the amount of money distributed for recruiting purposes."  *Biediger,* 616 F. Supp. 2d at 283.

chart produced by Plaintiffs' expert—Dr. Donna Lopiano, Ph.D.—summarizes the student enrollment and athletic participation statistics as reported by the University of Iowa:

| Survey Year | Male Under Grad | Percent Male Under Grad | Female Under Grad | Percent Female Under Grad | Total Under Grads | Total Male Athletes | Percent Male Athletes | Total Female Athletes | Percent Female Athletes | Total Athletes | Female Particip. Gap - # athletes to be added* | Percent Shortfall Female Opport. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003-04 | 8196 | 46.1% | 9578 | 53.9% | 17774 | 407 | 53.2% | 358 | 46.8% | 765 | 118 | -7.1% |
| 2004-05 | 8201 | 45.9% | 9678 | 54.1% | 17879 | 405 | 55.9% | 319 | 44.1% | 724 | 159 | -10.1% |
| 2005-06 | 8485 | 46.6% | 9709 | 53.4% | 18194 | 429 | 57.8% | 313 | 42.2% | 742 | 178 | -11.2% |
| 2006-07 | 9541 | 47.0% | 10759 | 53.0% | 20300 | 395 | 54.8% | 326 | 45.2% | 721 | 119 | -7.8% |
| 2007-08 | 10035 | 48.0% | 10872 | 52.0% | 20907 | 404 | 56.7% | 308 | 43.3% | 712 | 130 | -8.7% |
| 2008-09 | 9063 | 48.9% | 9478 | 51.1% | 18541 | 431 | 55.4% | 347 | 44.6% | 778 | 104 | -6.5% |
| 2009-10 | 8963 | 48.9% | 9356 | 51.1% | 18319 | 387 | 51.9% | 359 | 48.1% | 746 | 45 | -2.9% |
| 2010-11 | 9119 | 48.3% | 9776 | 51.7% | 18895 | 380 | 49.3% | 391 | 50.7% | 771 | 16 | -1.0% |
| 2011-12 | 9282 | 48.4% | 9876 | 51.6% | 19158 | 400 | 49.6% | 406 | 50.4% | 806 | 20 | -1.2% |
| 2012-13 | 9419 | 48.4% | 10030 | 51.6% | 19449 | 409 | 49.6% | 415 | 50.4% | 824 | 21 | -1.2% |
| 2013-14 | 9289 | 48.1% | 10012 | 51.9% | 19301 | 419 | 52.2% | 384 | 47.8% | 803 | 68 | -4.1% |
| 2014-15 | 9301 | 48.0% | 10074 | 52.0% | 19375 | 391 | 50.5% | 383 | 49.5% | 774 | 40 | -2.5% |
| 2015-16 | 9394 | 47.7% | 10318 | 52.3% | 19712 | 409 | 50.5% | 401 | 49.5% | 810 | 48 | -2.8% |
| 2016-17 | 9801 | 47.4% | 10889 | 52.6% | 20690 | 407 | 48.6% | 430 | 51.4% | 837 | 22 | -1.3% |
| 2017-18 | 9899 | 47.0% | 11180 | 53.0% | 21079 | 384 | 48.2% | 413 | 51.8% | 797 | 21 | -1.2% |
| 2018-19** | 10010 | 46.4% | 11546 | 53.6% | 21556 | 382 | 49.2% | 394 | 50.8% | 776 | 47 | -2.8% |
| 2019-20*** | 9733 | 45.8% | 11501 | 54.2% | 21234 | 391 | 51.4% | 370 | 48.6% | 761 | 92 | -5.5% |
| 2020-21*** | 9107 | 45.0% | 11146 | 55.0% | 20253 | 423 | 52.9% | 377 | 47.1% | 800 | 141 | -7.9% |

[ECF No. 12- 2 at 101 tbl.1].  EADA reports are submitted in October for the previous academic year.  *See Biediger*, 616 F. Supp. 2d at 283.  Because the University's EADA report for 2019–20 has not yet been made public and its report for the current 2020–21 academic year has not yet been submitted, Dr. Lopiano relied on data supplied by the University's official enrollment records and online website rosters to approximate the number of student athletes by gender for those years. *See* [ECF No. 12-2 at 102].  Although team website rosters are created and maintained by communications department staff at the University and not used for Title IX compliance, *see* [ECF No. 20-1 at 19], Dr. Lopiano testified they are reasonably likely to offer an estimation of those student-athletes who are actually eligible to compete and would be counted for such purposes.

Dr. Lopiano acknowledges that "EADA reports are Higher Education Act mandates and not Title IX compliance reports," which are typically made up of official athlete counts from NCAA squad lists, time-hour limitation records, and official competition results.  *Id.* at 103; *see*

*also* [ECF No. 29-1 at 10].  Yet, she opines, they are indicative of gender participation gaps in intercollegiate athletics and reliable in assessing Title IX proportionality to a reasonable degree of certainty due to the idiosyncratic counting mechanisms the EADA reports employ.  For instance, in the 2018–19 academic year, the University's EADA report reveals an undergraduate student population of 10,010 male and 11,546 female students, representing a student body that was 46.4% male and 53.6% female.  That year, the University reported 382 male athletes.  Though the nominal figure reported by the University shows 409 female athletes, changes to the EADA reporting rules required it to disclose that fifteen of those "female" athletes were in fact male practice players: ten in women's basketball, four in women's soccer, and one in women's volleyball.  *Id.* at 103–04.[4] Thus, according to the University's disclosure, the true number of female varsity athletes for that academic year was 394.  *Id.*  Men constituted 49.2% and females constituted 50.8% of varsity student athletes, producing a 2.8% disparity in the number of women enrolled at the University versus those who were given the opportunity to participate in intercollegiate athletics.  This disparity represents a 47 female athlete participation gap in intercollegiate athletics at the University of Iowa.[5]  And because the EADA report does not reflect later developments to teams'

---

[4] This reporting method is required by the EADA, but not Title IX.  *See infra.*

[5] As Dr. Lopiano explains, "the female participation gap represents the number of female participation opportunities that would need to be added if male participation remained constant and was equal to the percent males in the undergraduate student body."  [ECF No. 12-1 at 101] (emphasis deleted).  To compute the female athlete participation gap:

> Divide [the] actual number of male athletes by [the] percent of males in the undergraduate population to determine what the total athlete population would be if actual male participation was equal to [the] percent of males in the undergraduate student body.  Then subtract [the] actual number of male athletes and [the] actual number of female athletes.  The resulting number is the female participation gap—the number of female athletes which would need to be added

composition, Dr. Lopiano opines that it can be relied on to provide an overestimate of actual female participation that year. [ECF No. 29-1 at 9–10]; *see also* [ECF No. 20-1 at 19–20].

