**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF THE STATE OF IOWA**

| | |
|---|---|
| SAGE OHLENSEHLEN, CHRISTINA KAUFMAN, ALEXA PUCCINI, KELSEY DRAKE, MIRANDA VERMEER and ABBIE LYMAN,<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>THE UNIVERSITY OF IOWA, BRUCE HARRELD, in his official capacity as President of the University of Iowa, and GARY BARTA, in his official capacity as Director of the Department of Athletics at the University of Iowa,<br><br>       **Defendants.** | **CASE NO. 3:20-cv-0080-SMR-SBJ**<br><br><br><br>**PLAINTIFFS' RESISTANCE TO DEFENDANTS' MOTION TO DISMISS** |

**COME NOW** Plaintiffs, by and through their attorney, James C. Larew, LAREW LAW

OFFICE, pursuant to Local Rule 7(e), and for PLAINTIFFS' RESISTANCE TO

DEFENDANTS' MOTION TO DISMISS, hereby state as follows:

**TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................2

II. FACTUAL BACKGROUND ................................................................................4

III. ARGUMENT .....................................................................................................9

    A.  Motion to Dismiss Standard.....................................................................9

    B.  Summary of the Argument......................................................................10

    C.  Plaintiffs Have Stated a Claim for Violations of Title IX .........................12

          *1.  Plaintiffs Have Stated a Claim That University of Iowa
             Does Not Provide Equal Participation Opportunities to Female
             Athletes–Three-Prong Test* ............................................................12*

          *2.  Plaintiffs have Stated a Claim that University of Iowa
             Fails to Provide Equitable Treatment and Scholarships
             to Female Athletes*............................................................................16

          3.  *Plaintiffs Have Standing for Declaratory and Injunctive Relief*....................20

IV. CONCLUSION....................................................................................................20

## I. INTRODUCTION

In their 42-page Amended Complaint, Plaintiffs set forth a variety of specific facts stating a claim for relief under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX") and its implementing regulation at 34 C.F.R. Part 106, which is applicable to universities that receive financial assistance from the Department of Education. In filing its Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion to Dismiss"), Defendants University of Iowa, Bruce Harreld, and Gary Barta (collectively "Defendants"), focus almost entirely on merits-based arguments, trying to dispute the facts set forth. However, calling factual allegations set forth in Plaintiffs' Amended Complaint "speculative" or "outdated" does not change the fact that, for purposes of evaluating a motion to dismiss, such allegations must be accepted as true. Moreover, the vast majority of the arguments (as well as the cases cited) presented in the Motion to Dismiss merely echo those made by Defendants in their unsuccessful Resistance to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction ("Resistance to Preliminary Injunction").

Indeed, pages 12 through 21 of Defendants' Brief in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Defendants' Brief") address the Three-Prong (or Part) test as applied to whether equal participation opportunities were being provided by University of Iowa when Defendants announced the decision to terminate the women's swimming and diving team, which was the *entire* focus of Plaintiffs' Motion for a Preliminary Injunction. Further, in pages 21 through 24 of Defendants' Brief, Defendants *again* raise the same argument—that Plaintiffs' request for relief is speculative and not yet ripe because the women's swimming and diving team was to be eliminated in the *next* academic year—an argument Defendants also raised in their flawed Resistance to Preliminary Injunction. These are, moreover, merits-based arguments,

and not appropriate for a pre-answer motion to dismiss. However, *arguendo*, even if such merits-based arguments were appropriate here, Plaintiffs have already demonstrated a likelihood of success on the merits of these claims, going even further than the pleading requirements imposed upon Plaintiffs related to stating claims for relief under Federal Rule of Civil Procedure 12(b)(6).

Specifically, in an Order Granting Motion for Preliminary Injunction ("Order") issued on December 24, 2020, the Court enjoined Defendants from eliminating the women's swimming and diving team, or any other women's intercollegiate athletic team, pending a full trial on the merits. Doc. 42; Order, p. 33. Contrary to Defendants' arguments claiming data was outdated or speculative, the Court found that Dr. Donna A. Lopiano's expert testimony shows that:

> Plaintiffs have a fair chance of demonstrating the University is not, and has not been, in compliance with Title IX by providing its female athletes athletic participation opportunities substantially proportionate to their representation in the student body at the time it decided to cut women's swimming and diving.