To date, Defendants have not produced the NCAA squad lists, time-hour limitation reports, or official competition results that typically make up official Title IX athlete counts.[6] So in the more recent years for which EADA data is not yet available, Dr. Lopiano notes that University enrollment records for the 2019–20 academic year document a student body consisting of 9,733 males (45.8%) and 11,501 females (54.2%). That year, the online website rosters maintained by the University represented 391 male athletes (51.4%) and 370 female athletes (48.6%), producing a female participation gap of 92. *Id.* at 101–02. The University's enrollment records for the current 2020–21 academic year reflect 9,107 male (45.0%) and 11,146 female (55.0%) undergraduates, and although the sports calendar has not yet concluded, a preliminary look at the University's website rosters displays 423 male athletes (52.9%) and 377 female athletes (47.1%). With the caveat acknowledging a number of teams have not yet completed their seasons for 2020–21, Dr. Lopiano opines that a 141 female participation gap can be expected to exist in University of Iowa intercollegiate athletics for the current year. *Id.* at 102. And based on her study, she anticipates this disparity has existed since at least the 2015–16 academic year.

On August 21, 2020, Defendants Bruce Harreld, University President, and Gary Barta, University Athletics Director, announced that the University had decided to eliminate four

---

for female athletes to equal their percent of the undergraduate student body.

*Id.*

[6] Plaintiffs represent that they requested such documents from Defendants early in this litigation, and at the conclusion of the first day of hearing this matter, the Court inquired whether they would be turned over for the Court's review. Defendants have not been responsive to either request.

intercollegiate athletic teams from its athletics program starting in the 2021: men's gymnastics, men's tennis, and men's and women's swimming and diving.[7]  Citing the financial exigencies of the Covid-19 pandemic, they announced that the University's continued ability to adequately support all of its intercollegiate athletics programs was no longer viable due to the necessary cancellations of athletic events throughout the Big Ten conference and NCAA at large.  At the time of that decision, Defendants estimated lost revenue of approximately $100 million and projected an overall budget deficit of $75 million for the University of Iowa Athletics Department for fiscal year 2021.  [ECF No. 20-1 at 56].  However, Defendants pledged to continue to honor financial aid scholarships promised to members of the eliminated teams if they continued to enroll at the University of Iowa.  In a document titled "Prong One Compliance Projection for Academic Year 2021–2022," Defendants represent the University of Iowa's anticipated sports roster sizes for men's and women's intercollegiate teams after accounting for the elimination of the announced teams.

**University of Iowa**
Prong One Compliance Projection for Academic Year 2021-2022**

| Women's Sport | Squad Size |
|---|---|
| Basketball | 13 |
| Cross Country | 24 |
| Field Hockey | 22 |
| Golf | 10 |
| Gymnastics | 18 |
| Rowing | 92 |
| Soccer | 36 |
| Softball | 27 |
| Tennis | 9 |
| Track (i) | 54 |
| Track (o) | 53 |
| Volleyball | 18 |
| 12 | 376 |

| Men's Sport | Squad Size |
|---|---|
| Baseball | 38 |
| Basketball | 16 |
| Cross Country | 12 |
| Football | 129 |
| Golf | 8 |
| Track (i) | 46 |
| Track (o) | 51 |
| Wrestling | 36 |
| 8 | 336 |

| | | S-A Count | % | FT U'grad Count | % | Disparity % | P.1 Disp. SA | P.1 Disp. SA |
|---|---|---|---|---|---|---|---|---|
| P.1 Ratios: | men: | 336 | 47.20% | 9,733 | 45.80% | 1.40% | -9.6 | 0 |
| | women: | 376 | 52.80% | 11,501 | 54.20% | -1.40% | 9.6 | 21 |

---

[7] Bruce Harreld & Gary Barta, *Open Letter to the University of Iowa and Hawkeye Athletics Community* (August 21, 2020), https://hawkeyesports.com/news/2020/08/21/open-letter-to-the-university-of-iowa-and-hawkeye-athletics-community/ (last accessed December 9, 2020).

[ECF No. 20-1 at 16]. The projection is purportedly based on "2019–20 [T]itle IX compliance statistics." *See id.*

Women's swimming and diving at the University of Iowa, specifically, consists of thirty-five roster spots this year, and for the last ten years has consisted of between 26 and 37 members. [ECF No. 12-2 at 110 tbl.4]. Defendants estimate the total annual operating expenses for the women's swimming and diving team in a normal year to be approximately $1.5 million. *See* [ECF No. 41]. Even after its elimination, Defendants anticipate the University's cost associated with the team for the 2021–22 year to be $530,000, which will incrementally decrease as members graduate or transfer to other institutions. [ECF No. 20-1 at 56]. Maintaining the women's swimming and diving team for the 2021–22 academic year, Defendants estimate, would add an additional $1.1 million in costs to the fiscal year budget. *Id.*

Plaintiffs Sage Ohlensehlen, Christina Kaufman, Alexa Puccini, and Kelsey Drake are female student athletes on the University of Iowa women's swimming and diving team. *See generally* [ECF No. 12-2 at 2–19]. Since Defendants' announcement cutting their team for the next academic year, members of the team have been torn between remaining at the University of Iowa to continue their education and pursuing their athletic careers elsewhere; several have committed to other schools, and many others are considering transferring. *Id.* at 4. However, all agree there is great interest in maintaining the team at the University of Iowa, and many of its members would remain if given the chance to reinstate the team. *See, e.g., id.* at 4, 8, 13–14, 17–18. After unsuccessfully pleading with the University of Iowa to reinstate the women's swimming and diving team, they filed this lawsuit charging Defendants with failing to provide equal participation, equal treatment, and equal scholarship opportunities for female athletes at the University of Iowa and are in violation of Title IX. [ECF No. 9 ¶¶ 131–138]. At the present

moment, Plaintiffs seek a court order preliminarily enjoining Defendants from eliminating their team—or any women's team—until they can definitively prove the University is out of compliance with the law's mandates.