Order, p. 22. On the likelihood of success on the merits, the Court held that "Plaintiffs have shown that they possess a fair chance of succeeding on their Title IX claim for inequitable participation opportunities for female athletes at the University of Iowa." Order, p. 25 (footnote omitted). In addition, contrary to Defendants' arguments that Plaintiffs' claims were not ripe for review as there was no injury where the team had not yet been eliminated, the Court held that the harm was "clearly irreparable and immediate." Order, p. 25. By its very terms, where Plaintiffs have demonstrated a likelihood of success on the merits, Plaintiffs have stated a claim for relief. Therefore, Defendants' Motion to Dismiss must be denied in its entirety.

## II. FACTUAL BACKGROUND

Plaintiffs do not recite all of the facts set forth in their Amended Complaint, but incorporate them by reference, and, here, focus most specifically on those allegations of fact relevant to this Resistance.[1] Plaintiffs have pled the following facts in their Amended Complaint.

Plaintiffs contend that, had Title IX's mandate for equal athletics opportunities for men and women been followed, according to the information University of Iowa provided to the federal government in that academic year (2018-2019), UI would have needed to have added between 47 and 61 roster opportunities for women. (Amended Complaint, ¶89). Specifically, in that year, Iowa women had comprised approximately 53.56% of UI's student body, but had been provided with only approximately 50.77% of Athletics Department opportunities, based on the number of participants on the first day of scheduled contest. (Amended Complaint, ¶89, citing U.S. Department of Education's Equity in Athletics Data Analysis ("EADA"), *available at* https://ope.ed.gov/athletics/#/). During 2018-2019, the UI had provided just 2.83% of its female undergraduates with a sports experience, while it had provided approximately 3.36% of its men undergraduates with such experiences. (Amended Complaint, ¶90). Again, to have fulfilled one of the legal tests for compliance, UI would have needed to have provided between 47 and 61 roster opportunities for women—but had failed to do so. (Amended Complaint, ¶90).

Meanwhile, according to a different set of apparent facts published by University of Iowa, found at UI "Hawkeye Sports" websites, the reported number of women and male athletes were far different from those reported to the Department of Education. (Amended Complaint, ¶91). According to the rosters that UI has itself posted on its athletics website, for the 2020-2021 academic year, at the moment that University of Iowa announced its intent to terminate the

---

[1] Of course, there are many more facts now in the record, as the Court recites in its Order, but for their pre-Answer Motion to Dismiss, Defendants are attacking Plaintiffs' Amended Complaint.

women's swimming and diving program, along with three men's programs, those non-conforming statistical proportions were now far worse for women athletes.  It has been estimated that, just prior to the announced termination, UI needed to have added between 113 and 115 sports opportunities for women to have achieved gender equivalency. (Amended Complaint, ¶91). By 2020, based on long-term practices unrelated to the UI financial solvency or the rise of COVID-19, Iowa women were projected to occupy only 47% of the sports teams' rosters (as compared to 53% of Iowa's men), and only 2.56% of the women in UI's student body (as compared to 3.55% of UI's men's undergraduates) were afforded athletic opportunities. (Amended Complaint, ¶92).

The announced cuts of four sports teams in August 2020 (to three men's teams and the women's swimming and diving team), to be effective in 2021-2022, did not remedy UI's sex discrimination practices. (Amended Complaint, ¶115). Even under that announced scenario, the University will still be providing male students with far more athletics opportunities, more scholarship dollars and better treatment than its female students (Amended Complaint, ¶115). After the announced cuts to those men's and women's teams, based on the online rosters for all of UI's men's and women's teams, UI will still need to add 81 new athletics opportunities for women, in order to prevent UI from continuing to violate Plaintiffs' civil rights guaranteed to them under Title IX. (Amended Complaint, ¶113).  The impact of the termination decision has been immediate and detrimental to the student-athletes and to the coaches and staff members who are responsible for assuring that the female student athletes are provided with athletic opportunities equivalent to male athletes at University of Iowa. (Amended Complaint, ¶125). A significant number of swimming and diving team members have positioned themselves on the

so-called "transfer portal"—allowing them to transfer to other teams sponsored by other colleges and universities soon. (Amended Complaint, ¶125).