## III.    DISCUSSION

Injunctive relief is an extraordinary remedy that is not issued lightly.  At this early stage of the case, the Court weighs four factors in determining whether to issue a preliminary injunction: (1) Plaintiffs' probability or likelihood of success on the merits of their Title IX claim for unequal athletic opportunity; (2) the threat of irreparable harm or injury to Plaintiffs absent preliminary relief; (3) the balance of equities, weighing the harm suffered by Plaintiffs against the harm to the University that would result from issuing an injunction; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc).  Balancing these "*Dataphase* factors" is not a "rigid formula," *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999), but instead requires courts to "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined,'" *Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (quoting *Dataphase*, 640 F.2d at 113)).  No one factor is determinative, and Plaintiffs bear the burden of showing the balance of these factors weigh in favor of issuing the injunction.

### A.  Probability of Success on the Merits

The Court first turns to the merits.  This factor examines whether Plaintiffs' allegations find support in governing law.  *See Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1028 (N.D. Iowa 2010).  Because they do not challenge the validity of a state or federal law, Plaintiffs need only show a "fair chance" of succeeding on the merits of their Title IX claims.  *D.M. ex rel.*

*Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 974 (D. Minn. 2016) (analyzing probability of success on the merits of Title IX claim on motion for preliminary injunction). A "fair chance" means "something less than fifty percent" probability. *Rounds*, 530 F.3d at 730.

The parties agree the only question before the Court on the merits is whether the University of Iowa will comply with Title IX under Prong One of the Three-Part Test in 2021–22 after eliminating the women's swimming and diving team alongside three men's teams. [ECF No. 20 at 3]. After first examining the historical data analyzed by Dr. Lopiano, the Court will consider Defendants' projections for the upcoming year.

1.   Historical data and statistical analysis

Compliance with Title IX under Prong One of the Three-Part Test requires the University of Iowa to provide its female students athletic participation opportunities in substantial proportion to their representation in the student body. In other words, the percentage of female student athletes must approximate the percentage of women enrolled at the University. Substantial proportionality is a fact-specific inquiry, and although "a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate," *Portz*, 196 F. Supp. 3d at 975 (citing cases), Prong One is usually met "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team," 1996 Interpretive Guidance.

The most recent data from the University's 2018–19 EADA report discloses a 49.2%–50.8% male-female student athlete ratio despite a student body consisting of only 46.4%

men and 53.6% women—a 2.8% disparity that reflects 47 fewer athletic opportunities for women than there would be if participation were substantially proportionate to their representation on campus. Public data created by the University through its website rosters reflects a participation gap of 92 athletic opportunities for last year (2019–20), and for the current academic year (2020–21), anticipates an athlete gap of 141. And according to the expert testimony of Dr. Lopiano, the female participation gap reflected in this data is considerably understated. *See also* [ECF No. 12-2 at 102–03]. The 35 members of the University of Iowa women's swimming and diving team easily fits within any of these participation gaps as a viable team for which there is obviously great interest.

The crux of Defendants' resistance takes issue with Plaintiffs' reliance on EADA reports, website rosters, and the statistical analysis of the two—what Defendants label "speculative" and denigrate as "conspiracy theories." Defendants argue that because the EADA counts student-athlete participation differently than Title IX, the historical data relied on by Dr. Lopiano from 2018–19 and earlier is not only outdated, but is not probative of Title IX compliance *at all*. Further, they take umbrage with Plaintiffs' use of website rosters in estimating student-athlete participation, especially for more recent years in 2019–20 and the 2020–21 for which EADA reports have not yet been produced or made publicly accessible. They assert that because the online rosters are not static (evolving as team composition changes through an academic year) and are maintained by communications staff (not Title IX professionals), they are not credible or reliable records of athlete participation in any given year. Finally, Defendants claim the statistical analysis comprising Dr. Lopiano's testimony lacks the basis to make any conclusion specifically about Title IX athletic compliance at the University of Iowa. In her expert report and testimony, however, Dr. Lopiano explained why she is confident to a high degree of certainty in her

conclusion that women's intercollegiate athletics at the University of Iowa Athletics Department
is likely to lack substantial proportionality to female student enrollment under Prong One of the
Three-Part Test:

*First* is the matter of fact that, by their nature, EADA reports *always* overstate women's
participation in intercollegiate athletics.  Under Title IX, intercollegiate athletic participation is
measured by counting a university's "athletes," defined as those students:

> a) Who are receiving the institutionally-sponsored support normally
> provided to athletes competing at the institution involved, e.g.,
> coaching, equipment, medical and training room services, on a
> regular basis during a sport's season; and
>
> (b) Who are participating in organized practice sessions and other
> team meetings and activities on a regular basis during a sport's
> season; and
>
> (c) Who are listed on the eligibility or squad lists maintained for
> each sport, or
>
> (d) Who, because of injury, cannot meet a, b, or c above but continue
> to receive financial aid on the basis of athletic ability.

44 Fed. Reg. at 71415.  Under the EADA, by contrast, universities must report, among other things,
"[t]he total number of participants, by team, as of the day of the first scheduled contest for the
team."  20 U.S.C. § 1092(g)(1)(B)(i).  "Participants" counted for EADA purposes means:

> (i) . . . students who, as of the day of a varsity team's first scheduled
> contest—
>
> (A) Are listed by the institution on the varsity team's roster;
>
> (B) Receive athletically related student aid; or
>
> (C) Practice with the varsity team and receive coaching from one or
> more varsity coaches.
>
> (ii) Any student who satisfies one or more of the criteria in
> paragraphs (b)(3)(i)(A) through (C) of this section is a participant,
> including a student on a team the institution designates or defines as

>       junior varsity, freshman, or novice, or a student withheld from
>       competition to preserve eligibility (i.e., a redshirt), or for academic,
>       medical, or other reasons.

34 C.F.R. § 668.47(b)(3).  In other words, EADA reports permit the counting of male practice players on "female" teams and do not account for those athletes who stop participating or never fully participate on the team after the first scheduled competition.  [ECF Nos. 12-2 at 103–04; 29-1 at 9–11].  Therefore, Dr. Lopiano opines, EADA reports *always* underrepresent the female participation gap in a university's intercollegiate athletic program, which can form the basis for a conservative estimate of the difference between women's athletic opportunities and their representation on campus.  [ECF No. 29-1 at 10].