The impact, with respect to Iowa's noncompliance with Title IX, stands to worsen in the near future. (Amended Complaint, ¶126). According to records published by the University of Iowa Registrar, the trend line appears to show that the proportion of full-time enrolled male undergraduate students may be dropping. (Amended Complaint, ¶126). In the Spring 2020 academic semester, the number of full-time, enrolled male students was 45.2% of the undergraduate student body. (Amended Complaint, ¶126). If, in fact, the Registrar's reports demonstrate such a trend, then UI's non-compliance with Title IX—without cutting women's swimming and diving program—has been worsening. (Amended Complaint, ¶126).  In the midst of such a trend, the University of Iowa's decision to terminate one of its most viable women's sports teams resulted in Plaintiffs' allegation, in their Amended Complaint, that, without this Court's supervision and intervention, UI's team-termination decision will result in a future that is both increasingly inconsistent with the University's storied past, and contrary to this federal law. (Amended Complaint, ¶126). If not enjoined by this Court, Defendants' recent team-cut decision violates Title IX by allowing the University to terminate any women's team even when there is already a failure to comply with Title IX. (Amended Complaint, ¶128). Due to the fleeting nature of collegiate athletics, Plaintiffs are suffering and will continue to suffer irreparable harm if this decision is not reversed. Monetary damages would not make Plaintiffs whole. (Amended Complaint, ¶128). Injunctive relief is necessary to prevent further degradation of the women's swimming and diving team, where team members and others are already looking for other opportunities, including at least one freshman who has already left. (Amended Complaint, ¶128).

In FY 2020, based on publicly-available information, more than $46 million was budgeted for men's sports; well less than one-half of that amount—just short of $20 million—was earmarked for women's sports. (Amended Complaint, ¶51). The anticipated expenditure differential in FY 2020 was consistent with a salient characteristic of the Barta Era: even with access to deep new revenue streams provided by television contracts, the UI Athletics Department ("Department") during those same years has not made meaningful advances in providing women with equal athletics opportunities as compared to those enjoyed by men. (Amended Complaint, ¶52). Although substantial capital investments in sports facilities were made, those expenditures, cumulatively, heavily favored those used by male sports teams. (Amended Complaint, ¶52). Additionally, during the Barta Era, while coaching and administrative salaries for all sports have been significantly increased, those increases have drastically and disproportionately favored males. (Amended Complaint, ¶53). For example, Director Barta's own pay has been increased repeatedly, so much so that by the time of a three-year contract extension, on August 7, 2019, he was provided with an annual salary of $1 million, plus an opportunity to be paid incentive bonuses, to be determined by UI President Harreld. (Amended Complaint, ¶53). Following trend lines that characterized the Barta Era, according to the Athletics Department Operating Budget, no sport—men's or women's—"pays for itself" by generating more income than it incurs expenses. (Amended Complaint, ¶54). All of the sports are subsidized by funding streams that University of Iowa characterizes as "other income" sources ranging from student fees to media contracts; and from University of Iowa Foundation support to "Foundation Premium Seat Revenue" to what are described as "novelties." (Amended Complaint, ¶54). Hugely important to the operation of the entire Department are payments received from the Big Ten Conference, total amounts that, annually, typically exceed $50

million. (Amended Complaint, ¶54 (citing The University of Iowa Athletics Operation Budget FY 2020).  Prior to the COVID-19 disruptions, and before factoring in subsidies from other sources, by FY 2020, income generated by UI men's sports programs was projected to total $26,668,360, and expenses were anticipated to be nearly twice that amount, or $46,356,712 for a projected loss of nearly $20,000,000 ($19,668,352). (Amended Complaint, ¶56). The primary loss centers in FY 2020 in the men's programs were projected to involve the major sports teams, with football, basketball, and wrestling showing a net loss of $7,348,812, $4,191,996, and $1,330,264, respectively. (Amended Complaint, ¶57). The women's sports teams were projected to incur comparable losses as were the men's. (Amended Complaint, ¶58). Total income was projected to be $423,700, with expenses for all women's sports anticipated to be $19,915.387, or a total projected loss of $19,491,687. (Amended Complaint, ¶58). The expense sides of the budget ledgers, when comparing men's and women's sports programs, have demonstrated imbalances and inequities in the Barta Era. By the 2018-2019 fiscal year, for example, the average annual institutional head coach salaries were increased to nearly $1,000,000 for men, but, for women head coaches, less than one-third that amount, at only about $230,000. (Amended Complaint, ¶59). For assistant coaches, the average salaries for the men exceeded $197,000, while women assistant coaches received, on average, less than one-half that amount, approximately $72,500. (Amended Complaint, ¶59).

Defendants' failure to treat female athletes substantially equally with respect to athletic financial assistance, equipment and supplies, tutoring, locker rooms, practice and competitive facilities, housing and dining, and recruitment, violates Title IX's equal treatment requirements. (Amended Complaint, ¶135). University of Iowa, according to data published by it to the EADA from 2018-2019, provided $6,709,299 in athletic-related aid to men's athletic programs, but only

$6,399,154 to women's athletic programs, for a ratio of 51 percent for men, and 49 for women. (Amended Complaint, ¶137).