*Second*, comparing publicly available participation data from EADA reports, University-sponsored website rosters, and raw competition data produces additional counting disparities that are likely to further increase the participation gap in women's athletics and increase the understating of female participation.  Just as it disclosed in 2018–19, Dr. Lopiano states it is reasonable to expect that the University's EADA reports similarly overrepresent actual female participation in women's basketball, soccer, and volleyball by counting male practice players at least in the 2015–16, 2016–17, and 2017–18 reporting cycles.  Indeed, comparing the University's EADA reports for each team to that year's website roster produces a similar overcount of women on each team for each of those three academic years (26 in 2015–16, 13 in 2016–17, and 17 in 2017–18).  [ECF No. 12-2 at 104–05, 104 tbl.2].  Thus, just as the number of female athletes reported in the University's 2018–19 EADA records was sure to be fewer after removing male practice players from the count, it is reasonable to expect that a similar trend occurred in 2015–16, 2016–17, and 2017–18 to reflect greater actual participation gaps that shown on the face of those

reports.   Specifically, instead of the reported female participation gaps of 48, 22, and 21, respectively, it is more likely the gap was 74, 35, and 38 for those years.  *Id.* at 105.

Due to the fact that EADA reports count all nominal members at the time of a team's first competition, regardless of whether they continue to participate meaningfully after that date, Dr. Lopiano opines the reports are likely to reflect overstated female athlete counts in other sports like women's rowing, cross-country, and track and field, as well.  Comparing the number of rowing participants reported under the EADA to the team's historical website rosters for the women's rowing team reveals significant differences ranging between 28 and 46 additional female participants who are not reflected on the website rosters for those years.  [ECF No. 12-2 at 105 tbl.3].  Cross-referencing these figures to the most recent 2018–19 EADA numbers displays the 46-participant difference.  Those differences, Defendants' rowing coach attested, reflect natural attrition common in intercollegiate rowing.  *See* [ECF Nos. 20-1 at 66–67; 33 at 2].  But those numbers still bear on the female participation gap reported under the EADA, Dr. Lopiano points out, and therefore contribute to overstating actual female participation considered in the EADA reports that are not reflected in Title IX participation counts.

Cross-country and track require slightly more complex calculations.  Because universities do not separately report cross-country, indoor track, and outdoor track under the EADA (but are required to do so under Title IX), and the University's website rosters do not distinguish between its indoor and outdoor track teams, Dr. Lopiano examined the teams' competition results through the publicly accessible U.S. Track & Field Results Reporting System ("TFRRS").  For each of the preceding four years, her examination revealed cross-country website roster counts that reflected a distinction between those athletes who participated in multiple cross-country competitions, those who participated only in a single home contest, and others who participated in no events at all.

*See* [ECF No. 12-2 at 106].  Adding the cross-country runners to the track and field athletes listed on the website rosters who were also recorded on TFRRS as participating in at least one indoor event or one outdoor event fell noticeably short of the number of combined athletes ("All Track Combined") reported under the EADA.  [ECF No. 12-2 at 108].  This trend was confirmed by cross-referencing the most recent EADA numbers reported in 2018–19.  While it could be that several of the athletes on these teams who did not participate in an event (or more than just the hosted competition) were injured and unable to compete further into the season, Dr. Lopiano opines that in her experience such a high number of injured cross-country or track and field athletes each year would be highly unusual, and more likely reflects athletes who could not actually be counted for Title IX purposes.  [ECF No. 12-2 at 106, 108].

Next, Dr. Lopiano compared the University's historically-reported EADA numbers and website roster data to the average NCAA Division I team size for each sport in the 2018–19 academic year.  *See* [ECF No. 12-2 at 110 tbl.4, 111 tbl.5].  Doing so revealed several important considerations.  Chief among these is a correlation between the average NCAA team size and website roster numbers, contrasted with the large disparity between NCAA average and the athlete counts produced under the EADA.  Looking more closely at the EADA statistics for that year also demonstrates a greater variability between mean and median values in overall female athletic participation than was reflected in male participation, which Dr. Lopiano testified indicates skewed distribution in team size.  *See id.* at 110, 112.  Dr. Lopiano reported that website rosters for women's rowing closely resembled the average NCAA Division I team size, confirming the skewed data on the team as reported under the EADA; though website roster averages for both men's and women's track and field well exceeds the NCAA average team size, she noted it is greater for the women's team.  *See id.*

*Third*, taking a historical view of EADA data to compare reported female participation with the University's spending on financial aid scholarships and recruiting expenditures reveals a stark contrast between female undergraduate enrollment and the amount of money actually allocated to women's intercollegiate athletics.  Spending on scholarships and recruitment, Dr. Lopiano opines, are often strong indicators of gender parity in athletic participation opportunity—or a lack thereof. Historically, at no time in the last twenty years have female athletes at the University of Iowa received financial aid proportional to their percentage of undergraduate enrollment.  [ECF No. 12-2 at 121 tbl.8].[8]  This is significant because female athlete participation in a given year should typically approximate the percentage of female undergraduate enrollment, and financial aid entitlement for female athletics should mirror that participation percentage.  *Id.* at 120.  Comparing recruiting expenditures on male and female athletes, the trend shows a widening disparity between the percentage spent on male athlete recruiting versus female athlete recruiting.  [ECF No. 12-2 at 123 tbl.9].[9]

Though certainly not dispositive, Dr. Lopiano opines that these figures, collectively, tend to reflect participation gaps for female athletes.  If in compliance with Title IX's substantial proportionality requirements, variable variance gaps between male and female participation opportunities would exist.  Stated differently, if in Title IX compliance, it would never be the case that, historically, the same sex was always underrepresented in participation opportunity. Dr. Lopiano testified that she has never seen a historical EADA record with such a consistent and

---

[8] In fact, Table 8 reveals that female athletes at the University of Iowa "were shortchanged a total of $6,560,866 in athletics financial aid over this 16-year period."  [ECF No. 12-2 at 120].

[9] Dr. Lopiano opines that "[t]hese per capita recruiting expense differences are so substantial and the pattern in favor of male athletes so consistent that there is good reason to believe that there are gender inequities in this area."  [ECF No. 12-2 at 122].

persistent female participation gap like the University of Iowa's that has actually provided substantially proportionate athletic participation opportunities in compliance with Prong One of Title IX.  The historical data matters, she says, because it demonstrates a disparity in gender equity that is growing larger as the percentage of female enrollment at the University of Iowa increases, but female athlete participation, financial aid, and recruitment expenditures have proportionally diminished.  *See* [ECF No. 12-2 at 121 tbl.8, 123 tbl.9].  And because Title IX compliance cannot be fully known until after an academic year is complete, historical data is always relevant.  Based on 2019–20 and 2020–21 website rosters, 16-year EADA mean and median team sizes, and average NCAA Division I team size as compared to actual enrollment, Dr. Lopiano predicts a minimum female athlete participation gap of 65 for the 2021–22 academic year, with the highest figure reflecting a 144 female gap.  [ECF No. 12-2 at 134–37, 137 tbl.15].