### III. ARGUMENT

#### A.  Motion to Dismiss Standard

"To survive a motion to dismiss [based on Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Federal Rule of Civil Procedure 8 does not require "detailed factual allegations," but they must be more than mere "unadorned" assertions. *Id*. A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While all facts are accepted as true, legal conclusions are not. *Id*. Demonstrating success on the merits is a plausibility requirement (more than a "sheer possibility"), but not a probability requirement, however. *Bell Atl. Corp*., 550 U.S. at 556.[2]

All reasonable inferences must be granted in favor of the non-moving party. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 595 (8th Cir. 2009) (internal citations omitted). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594. The requirement of a short and plain statement is designed to "give defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Brooks v. Roy*, 776 F.3d 957, 960 (8th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555).

---

[2] Of course, demonstrating a likelihood of success on the merits, as Plaintiffs were required to do in order to obtain a preliminary injunction, is a probability requirement, and has already been met, as noted above. *See* Court's Order, p. 12 ("A 'fair chance' means 'something less than fifty percent' probability.") (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008)).

If matters outside of the pleadings are presented, the motion "must be treated as one for summary judgment under Rule 56," and the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (2020). As Defendants recognize, matters in the public record, or that are "contemplated by or expressly mentioned in the complaint," are not generally considered "outside the pleadings." *Dittmer Props., L.P. v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013). While Plaintiffs had not seen the OCR 2019 letter attached to Defendants' Motion prior to filing their Amended Complaint, they had received it prior to the motion to dismiss filing, and do not contest that their Complaint describes the OCR investigation generally, and therefore "contemplates" the document. Plaintiffs therefore agree that Defendants' motion should be treated as a motion to dismiss.[3]

### B.  Summary of the Argument

Given that Plaintiffs have already demonstrated a likelihood of success on the merits of their equal participation opportunity claims under the preliminary injunction, as the Court held, Plaintiffs assert that, as a matter of law (beyond the plausibility agreement), they have therefore met their burden under 12(b)(6) to state a claim for relief. Similarly, to the extent that Defendants challenge Plaintiffs' standing (Defendants' Brief, pp. 8, 21-22, 24-25) and question whether Plaintiffs have suffered in injury for the future termination of their team, that issue was fully addressed by the Court in its Order, and resolved in Plaintiffs' favor. Order, pp. 25-29. Standing based on whether one has suffered an injury is of course a jurisdictional requirement, and therefore

---

[3] As Plaintiffs recall, the Court again noted at the end of the evidentiary hearing on December 22, 2020, that it would like to see Defendants' Title IX data (NCAA squad lists, time-hour limitation records, and official competition results) and any analysis of those numbers, if it is different, in order to review Defendants' Motion in a different light. Defendants, still, have not provided this data to Plaintiffs, or supplemented the record with such data, which might have turned this into a motion for summary judgment. If that had occurred, Plaintiffs would have sought the opportunity for other discovery prior to responding.

the issue would fall under Fed. R. Civ. P. 12(b)(1), which Defendants do not cite in support of their Motion. *See City of Kan. City v. Yarco Co.*, 625 F.3d 1038, 1040 (8th Cir. 2010) (describing threshold inquiry of standing as jurisdictional prerequisite prior to "reaching the merits of a suit" and holding that no subject matter jurisdiction existed where City had not suffered an injury in fact). Given the Court's determination of the injury suffered by Plaintiffs, contrary to Defendants' argument that Plaintiffs "do not face a threat of legally-cognizable injury" (Defendants' Brief, p. 24) or only have "prospective damages," (Defendants' Brief, p. 25), as well as the Court's exercise of jurisdiction over this matter, Plaintiffs clearly have standing.[4]  For that reason, too, Defendants' motion must be over-ruled.

Moreover, Defendants' attempts to re-write Plaintiffs' Amended Complaint and add their own interpretation of factual assertions must be rejected for at least two reasons. First, any such alternative characterizations of the facts, by definition, place them in dispute, and, therefore, cannot serve as the basis for a motion to dismiss. Second, however, Defendants' alternative characterizations of piecemeal statements made in Plaintiffs' Complaint, offered in a manner that ignores dozens of previous pages, does not conform with any known standard for review as applied to motions to dismiss. For instance, Defendants claim that Plaintiffs, while providing many pages of historical background in their Amended Complaint, only related their claims to the present. Defendants' Brief, p. 4 (citing Amended Complaint, ¶ 86 n. 6). Plaintiffs would not have provided the historical data if it were not important, and Defendants reference to a footnote

---

[4] Plaintiffs agree that they have the burden of proof on standing, which they have met. The assertion, however, that Plaintiffs have somehow not demonstrated an "injury in fact" because a few of them are seniors, so can "allege no future harm" (Defendants' Brief, p. 22) is disconcerting, at best.

in Plaintiffs' Complaint does not negate the other asserted facts.[5] Indeed, the clear language of the footnote in no way indicates that the past is unimportant, but is an aside to describe what Plaintiffs knew at the time of the past OCR investigation, which undisputedly had been completed prior to the University's decision to terminate women's swimming and diving.