### 2.   The University's 2021–22 projections

Defendants proffered their own athletic participation projections for the 2021–22 academic year to justify the elimination of the women's swimming and diving team, which is reproduced above.  *See* [ECF No. 20-1 at 16].  According to this document, Defendants anticipate a student body composed of 9,733 men (45.8%) and 11,501 women (54.2%), with 336 male student-athletes (47.2%) and 376 female student-athletes (52.8%).  At a disparity of 1.4%, Defendants claim they estimate the female participation gap for next year to be 21, which is less than the average women's swimming and diving team size.

But Defendants declined to produce the NCAA squad lists, time and hour limitation records, and competition results that make up the raw data for official Title IX counts that they say supports their figures, despite Plaintiffs'—and the Court's—requests for them to do so.  In her supplemental report, Dr. Lopiano opines that, even assuming the data underlying Defendants'

projections to be true,[10] the University's admitted anticipated participation gap of 21 is likely to be a conservative estimate at best.  [ECF No. 29-1 at 9–11, 13].  Enrollment records for the present 2020–21 academic year reflect a 55% female student body, however, and based on these more recent figures, produce an even greater minimum participation gap of 35 women.  *Id.* at 14.[11] Taking into account Defendants' admitted attrition of female rowing participants after the first day of competition, Dr. Lopiano maintains such extra "novice" or "sub-varsity" participants are not comparable to varsity opportunities afforded to male athletes and would not be counted for Title IX purposes, thus adding to the anticipated participation gap.  *Id.* at 15.  Indeed, the quality of competition afforded to male and female athletes is an important factor in evaluating whether a university satisfies these requirements of Title IX.  *Roberts*, 998 F.2d at 829 (citing 44 Fed. Reg. at 71,418); *see also Cohen v. Brown Univ.*, 879 F. Supp. 185 (D.R.I. 1995) (*Cohen III*) (defining "intercollegiate" teams as those that "regularly participate in varsity competition"), *aff'd*, 101 F.3d 155, 187 (1st Cir. 1996) (*Cohen IV*); *cf.* 34 C.F.R. § 668.47(b)(3)(ii) (including "junior varsity" and "novice" team members as EADA "participants").  Dr. Lopiano also reiterates her analysis of

---

[10] Dr. Lopiano's calculations reach a 22 female gap, but she acknowledges this is due to a "rounding difference."  [ECF No. 29-1 at 13].

[11] Defendants contend the 55% female enrollment figures for the current 2020–21 academic year should not be used to analyze female athletic participation because such numbers are unreliable, asserting in the same breath that the Court should instead accept their lower figures despite acknowledging that the same University office has certified both sets of numbers to be accurate and official enrollment records and relying on the 2020–21 enrollment numbers to originally justify their decision to eliminate teams from the University's athletic program.  At any rate, Defendants contend the 2020–21 gender ratios should not be used because the Covid-19 pandemic has produced an anomalous year in higher education enrollment.  Although that may or may not be true as a general matter, the record does not support the assertion that the pandemic has produced a decrease in enrollment that would render higher *female* numbers to be the anomaly, as opposed to higher *male* numbers.  Further, Dr. Lopiano noted the current year's gender statistics are reasonable figures to rely on, despite the effects of the pandemic on undergraduate enrollment, because the University has shown a historical trend over the last ten years increasing its percentage of female undergraduates to approach 55%.  *See* [ECF No. 12-2 at 101 tbl.1].

the women's cross-country team, noting that Defendants' anticipated participation exceeds the average NCAA team size by 7 and is double that of its men's counterpart. *Id.* at 16.  Finally, she points out that the projected softball team is 2 participants greater than the largest softball team ever sponsored by the University (5 more than the average NCAA Division I team size), while the field hockey team matches its largest participation level ever. *Id.* at 16.

Together, along with her analysis of the University's historical female participation in intercollegiate athletics, Dr. Lopiano opines: "add[ing] [the University's] admitted intended [female] gap of 21 with the rowing inflation of 41, the cross country inflation of 7, and the softball inflation of 2, we are looking at the real probability of a 2021–22 [female] participation gap of 71, even using [Defendants'] lower student enrollment numbers for 2019–2020."  [ECF No. 29-1 at 17].  And using current enrollment numbers of 55% female undergraduates, that gap would increase to 84. *Id.*

### 3.  Objections

Defendants contend the Court should accept their unverified projections and strike Dr. Lopiano's expert opinion from the record as unduly speculative and reliant on outdated and inaccurate data.  Expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Fundamentally, expert opinion must be both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Smith v. Bubak*, 643 F.3d 1137, 1140 (8th Cir. 2011) (citation omitted). With its purpose to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), the Court possess "wide latitude" to determine whether the evidence meets this threshold. *Fireman's Fund Ins. Co. v. Canon USA, Inc.*, 394 F.3d 1054, 1057 (8th Cir. 2005) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)).

The Court finds Dr. Lopiano to be highly credible and her opinion exceedingly reliable. Her expert testimony tends to show Plaintiffs have a fair chance of demonstrating the University is not, and has not been, in compliance with Title IX by providing its female athletes athletic participation opportunities substantially proportionate to their representation in the student body at the time it decided to cut women's swimming and diving. Dr. Lopiano is a highly accomplished expert on gender equity in intercollegiate athletics and Title IX compliance. She has written dozens of publications on Title IX gender parity in athletics—she quite literally wrote the book on the subject. She has testified before Congress and served as the President of the Association for Intercollegiate Athletics for Women (before the organization was absorbed by the NCAA). And she helped draft the federal agency regulations containing the Three-Part Test as a consultant to the Department of Education and OCR. [ECF No. 12-2 at 113, 146–61]. Her understanding of Title IX and intercollegiate athletics is unparalleled, and Defendants have provided no basis by which to discard her opinion.