### C. Plaintiffs Have Stated a Claim for Relief Under Title IX

#### 1. Plaintiffs Have Stated a Claim That University of Iowa Does Not Provide Equal Participation Opportunities to Female Athletes– Three-Prong Test

Rather than to reiterate their arguments as to the *merits* of this claim, Plaintiffs incorporate by reference herein their arguments made in their Brief in Support of Motion for Preliminary Injunction, which arguments went beyond stating a claim, and demonstrated a likelihood of success on the merits based on the publicly available information. Docket No. 12-1, pp. 11 to 34. Plaintiffs do not take the Motion to Dismiss lightly, but do not think it necessary to re-argue the merits of the equal participation opportunity claim on a motion to dismiss. *Compare* Defendants' Brief, pp. 12-21 (arguing the merits as to whether Plaintiffs have stated a claim for relief under the Three-Prong test applicable to Title IX's requirement for equal participation opportunities) *with* Defendants' Resistance to Motion for Preliminary Injunction, Doc. 20, pp. 7 to 22 (same). Moreover, Plaintiffs assert that they clearly met their burden necessary to defeat a motion to dismiss when, in proving their need for a preliminary injunction, they went beyond stating a claim,

---

[5] While Defendants rebuke Plaintiffs for their "outdated allegations—describing them as "through the 2018-2019 academic year"—Defendants, then, in the very same paragraph, begin to recite data from the U.S. Department of Education's Office for Civil Rights ("OCR") from 2017 and 2019. Defendants' Brief, p. 5. These are, again, the same arguments Defendants made in unsuccessfully resisting Plaintiffs' Motion for Preliminary Injunction, concerning which Motion the importance of historical data was apparent. Indeed, as Plaintiffs' expert Dr. Lopiano recognized, and the Court referenced in its analysis of the data, historical data is always relevant where "Title IX compliance cannot be fully known until after an academic year is complete." Order, p. 19; *see also* Order, pp. 12-19 (reviewing historical data analyzed by Dr. Lopiano and its potential import).

and in fact, demonstrated a likelihood to succeed on the merits. *See* Order, pp. 24-25; *see also Myers v. Gant*, 49 F. Supp. 3d 658, 663 (D.S.D. 2014) (addressing a motion to dismiss at the same time as a motion for preliminary injunction, and noting that the discussion regarding the merits of the motion for preliminary injunction "explains why the Rule 12(b)(6) motion to dismiss" must "be denied"). This must be the case, as of course the standard applicable to a motion for preliminary injunction goes further than stating a claim for relief under a 12(b)(6) motion. *See Vice v. Kaeminak*, 2016 U.S. Dist. LEXIS 173319, at *9 (D.S.D. Dec. 15, 2016) (holding that Vice could not show a likelihood to succeed on the merits at that stage, but had "only stated a claim upon which relief may be granted."); *see also Midwest Great Dane Trailers v. Great Dane Ltd. Pshp*, 977 F. Supp. 1386, 1395 (D. Minn. 1997) ("Although this Court has serious reservations about the likelihood of success on this claim . . . for the purposes of a 12(b)(6) motion, Plaintiff has sufficiently stated a claim upon which relief may be granted.").

As noted above, the motion to dismiss standard is the lesser-burdened *plausibility* requirement, not a higher-burdened *probability* requirement, whereas the motion for preliminary injunction standard is in fact a *probability* requirement. *See Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1029 (N.D. Iowa 2010) ("The first '*Dataphase* factor' is the likelihood or **probability** of success on the merits) (emphasis added) (quoting *Dataphase Sys., Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir. 1981); *see also* Court's Order, p. 12 ("A 'fair chance' means 'something less than fifty percent' probability.") (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008)). If something is *probable*, even at less than fifty percent, it is certainly more than *plausible*, the standard applicable to a motion to dismiss. *See also Fresenius Kabi USA, LLC v. Fera Pharm., LLC*, 2016 U.S. Dist. LEXIS 128126, at *29-31

(D.N.J. Sep. 20, 2016) (describing in the denial of a motion to dismiss that it is "analyzed on a lower standard than" a preliminary injunction).