Defendants' efforts to discredit Dr. Lopiano's testimony through their own witnesses are ineffective, too.  Defendants provided written testimony from several University employees including its Deputy Director of Athletics and Deputy Title IX Coordinator to attest to Defendants' predictions for the 2021–22 academic year and dispute Dr. Lopiano's conclusion that the University of Iowa is unlikely to be in compliance with Title IX after eliminating the women's swimming and diving team.  *See* [ECF Nos. 20-1 at 2–5, 17–20; 32; 34].  But both acknowledge EADA reports count student-athlete participation different from Title IX by *overestimating* female participation.  Similarly, Defendants presented an affidavit from the women's rowing coach to attest to the natural attrition that commonly occurs in the sport of rowing to explain the disparities pointed out by Dr. Lopiano in her report, but this wholly misses the point that these individuals are highly unlikely to be counted for Title IX purposes as they are under the EADA.  *See* [ECF Nos. 20-1 at 65–68; 33].  Defendants presented no evidence concerning the other women's sports discussed in Dr. Lopiano's report, cross-country and track, or to address the impact of the EADA overcounts of male practice players in basketball, soccer, and volleyball.  And none of Defendants' affiants contradict the statistical analysis performed by Dr. Lopiano by looking beyond the data supplied by the University's EADA reports, website rosters, and NCAA statistics.  The numbers do not lie.  Though variations in athletic participation by men and women do occur, Dr. Lopiano stresses that, "statistically, the variance could <u>never</u> *always* result in the underrepresentation of females and certainly not to the extent that has occurred at [the University of Iowa] over the years." *Id.* at 11 (both emphases in original).

The blanket assertion that Dr. Lopiano's analysis is too speculative—when, as a rule, EADA reports can be reliably counted on to provide *overestimates* of female athletic participation—amounts to an argument that the Court ought to "pay no attention to that [wo]man

behind the curtain."[12]  Defendants' argument that EADA reports cannot be relied on carries no force, considering that other courts have specifically relied on such records at the early stages of Title IX litigation.  *See Biediger*, 616 F. Supp. 2d at 297 (preliminary injunction), *inj. sustained after trial*, 728 F. Supp. 2d 62, 113–14 (D. Conn. 2010), *aff'd*, 691 F.3d 85, 108 (2d Cir. 2012); *Barrett v. W. Chester Univ. of Pa.*, No. Civ.A. 03–CV–4978, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003); *Choike v. Slippery Rock Univ.*, Civ. Action No. 06-622, 2006 WL 2060576 (W.D. Pa. July 21, 2006); *cf. Robb v. Lock Haven Univ. of Pa.*, No. 4:17-CV-00964, 2019 WL 2005636, at *7 (M.D. Pa. May 7, 2019) (analyzing Title IX Prong One claims with EADA data on class certification motion); *Mansourian v. Bd. of Regents of Univ. of Calif. at Davis*, 816 F. Supp. 2d 869, 885,  913 (E.D. Cal. 2011) (discussing EADA reports and noting the parties agreed "female athletic participation opportunities were not substantially proportionate");  *Brust v. Regents of Univ. of Cal.*, No. 2:07-cv-1488 FCD/EFB, 2007 WL 4365521 (E.D. Cal. Dec. 12, 2007) (denying motion to dismiss Title IX suit because the plaintiffs might be able to show EADA numbers were not accurate, showing an even greater disparity).  Their position is especially disingenuous considering Defendants' refusal to disclose the official Title IX data they claim exonerates the University—data they admit is discoverable but have nonetheless declined to produce in response to Plaintiffs' request.  Defendants offer no authority for the position, and the Court finds it utterly unpersuasive.

### 4.  Summary

In sum, Plaintiffs have demonstrated a fair chance that the University of Iowa does not presently provide its female student with intercollegiate athletic opportunities in substantial proportion to their enrollment, and is unlikely to do so after eliminating the women's swimming

---

[12] Wizard of Oz (MGM Studios 1939).

and diving team for the 2021–22 academic year.  *See Portz*, 196 F. Supp. 3d at 977.  Financial

exigency is not a defense to the gender equity requirements Title IX.  *Cohen II*, 991 F.2d at 905;

*Favia v. Indiana Univ. of Pa.*, 812 F. Supp. 578, 583 (W.D. Pa. 1993).  Thus, Plaintiffs have shown

that they possess a fair chance of succeeding on their Title IX claim for inequitable participation

opportunities for female athletes at the University of Iowa.[13]

### B.  Irreparable Harm

Having shown a fair chance of succeeding on their Title IX claims, the Court next considers

the harm Plaintiffs will suffer if they are not awarded preliminary injunctive relief while awaiting

a full trial on the merits.  The injury suffered by Plaintiffs is clearly irreparable and immediate.

Simply put, Plaintiffs will lose the opportunity to participate in intercollegiate swimming

and diving at the University of Iowa "on a continuous and uninterrupted basis" if the team is not

immediately reinstated.  *Portz*, 196 F. Supp. 3d at 972 (citing *Biediger*, 616 F. Supp. 2d at 291).

For some, this opportunity will be lost forever.  Civil cases ordinarily take many months — more

often than not, years—to reach final judgment in federal court.  If Defendants are not enjoined

from eliminating the team in the interim, there will not be a team to reinstate for many years.  [ECF

No. 12-2 at 138–40].  Since the decision to eliminate the women's swimming and diving team was

---

[13] For the same reasons, Plaintiffs demonstrate a fair chance showing Defendants cannot comply with Title IX under Prong Three because eliminating an existing viable women's sports team creates a "presumption that the institution is not in compliance" with that prong.  Department of Education, Office for Civil Rights, Intercollegiate Athletics Policy Clarification: the Three-Part Test—Part Three, at 5 (April 20, 2010) ("2010 OCR Policy Interpretation"), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.pdf.  To overcome the presumption, Defendants bear the burden of advancing "strong evidence that interest, ability, or competition no longer exists."  *Id.*  There is no evidence in the record that Defendants attempted to assess female students' interest in other sports.  Neither does the record reflect any evidence of a lack of interest in a viable sport, considering Plaintiffs remain passionate about maintaining their athletic careers swimming and diving at the University of Iowa.  Defendants make no effort to demonstrate compliance under Prong Two.

announced in August, several of its coaches have left the school, and 15 of its 35 members have put in to transfer and swim elsewhere.  Even though their decisions are reversible, waiting until after trial to reinstate the team will be too late.  Already, the team will suffer years of setback as recruiting efforts have ground to a halt.  With one coach to assist the team for the remainder of this season, the current women on the team stand in a far less favorable position to train and prepare for major meets that are the peak of their athletic careers.  Indeed, the damage to the women's swimming and diving team is already being felt.  Stated plainly, the harm to Plaintiffs should Defendants be allowed to eliminate the women's and diving team before a full trial is held is not only irreparable—it is existential.