As it applies to equal participation opportunities, Defendants describe in detail the Three-Prong test of the OCR, and, again, rely on case law that is readily distinguishable. Defendants' Brief, pp. 12-21. Specifically, as they did in resisting Plaintiffs' Motion for Preliminary Injunction, Defendants rely heavily on *Berndsen*, 395 F. Supp. 3d 1194. Defendants' Brief, pp. 4, 7, 10, 16, 18, 23. In *Berndsen*, the U.S. District Court for the District of North Dakota quoted the plaintiffs' allegations in the case as follows:

> UND fails to provide its female students with proportionately equal opportunities to participate in intercollegiate athletics as compared with its male students, due to, among other things, its elimination of its women's ice hockey program, its improper calculations of bona fide opportunities for female participation in intercollegiate athletics, and its over-reporting of the number of female athletes on teams.

395 F. Supp. at 1199. The district court then noted that these "are the Plaintiffs' *only* allegations that UND failed to provide participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments. The allegations start with a legal conclusion.[.]" *Id.* (emphasis added). There is no comparison between the conclusory allegation in that case, with the pages of facts and details presented by Plaintiffs in this case regarding University of Iowa's failure to provide substantially proportionate opportunities to female athletes. *See* Amended Complaint, ¶¶ 88-92. Indeed, as recited above, among others, Plaintiffs set forth the very specific numbers by which University of Iowa had failed to provide equal athletic participation opportunities based on publicly available data. Plaintiffs are not required to prove their case prior to discovery in their complaint; they are only required to give Defendants notice and state a claim that is plausible. Plaintiffs alleged that the University is short at a minimum of 47 participation slots for female athletes, and that it may be short up to 115 slots. (Amended Complaint, ¶¶89, 91).  Having made this factual allegation in their Amended

14

Complaint, Plaintiffs have met their burden under *Iqbal*. 556 U.S. at 677-78 (describing standard applicable as requiring sufficient facts, accepted true, to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citation omitted).

Defendants also continue to ignore the issues with current Title IX non-compliance in making the determination of cutting a woman's team, stating that "[t]here is no dispute that UI will be eliminating more men's athletic opportunities than women's opportunities with the pending changes, so any current compliance disparity will be lessened next year." Defendants' Brief, p. 17, n. 15. "Current compliance disparity" is equivalent to saying "not in compliance," and as Plaintiffs have argued, Defendants cannot, as a matter of law, cut a viable women's team when they are out of compliance. Defendants repeatedly misconstrue the "pertinent timeframe" (Defendants' Brief, p. 15) for determining a Title IX violation and reviewing its actions. The Court has made an initial determination on the likelihood of success on the merits, and reviewed the relevant time frames to its determination.[6] Therefore, Plaintiffs will not belabor the point.

Defendants argue that Plaintiffs facts are wrong, or "demonstrably false based on publicly-available information" (Defendants' Brief, p. 12 n. 7), but again, this is not the stage for such arguments on the merits. Plaintiffs' facts are accepted as true for the purpose of considering Defendants' Motion to Dismiss. And, indeed, the Court has already made a merits determination beyond plausible facts, to a "fair chance" of probability of proving facts. Order, pp. 24-25.

---

[6] Defendants also argue that Plaintiffs did not meet their burden under Prongs Two or Three to assert that the University is violating those prongs. Defendants' Brief, pp. 19-21. Defendants ignore, however, that if the University cannot invoke the safe harbor of Prong One, the burden is on Defendants to demonstrate compliance with Prongs Two or Three, which they cannot do. See *See, e.g., Cohen II*, 991 F.2d at 901 (holding burden shifts for second and third prongs); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994) (finding burden on defendants for second prong). Indeed, the Court, in its preliminary injunctive Order, has already determined that Defendants could not meet Prong Three because of its cut to the viable women's swimming and diving team, and that Defendants had not attempted to prove Prong Two. Order, p. 25 n.13.

2.   *Plaintiffs have Stated a Claim that University of Iowa Fails to Provide Equitable Treatment and Scholarships to Female Athletes*

Defendants also claim that Plaintiffs did not adequately assert claims against Defendants for a failure to provide equal treatment and scholarships. Defendants' Brief, pp. 9-12. These issues were not the direct subject of Plaintiffs' Motion for Preliminary Injunction or the Court's recent Order, although they were raised, and therefore Plaintiffs address them in more detail.

Regulations promulgated by the now Department of Education, in addition to describing the requirement of effective accommodation of both sexes, also describe the following factors to consider:

> (2) the provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

Court's Order, p. 3 (quoting 34 C.F.R. § 106.41). Additionally, failing to "provide necessary funds for teams for one sex" is also considered in "assessing equality of opportunity for members of each sex." *Id*.