Defendants argue Plaintiffs will not suffer ham that is irreparable because even though they will not be able to swim or dive at the University of Iowa, they have retained their scholarships and are free to complete their undergraduate degrees, or, with an additional year of eligibility granted by the NCAA, may choose to transfer to a different school to compete in intercollegiate swimming and diving.  But to transfer, Plaintiffs "must 'break into new programs with new coaches and established rosters," increasing the possibility that their athletic development will be "stunt[ed]" just as they are on the precipice of the "highest level of amateur competition.'" *Portz*, 196 F. Supp. 3d at 972 (quoting *Biediger*, 616 F. Supp. 2d at 292).  That does not even guarantee they will be accepted on the new team.  And even if they are, those who transfer as walk-on athletes will be less likely to receive the athletic scholarship and financial assistance enjoyed at the University of Iowa, despite their skill.  *See* [ECF Nos. 12-2 at 13–14; 29-1 at 5–6].  Moreover, to transfer Plaintiffs "must leave behind the professors, friends, and campuses they are familiar with to start all over again." *Id.* The emotional harm of doing so is outweighed only by the academic disruption to Plaintiffs' education: the University of Iowa is consistently counted among the top

public universities in the region, and ranked highly among other institutions across the country; forcing Plaintiffs to transfer in order to continue swimming may result in attending a less-selective institution offering an education that is not as academically rigorous.  *See* [ECF No. 12-2 at 140].

Of course, Plaintiffs can take the money and quit competitive swimming and diving altogether.  Such a choice, however, would require Plaintiffs to give up a sport that has been a defining part of their identity since their early childhood.  *See* [ECF No. 12-2 at 2–3, 6–7, 11–12, 16–17].  For many, the grit and confidence and determination gained through athletic competition helps them excel academically; removing that from their experience is likely to have negative consequences on their education and development as young women.  It makes sense, then, that for Plaintiffs, this is not about the money at all.

Defendants chiefly rely on cases where courts have held that student athletes did not suffer irreparable harm where they had the opportunity to transfer to another school to compete in their chosen sport and did not lose the financial assistance from their athletic scholarship after their team was eliminated.  *See Equity in Athletics, Inc. v. U.S. Dep't of Ed.*, 291 Fed. App'x 517, 521 (4th Cir. 2008); *Miller v. Univ. of Cincinnati*, No. 1:05-cv-764, 2007 WL 2783674, at *11 (S.D. Ohio 2007); *Gonyo v. Drake Univ.*, 837 F. Supp. 989, 994 (S.D. Iowa 1993).  This Court agrees, however, that in addition to their other distinguishable characteristics, those cases "give insufficient consideration to the unique circumstances college athletes face" and make "short shrift of the brief time-span" they are given to experience undergraduate studies and intercollegiate athletics.  *Biediger*, 616 F. Supp. 2d at 292.  As more recent cases note, "[t]he calculus is different when, as in this case, [Plaintiffs] have demonstrated that their right to be free from discrimination under Title IX has likely been violated."  *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 998

(E.D. Mich. 2018), *inj. stayed on other grounds*, No. 19-1177, 2019 U.S. App. LEXIS 9373, at *2–3 (6th Cir. Mar. 28, 2019).[14]

Moreover, Plaintiffs stand to suffer the harm of being denied gender parity in intercollegiate athletics at the University of Iowa absent preliminary relief.  "Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment" to combat gender discrimination in education, and "[t]he denial of a constitutional right is a cognizable injury and an irreparable harm." *Portz*, 196 F. Supp. 3d at 973 (citing *Heckler v. Mathews*, 465 U.S. 728, 738–39 (1984); *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)).  Having demonstrated a fair chance of success on the merits, "Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms" qualifies as an injury that is irreparable. *Id.*; *see also Mayerova*, 346 F. Supp. 3d at 997.

In short, the college years are highly formative, but they are also quickly fleeting.  No less than the arts, music, or theater, intercollegiate athletics supplies an important component of higher education.  The Hobson's choice callously presented by Defendants is cold comfort to students like Plaintiffs who have poured much of their lives into swimming and diving and have loyally

---

[14] Defendants point to the decision of the United States Court of Appeals for the Sixth Circuit in *Mayerova* to stay a district court's injunction in support of their argument that "[T]itle IX requires equality between men's and women's teams, not that certain teams (say, women's [swimming and diving]) be reinstated rather than other sports teams be created, supported, or expanded."  2019 U.S. App. LEXIS 9373, at *3.  The injunction in that case had required the university to re-create the women's softball and tennis teams that it had previously eliminated. Noting that the matter presented "a challenging call," the appellate court found that "the university's agreement to reinstate the women's tennis team" placed it "in greater compliance with Title IX and fixe[d] the irreparable-harm piece of the puzzle for the tennis players."  *See id.*  Here, Defendants have agreed to reinstate nothing.  Plaintiffs ask not for a specific team of their choice to be created, but that the University not eliminate an existing viable team that renders women's athletic participation disproportionate to the opportunities afforded to its male athletes.  This comparison is further inapt for the reason that *Mayerova* did not involve evidence strongly suggesting a historical trend of providing female athletes with disproportionate athletic participation opportunities before eliminating the women's teams.

chosen to call the University of Iowa their collegiate home.  Plaintiffs have shown they will incur irreparable harm if an injunction does not issue.

### C.  Balance of Equities

The Court next weighs the effects on Defendants and other interested parties of granting the injunction.  Defendants argue the University will suffer significant harm if the Court enjoins it from eliminating the women's swimming and diving team because maintaining that team would add an estimated additional cost of $1.1 million in annual expenses in a year when its budget has already been hamstrung by the Covid-19 pandemic.  *See* [ECF No. 20-1 at 56].  The Court should maintain the status quo, Defendants contend: enjoining the University would cause confusion for student-athletes deciding whether to transfer elsewhere and make the future of the women's swimming and diving team at the University less certain.