Plaintiffs set forth specific facts, as again set forth above, describing the deficient disparities in scholarship dollars provided to women athletes, and in other benefits, as compared to those provided to men athletes, based on the publicly available information. Amended Complaint, ¶¶51-59, 84, 137. Specifically, as of 2018-2019, 49% of the total athletic-related aid, or $6,399,154, was being provided to women's programs, while 51%, or $6,709,299, was being provided to men's programs, despite their being the smaller percentage of the undergraduate population. That is all that Plaintiffs can, or are required, to assert at the pleading stage. Of course,

as part of the Motion for Preliminary Injunction, Plaintiffs' expert Dr. Lopiano reviewed the scholarship benefits and recruitment in detail, which the Court also reviewed. Order, p. 18. Dr. Lopiano has opined that the spending on scholarships and recruitment is often a strong indicator of whether there is gender parity in athletic participation opportunity, and at no time in the last twenty years have females received financial aid in proportion to their undergraduate enrollment percentage—they have always been shorted. *Id*. (citing ECF No. 12-2 at 121 tbl. 8). Similarly, the recruiting dollars for males and female athletes showed a similar, ongoing, disparity, which continued to widen over past years, with the growing percentage of undergraduate females at the University contributing to that trend. *Id*. (citing ECF No. 12-2 at 123 tbl. 9).

Defendants, again, begin with an argument on the merits of these claims, as opposed to whether Plaintiffs have stated a claim. Specifically, Defendants rely on the OCR investigation, which began in 2015 and concluded in 2019, to argue that they were in compliance in 2019, and Plaintiffs' Amended Complaint does not plausibly assert that UI violated Title IX since then. Defendants' Brief, p. 9. However, where Plaintiffs have asserted the differential in the numbers based on the data available for 2018-2019, which is not consistent with the female percentage undergraduate enrollment at the time, they have stated a claim for violation of Title IX.[7] Defendants continue to misconstrue the relevant timeline to Plaintiffs' causes of action, and attempt to thereby dismiss the entire case based on their misreading. *See* Defendants' Brief, p. 10

---

[7] While this is of course an argument again on the merits, Plaintiffs would further note that the letter attached by Defendants from the OCR in 2019 only addressed equal recruiting dollars, and further noted that even the complainant who had raised the issues (let alone these different Plaintiffs) could still "file a private suit in federal court, whether or not OCR finds a violation." Defendants' Ex. B, p. 3. Dr. Lopiano, during the evidentiary hearing on the preliminary injunction, also testified as to the merits regarding whether OCR generally audits the data provided by universities with respect Title IX compliance, such as equal participation opportunities.

("At most, the Amended Complaint suggests factual support *outside of the relevant time* frame as allegedly affecting previous classes of female student-athletes but not Plaintiffs[]") (emphasis added). Defendants therefore admit that Plaintiffs have alleged facts to prove their claims, but contest the relevant timing of them based on a legal argument. This is not an argument for a motion to dismiss, which must accept all of Plaintiffs allegations of fact, as set forth in their Amended Complaint, as true, and does not argue the merits of the timing of the law. As Plaintiffs have argued, if an institution such as UI is out of compliance with Title IX, it cannot make any cuts to a viable women's swimming and diving team. *See* Amended Complaint, ¶¶96, 109, 113, 115, 117, 118; Plaintiffs' Brief, pp. 13-19, and Reply Brief, pp. 3-13.  The relevant time periods are therefore (1) historical, to provide context, (2) the time that the decision was made (based on the most recent Title IX data finalized), and (3) the future, when the University will still be out of compliance. *See* Court Order, pp. 12-19, 24-25.  Indeed, if the past were not relevant, the University would presumably have already lost on the merits, as it admits that it cannot demonstrate actual compliance in the future, and merely "fully expects to comply with Part One" (Defendants' Brief, p. 18 n. 16), but that is not the same as proving compliance with the law.[8] And indeed, as demonstrated during the preliminary injunction hearing, even based on the University's own projected numbers, UI will not be in compliance with Title IX during the next academic year. *See* Court Order, p. 19-21 (citing Dr. Lopiano's analysis of the numbers and projections, which found the University falling short by between 35 and 84 participation opportunities for women).

---

[8] While Defendants continue to attack Plaintiffs for sometimes "outdated" and sometimes "speculative" data, in addition to still failing to provide any data, Defendants "expectations" of compliance, where they have not been in compliance for more than a decade, is the most speculative of all. Particularly where Defendants are not providing any other data, the past EADA data, which *always* overestimates the number of women on the team according to Dr. Lopiano, is the best measure for future compliance.