In so arguing, Defendants confuse the status quo.  The point of prohibitive injunctive relief is to preserve the "last uncontested status between the parties which preceded the controversy." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citation omitted); *accord Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  "'To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions,' but . . . '[s]uch an injunction restores, rather than disturbs, the status quo ante.'"  *Aggarao v. MOL Ship Mgmt. Co.,* 675 F.3d 355, 378 (4th Cir. 2012) (citation omitted).  Here, that is reinstatement of the women's swimming and diving team.  Eliminating Plaintiffs' team has already upended these young women's lives and interfered with their college experience.  And as they have made a fair chance of showing, that decision is likely to continue a trend of gender inequality in intercollegiate athletics at the University of Iowa.  By contrast, the administrative burden of

reprogramming the University's athletics department to comply with Title IX dictates serves an admirable purpose at a much lower cost.

The Court acknowledges the financial harm suffered by the University at the hands of Covid-19.  It is important to note, though, that Defendants originally premised their decision on budget shortfalls that projected losses and no income from football in fiscal year 2021 when little to no athletics income was expected due to event cancellations.  Since then, the University of Iowa football team has played a number of televised games, and the basketball season has begun as well.  The University faces budgetary setbacks, to be sure; but those setbacks do not outweigh the harm to Plaintiffs have shown after demonstrating a fair chance their rights under Title IX have been infringed.  Ultimately, "financial hardship is not a defense to a [probable] Title IX violation." *Mayerova*, 346 F. Supp. 3d at 998.  Public universities "may not simply plead limited resources to excuse the fact that there are fewer opportunities for girls than for boys."  *Horner*, 43 F.3d at 275.

### D.  Public Interest

Finally, the Court considers the public's interest in this case.  The University of Iowa is a public institution funded by public dollars administered by public servants serving the public good by educating Iowa's youth.  Defendants refrain that the public interest lies in protecting the University's fiscal health, and in its own self-governance without the intrusion of the federal courts.  Certainly.  But, certainly, it is also true that "the public's interest in eradicating sex discrimination [in education] is compelling."  *Portz*, 196 F. Supp. 3d at 978; *see also Favia*, 812 F. Supp. at 585; *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D. R.I. 1992) (*Cohen I*) ("[T]he public interest will be served by vindicating a legal interest that Congress has determined to be an important one.").  Here, "the public interest demands that [the University of Iowa] comply with federal law and in this instance that means compliance with Title IX."  *Barrett*, 2003 WL

22803477, at *15.   Especially considering that Plaintiffs have established a fair chance of succeeding on the merits of their Title IX complaint for equal participation in intercollegiate athletics, the public interest weighs in favor of a preliminary injunction.

### E.  Security

Rule 65 of the Federal Rules of Civil Procedure also requires the moving party to post bond to obtain preliminary injunctive relief: "The court may issue a preliminary injunction . . . order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added).   Having succeeded on demonstrating the balance of considerations weighs in favor of a preliminary injunction, Plaintiffs ask the Court to waive the bond requirement.   Defendants resist that request.

"Courts in this circuit have almost always required a bond before issuing a preliminary injunction . . . ."   *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citing *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1278 (N.D. Iowa 1995)).   It is true that informal exceptions have been recognized despite the apparent clarity of Rule 65(c), such as "where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown."   *Id.* (citing *Fantasysrus 2, LLC v. City of East Grand Forks*, 881 F. Supp. 2d 1024, 1033 (D. Minn. 2012); *Bukaka, Inc. v. Benton Cty.*, 852 F. Supp. 807, 813 (D. Minn. 1993)).   But Rule 65(c) is unambiguous and unequivocal: preliminary injunctive relief is available "only if" security is posted.   Moreover "[t]here are very sound policy reasons for the bond requirement" in preliminary proceedings.   *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 979 (N.D. Iowa 2006) (Bennett, J.).   "[T]he defendant who has been wrongfully enjoined has no

recourse for damages in the absence of a bond." *Id.* (citations omitted).   And "because a preliminary injunction proceeding is both expedited, resulting in only provisional findings of fact, and interlocutory, there is a higher chance that the district court will err in granting the preliminary injunction." *Id.* (citations omitted).   Although some courts granting preliminary injunctions in Title IX cases have declined to order security because the case rests of vindicating underrepresented civil rights and the cost to universities in maintaining the athletic team in question is typically negligible, *see Portz*, 196 F. Supp. 3d at 978–79; *Biediger*, 616 F. Supp. 2d at 293 n.8, the Court declines to follow these decisions due to the mandatory language of Rule 65(c) and financial straits the Covid-19 pandemic has placed on the University of Iowa.

That said, Rule 65(c) requires bond in the amount "the [C]ourt considers proper."   At the direction of the Court, Defendants submitted evidence of their anticipated financial expenditures for maintaining the women's swimming and diving program through an affidavit by the Athletic Department Chief Financial Officer. *See* [ECF No. 41].   The affidavit provides an itemized list of expenses consisting of a total estimate of $1,479,323 in annual direct expenses associated with operating the team.   However, that figure includes $200,000 to maintain the Campus Recreation and Wellness Center ("CRWC Facility"), which Defendants acknowledge will still be a cost they must bear even if the swimming and diving programs are eliminated.   The figure also includes $287,223 in salaries and benefits for the women's swimming and diving program coaches, as well as $633,075 in women's swimming and diving scholarships.   However, Defendants agreed to maintain these salaries, benefits, and scholarships during the 2021-22 year despite the cancellation of the women's swimming and diving program.   Thus, there is no "new" cost to maintaining the

program resulting from those budget areas.  Removing these entries from the original $1,479,323 figure leaves a total cost of $359,025.[15]

After considering the costs anticipated by Defendants and the harm suffered by Plaintiffs, the Court finds $360,000 to be a reasonable figure for security.  Plaintiffs are welcome to request the Court to reconsider the amount of security at a later date.  For now, Plaintiffs shall post bond in the amount of $360,000 within 14 days of the date of this Order.

## IV.    CONCLUSION

Plaintiffs' Motion for Preliminary Injunction, [ECF No. 12], is GRANTED.  Defendants are hereby ENJOINED from taking any action in furtherance eliminating the University of Iowa's women's swimming and diving team, or any women's intercollegiate athletic team or athletic participation opportunities at the University of Iowa, pending a full trial on the merits.  Defendants are ORDERED to provide the team with full funding, staffing, and other benefits commensurate with its status as an intercollegiate team.

IT IS SO ORDERED.

Dated this 24th day of December, 2020.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT

---

[15] Defendants also suggest the 2021-22 program could also require approximately $137,983 in costs for items such as inflation, indirect overhead, and indirect athletic training.  The Court finds these figures are too speculative and unsubstantiated to be relied upon at this time.