Similarly, Defendants' argument that Plaintiffs' assertions based on a January 2018 OCR letter implying "that Iowa might not have been in compliance with Title IX's AFA [athletics financial aid] requirements in prior years" are misleading—but that another OCR letter definitively determined the University to be in compliance—are all factual, merits-based arguments. Defendants' Brief, p. 11. Defendants even admit that they are taking this to a factual analysis in its footnote (n. 7), but, then, again fail to recognize that the underlying premise itself is disputed, and, therefore, the facts would of course be disputed. Defendants then recite all of the factual data that Plaintiffs had alleged in their Complaint, and argue that those ratios match the female proportion of student athletes. Even engaging, *arguendo*, in this merits' analysis at this stage, it must fail. Plaintiffs' allegations are that UI does not provide equal athletic participation opportunities, and, therefore, relying on the EADA numbers and percentages to argue that financial aid ratio is accurate starts from a flawed premise. Indeed, as Plaintiffs have argued, the EADA numbers always overcount female participants. *See also* Court Order, pp. 18, 23.

Defendants have tied themselves in logical knots: they argue both that Plaintiffs cannot rely on the past to state a claim for relief, but, also, that Plaintiffs failed to argue that Defendants will not provide equitable athletic financial assistance in the future, (or that the University "will discriminate against one sex or the other" – Defendants' Brief, p. 12), which, of course, has not yet occurred, so even Defendants cannot, and do not, claim that they will be in compliance. Plaintiffs do, in fact, claim that the UI will discriminate against female athletes, as it has done in the past, and that is all they can do at this stage, as Plaintiffs cannot possibly assert the exact non-existent future facts necessary to prove the same. Plaintiffs can only do what they have done, which is to show that, based on the past figures, published by the University, the institution is out of

compliance, and that based on this history, and according to the numbers thusfar accessible to Plaintiffs and to the Court, it will continue to be out of compliance with Title IX.

### 3.   *Plaintiffs Have Stated a Claim for Injunctive and Declaratory Relief*

Defendants again challenge Plaintiffs' standing to seek declaratory and injunctive relief. Defendants' Brief, p. 24. First, of course, this was filed prior to the Court's Order, but as described above, given the finding of Plaintiffs' likelihood of success on the merits for this relief, this argument must fail. Defendants in fact cite *Portz v. St. Cloud State University*, 401 F. Supp. 3d 834, 868 (D. Minn. 2019), and try to distinguish it, but of course Plaintiffs relied on *Portz* in its own arguments, and the Court cited it as well in describing the irreparable harm. Order, pp. 25-26. Defendants then, again, allege that Plaintiffs' claim for permanent injunctive relief must fail as they only "allege prospective damages." Defendants' Brief, p. 25. As Plaintiffs argued earlier, and as the Court has found, Plaintiffs are suffering, and, in the future, will continue to suffer, irreparable harm from the University's decision to eliminate the women's swimming and diving team. Court Order, pp. 25-29 (describing the fleeting University years, transferring teammates, coaches, the Hobson's choice of staying and quitting life-long dedication to swimming, or leaving and losing everyone one knows, as well as the harm of being subjected to gender discrimination). Moreover, given the Court's initial determination on the preliminary injunction, finding harm and therefore standing, Defendants' argument is moot.

### IV. CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Plaintiffs hereby request that Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) be denied.

Respectfully submitted,

LAREW LAW OFFICE

_____/s/ *James C. Larew*_____
James C. Larew   AT0004543
LAREW LAW OFFICE
504 E Bloomington St.
Iowa City, IA  52245
Phone: (319) 337-7079
Fax: (319) 337-7082
Email: James.Larew@LarewLawOffice.com
**ATTORNEY FOR PLAINTIFFS**

Copy to:

Kayla Burkhiser
Audra Drish
Meghan Jolly
Jeffrey Thompson
Ryan Sheahan
Attorney General's Office
Hoover Building
1305 E Walnut Street
Des Moines, Iowa 50319
Phone: (515) 281-5164
Email:  kayla.burkhiser@ag.iowa.gov
        audra.drish@ag.iowa.gov
        meghan.jolly@ag.iowa.gov
        Jeffrey.thompson@ag.iowa.gov
        Ryan.sheahan@ag.iowa.gov
**ATTORNEYS FOR DEFENDANT UNIVERSITY OF IOWA**

---

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon all parties to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on January 8, 2021.

By:
☐   Hand Delivered
☐   US Mail
☐   Fax
☐   Email
X   Other-CM/ECF

Signature__/s/ *Andrew Kramer*___

---